# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|  |  |  |
|---|---|---|
| | § | |
| ERFINDERGEMEINSCHAFT UROPEP GbR, | § | |
| | § | |
| Plaintiff, | § | Civil No. 2:15-cv-01202 |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| ELI LILLY AND COMPANY, and | § | |
| BROOKSHIRE BROTHERS, INC., | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

### FISH & RICHARDSON'S RESPONSE TO BROOKSHIRE'S MOTION TO DISQUALIFY

**BAKER BOTTS L. L. P.**

Rod Phelan
State Bar No. 15899800
Rod.Phelan@BakerBotts.com
Charles D. Strecker
State Bar No. 24066157
Charles.Strecker@BakerBotts.com
2001 Ross Avenue, Suite 600
Dallas, Texas  75201-2980
Telephone:  (214) 953-6500
Facsimile:   (214) 953-6503

ATTORNEYS FOR FISH & RICHARDSON

November 6, 2015

# TABLE OF CONTENTS

I.  Facts .................................................................................................. 2

    A.  The GeoTag and UroPep patents are unrelated................................................. 2

    B.  Fish's engagement was only for the *GeoTag* case, which ended in 2013. ............. 3

    C.  Brookshire's involvement with Fish and *GeoTag* was unusually limited. ............. 3

    D.  Fish does not have any useful Brookshire documents. ......................................... 5

    E.  Brookshire's claim that it *told* Fish useful confidential information is false. ......... 5

    F.  Brookshire did not have or disclose a "playbook."............................................. 7

    G.  In settling the *GeoTag* case, Brookshire revealed no confidential
information, either to Fish or to GeoTag.............................................................. 8

    H.  Brookshire's general counsel has acknowledged the prior termination of
Fish's representation of Brookshire...................................................................... 9

    I.  The erroneous "client pruning" language in Fish's May 2015 closure letter
did not alter the fact that the attorney-client relationship had ended over
a year earlier. ......................................................................................... 10

    J.  Brookshire and Ms. Fenley are sophisticated consumers of legal services.......... 11

    K.  Brookshire's general counsel waived future conflicts. ....................................... 12

II.  Argument .......................................................................................... 14

    A.  Depriving a client of its counsel of choice requires a "painstaking analysis
of the facts and precise application of precedent." ............................................. 15

    B.  Courts must guard against tactical use of disqualification motions.................... 15

    C.  Brookshire falsely claims it was still Fish's client when it signed the
closure letter acknowledging that the relationship was over. ............................. 16

    D.  *GeoTag* and *UroPep* are not substantially related. ............................................. 18

    E.  Brookshire did not share with Fish confidential information useful to
UroPep. ......................................................................................................... 19

    F.  Brookshire waived its right to complain of a conflict. ......................................... 20

    G.  Brookshire's claims of disloyalty are unfounded................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abney v. Wal-Mart*,
  984 F. Supp. 526 (E.D. Tex. 1997) (Schell, J.) ................................................... 15, 16, 20n, 21n

*City of El Paso v. Soule*,
  6 F. Supp. 2d 616 (W.D. Tex. 1998) ......................................................................................... 24

*Duncan v. Merrill Lynch, Pierce, Fenner & Smith*,
  646 F.2d. 1020 (5th Cir.), *cert. den*. 44 U.S. 895 (1981) ..................................................... 15, 19

*Estate of Dogley v. Vega*,
  797 S.W.2d 299 (Tex. App.—Corpus Christi 1990, no writ) ................................................. 21n

*Fed. Deposit Ins. Co. v. United States Fire Ins. Co.*,
  50 F.3d 1304 (5th Cir. 1995) ............................................................................................... 15, 16

*Freeman v. Chicago Musical Instrument Co.*,
  689 F.2d 715 (7th Cir. 1982) ................................................................................................. 16n

*G—W—L, Inc. v. Robichaux*,
  643 S.W.2d 392 (Tex. 1982) ................................................................................................... 21

*Galderma Laboratories, L.P. v. Actavis Mid Atlantic LLC*,
  927 F. Supp. 2d 390 (N.D. Tex. 2013) (Kinkeade, J.) ............................................. 22, 23, 24, 25

*Gibbs v. Paluk*,
  742 F.2d 181 (5th Cir. 1984) ................................................................................................. 15

*Hill v. Hunt*,
  No. CIVA 307-CV-02020-O, 2008 WL 4108120 (N.D. Tex. Sept. 4, 2008)
  (O'Connor, J.) ....................................................................................................................... 17

*In re Riles*,
  243 F.3d 553 (Fed. Cir. 2000) ............................................................................................... 19

*JuxtaComm-Texas Software, LLC v. Axway, Inc.*,
  No. 6:10-CV-11, 2010 WL 4920909 (E.D. Tex. Nov. 29, 2010) (Davis, J.) ............................... 18

*Kalmanovitz v. G. Heileman Brewing Co., Inc.*,
  610 F. Supp. 1319 (D. Del. 1985) ......................................................................................... 16

*Keller Indus., Inc. v. Blanton,*
804 S.W.2d 182 (Tex. App.—Houston [14th Dist.] 1991, no writ)..........................................15

*Microsoft Corp. v. Commonwealth Scientific,*
No. 6:06-CV-549, 2007 WL 4376104 (E.D. Tex. 13, 2007) (Davis, J.) ......................................15

*Nat'l Prop. Holdings, L.P. v. Westergren,*
453 S.W.3d 419 (Tex. 2015) ............................................................................................. 21n

*Optyl Eyewear Fashion Inter. Corp. v. Style Cos. Ltd.,*
760 F.2d 1045 (9th Cir. 1985) ............................................................................................. 16n

*Power Mosfet Techs, L.L.C. v. Siemens AG,*
No. 2:99-CV-168, 2002 WL 32785219 (E.D. Tex. Sept. 30, 2002) (Folsom, J.)..................18, 19

*Richardson-Merrell, Inc. v. Koller,*
472 U.S. 424 (1985)................................................................................................................. 16

*Simpson v. James,*
903 F.2d 372 (5th Cir. 1990) .................................................................................................. 17

*Spears v. Fourth Court of Appeals,*
797 S.W.2d 654 (Tex. 1990) ..............................................................................................15, 16

*Stephenson v. LeBoeuf,*
16 S.W.3d 829 (Tex.App.-Houston [14th Dist.] 2000, pet. denied)........................................ 17

*Stewart v. Johnson,*
No. 07-05-0272-CV, 2007 WL 1345372 (Tex. App.—Amarillo May 8, 2007,
pet. denied)............................................................................................................................. 21n

*Thigpen v. Locke,*
363 S.W.2d 247 (Tex. 1962) .................................................................................................. 21

*Williams v. Adams,*
696 S.W.2d 156 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.)............................ 21

**OTHER AUTHORITIES**

Model Rule 1.3. cmt. 4 ....................................................................................................17, 18

Tex. Discip. R. Prof'l Conduct 1.02 ......................................................................................... 18

Tex. Discip. R. Prof'l Conduct 1.02 cmt.6 ............................................................................... 17

Tex. Discip. R. Prof'l Conduct 1.06 cmt. 17 ........................................................................... 16

**Fish's Response to Brookshire's Motion to Disqualify**

This is not a suit against a current client or a "hot potato" or "side-switching" case.   The Fish-Brookshire attorney-client relationship ended in 2013 when Fish completed its Brookshire engagement by settling the *GeoTag* case.  UroPep did not contact Fish until Fall 2014 and did not engage Fish until March 2015.

To disqualify Fish, Brookshire must (1) prove that either (a) *GeoTag* is "substantially related" to *UroPep*, or (b) Brookshire gave Fish confidential information useful in *UroPep*, *and* (2) escape its advance conflict waiver.  It cannot do either.

The *GeoTag* and *UroPep* cases are not substantially related.   To prove a substantial relationship, more is required than "they're both patent cases."   The patents—one allegedly covering a website store locator (GeoTag), the other a therapeutic method (UroPep)—are decidedly different.  Brookshire does not contend otherwise, and it follows that the cases are not substantially related.

Brookshire does not contend that Fish has *any* useful Brookshire *documents*.  It relies instead on vague and inaccurate allusions to *undocumented* oral communications during the *GeoTag* case.  As a low-exposure defendant in a case brought by a non-practicing entity, Brookshire's involvement in *GeoTag*—and with Fish—was quite limited.  No one from Brookshire ever met anyone from Fish, no one from Brookshire was deposed, no expert opined about Brookshire, and apart from data showing the number of "clicks" on its website, Brookshire never produced any documents, even to Fish.  Brookshire settled cheaply and without disclosing *any* useful confidential

information—either to Fish or GeoTag.

Finally, Brookshire's claim that it is not bound by its advance conflict waiver because its general counsel did not understand what she was signing is implausible and untenable.

## I.       Facts

Deciding whether two cases are substantially related or involve the same useful confidential information turns on the facts:

### A.       The GeoTag and UroPep patents are unrelated.

Fish represented Brookshire in a single case, *GeoTag*.  Fenley  Ex. F.  The GeoTag patent classification was "data processing: database and file management or data structures."  The accused technology—which it purchased from a vendor—concerned a website store locator and store list.  The store locator Brookshire contracted to use on its website simply incorporated Google Maps functionality.  App. 003, Harris ¶ 6.

The UroPep '124 patent concerns "Use of Phosphodiesterase Inhibitors in the Treatment of Prostatic Diseases."  Defendant Eli Lilly makes and markets and Brookshire sells one well-known "Phosphodiesterase Inhibitor," Cialis, for the treatment of benign prostatic hyperplasia—enlargement of the prostate.  App. 012, Davis ¶ 4.

These patents and technologies could not be more different.   Brookshire's website store locator is not at issue in UroPep, and Cialis was not at issue in GeoTag. App. 003, 016, Healey ¶ 5, Harris ¶ 6-7.

**B.      Fish's engagement was only for the *GeoTag* case, which ended in 2013.**

GeoTag settled with Brookshire in November 2013 and immediately dismissed all claims against Brookshire.  App. 3, Harris ¶ 4-5.

After November 2013, Fish recorded only one tenth of an hour on the Brookshire engagement—in January 2014.   In June 2014, Fish responded to a Brookshire email inquiry about assigning the GeoTag license.  Fish's response was a courtesy; the firm did not record time or send a bill.  App. 3, Harris ¶ 5.

**C.      Brookshire's involvement with Fish and *GeoTag* was unusually limited.**

GeoTag sued scores of Defendants. Fish represented 39 (the Fish Defense Group), 40 counting Brookshire.   Other defendants formed a Joint Defense Group.   "Piggy-backing," Brookshire only peripherally participated in the JDG.  Brookshire did not join the Fish Defense Group (i.e., it was not part of the cost-sharing agreement), and Fish did not bill Brookshire for work by Fish lawyers serving only the Fish Defense Group.  Brookshire did not contribute to the fees incurred by Fish's other clients; Fish billed Brookshire only for work done specifically for Brookshire.   Brookshire paid Fish and $71,218 in fees and $1,350 in expenses.  App. 3-4, 17, Harris ¶ 8-9, Healey ¶ 9-10.

GeoTag was a "non-practicing" or "patent assertion" entity.  Fish knew that, and also knew Google was defending Google Maps, which Brookshire's website store locator used.   Fish concluded that Brookshire's principal exposure was cost of defense.  Consequently, Fish's defense of Brookshire was  low-profile,  and  Brookshire's participation was likewise low.  Fish kept Brookshire informed on JDG activities and at

hearings, and occasionally modified work product from the Fish Defense Group or the

JDG for use by Brookshire.  App. 3, 5, 16-17, Harris ¶ 9-11, Healey ¶ 6, 11.

Brookshire's involvement in GeoTag and with Fish was remarkably limited:

- No one from Brookshire ever met anyone from Fish.

- Brookshire did not deliver to Fish or produce any financial documents of any kind.  Fish received no Brookshire income statements, balance sheets, cash flow statements, projections, or anything disclosing Brookshire's firm or single-store sales, expenses, or profits.

- Brookshire did not give Fish anything about product-line sales or profits.  In particular, Brookshire gave Fish nothing about the profitability of Brookshire's pharmacy operations, or about any particular product sold in its pharmacy.

- Brookshire did not deliver to Fish any technical documents describing the accused technology—a Google-Maps-based website store locator that Brookshire paid a third party to build and maintain.  That vendor, not Brookshire, supplied Fish with documents describing the website store locator.

- Invoices from that third party and data showing the numbers of visits to Brookshire's website were the only documents Fish received from Brookshire or produced to Geotag.

- Brookshire did not provide Fish with any prior art or other information concerning the validity of the GeoTag patent.

- Other than the dates the website store locator was added, altered, or removed from Brookshire's website, Brookshire did not give Fish any information used in answering interrogatories.  Brookshire's interrogatory responses were mostly objections, and GeoTag did not move to compel further answers.  Brookshire does not point to any information in those interrogatory answers even arguably relevant here, and none of it is.

- No one from Brookshire was deposed or even prepared for a deposition.

- Brookshire did not meet with or provide information to the "JDG" experts on invalidity, infringement, or damages.

- Brookshire did not provide information to Fish for delivery to any expert.

App. 3-4, Harris ¶ 9.

**D.      Fish does not have any useful Brookshire documents.**

In email exchanges prior to the filing of this motion, Fish asserted that it had no relevant Brookshire documents and asked if Brookshire disagreed.  Brookshire did not contest that assertion.  App. 35, 38-42, Feldman ¶ 3, Ex. A.  Brookshire's motion does not assert that Fish has even one Brookshire document useful in this case, and Brookshire did not tender any documents in camera.  Fish has no such documents.  App. 3-6, 17-19, Harris ¶ 9-16, Healey ¶ 11-15.

During *GeoTag*, Brookshire did not give Fish any documents concerning sales, expenses, profits, store profitability, product line profitability, projections, or any other business information, financial or operational.   Nor did Brookshire give Fish any documents concerning (a) litigation management, budgeting, spending, handling, or reporting, (b) outside counsel guidelines, or (c) accounting reserves for litigation; Fish does not know whether Brookshire even has any such documents.  Finally, Brookshire gave Fish no documents or information concerning Brookshire's accounting systems or document retention policies.  *Id.*

**E.      Brookshire's claim that it *told* Fish useful confidential information is false.**

Fish has no Brookshire financial information, nothing concerning damages.

Unable to contest Fish's assertion that it has no confidential Brookshire documents, App. 035, Feldman ¶ 3, Brookshire now asserts that it gave Fish "confidential and proprietary financial information" to "formulate a damages analysis and respond to Plaintiff's settlement demand."  Motion at 9.  That unsupported claim is untrue.  App. 3-6, 17-19, Harris ¶ 9-16, Healey ¶ 11-15.  Unable either to offer any proof on this point or to identify any documents in Fish's possession, Brookshire implies that the disclosure was oral, apparently by phone—since Fish and Brookshire never met. This implication is unfounded.

Ms. Fenley's declaration is Brookshire's only evidence identifying information given to Fish.  She asserts that it is "not true" that Fish had no information about Brookshire's sales or profits, and adds that "we had discussion with Fish attorneys where we provided Fish with confidential information regarding Brookshire's operations and finances."  Fenley ¶ 8.  But what does she say Fish had?

Ms. Fenley points only to a March 2012 email exchange with Fish's David Healey, and uses it to suggest that Fish knew Brookshire's "size" because Healey's email says GeoTag's settlement demands had been "approximately 25% or more of one year's [Brookshire] revenue."  Ms. Fenley does not say what information Brookshire gave Fish about "size" or point to a document delivered to Fish, and Mr. Healey has no recollection of Brookshire's size or 2011 revenue.  App. 18, Healey ¶ 13.  Brookshire does not claim its "size" or 2011 revenue is relevant in this case; but if it were, it would

6

be discoverable.

In October 2013, the month before the settlement, GeoTag's lawyers wrote Fish listing 12 categories of documents that GeoTag said it had requested but had not received. App. 5, Harris ¶ 15 (attachment).  All concerned damages.  After receiving this GeoTag letter, Fish emailed Brookshire saying "we've reached the portion of the case where we need to start getting into discovery and document production," then proposing a phone call to discuss "collecting" information including "sales/revenue documents." *Id.* The case settled the next month, and Brookshire never gave Fish any of these documents.  *Id.*

Fish has no information concerning Brookshire's accounting.  Without citing evidence, Brookshire's motion claims that it gave Fish information—again, apparently orally—about Brookshire's "accounting system, including its methods for classifying products, calculating prices and deductions, and estimating figures where data is not available."  Motion at 22.  Ms. Fenley, who provided the only substantive declaration supporting the motion, does not mention that claim, and it is false.  Fish did not regard any of this information as relevant in GeoTag and did not obtain any such information, either written or unwritten.  App. 5, Harris ¶ 12-13.

## F.     Brookshire did not have or disclose a "playbook."

Brookshire admits that GeoTag was its first patent case. Before hiring Fish, Brookshire "had never been sued for any type of intellectual property matter."  Motion at 7.  Since this was Brookshire's first patent case, it had no "playbook" for patent cases,

no "approach to litigating" them, no identified objectives, do's, or don'ts.  App. 6, 17-18, Harris  ¶17-19, Healey ¶ 12.

Ignoring that it had no patent litigation experience, Brookshire says it told Fish about Brookshire's "approach to litigating patent cases."  Brookshire then speculates that it "likely" also told Fish about Brookshire's "general litigation philosophy, settlement strategies, and issues unrelated to litigation that weigh into Brookshire's settlement decisions." Motion at 22–23.  None of this is true. App. 6, 17-18, Harris ¶ 17-19, Healey ¶ 12.

Brookshire did not share with Fish any case management policies or procedures, outside counsel guidelines, or litigation or settlement strategies—for any kind of litigation.  *Id.*

Fish understood that Brookshire's objective was the same as that of nearly all low-exposure defendants in a case brought by a non-practicing entity: Lie low, do little, spend little, and get out—hopefully, for less than the cost of defense.  That is what happened.  App. 4, 16, Harris ¶ 10, Healey ¶7.

**G.    In settling the *GeoTag* case, Brookshire revealed no confidential information, either to Fish or to GeoTag.**

 GeoTag negotiated a settlement with the Fish lawyers who were representing the Fish Defense Group. The settlement was generally for smaller defendants in that group.  At the very end of that settlement negotiation, GeoTag proposed a number for Brookshire to the Fish lawyers representing the settling members of the Fish Defense

Group.  Those lawyers passed it along to the Fish lawyers representing Brookshire, and Brookshire accepted it.  App. 18-19, Healey ¶ 14-15.

As far as Fish knows, the settlement number GeoTag proposed and Brookshire accepted was entirely arbitrary.  App. 19, Healey ¶ 15.  Brookshire had provided GeoTag (and Fish) nothing upon which to base it—nothing about Brookshire's sales, margins, or profits for the company, for single stores, or from using the store locator.  Brookshire did not give Fish any information bearing on any of the factors that would affect a reasonable royalty calculation in the context of *GeoTag*.  App. 6, 19, Harris ¶16, Healey ¶15.

**H.      Brookshire's general counsel has acknowledged the prior termination of Fish's representation of Brookshire.**

Fish first spoke with UroPep about this potential representation in Fall 2014.  In March 2015, Fish signed an engagement letter with UroPep.  App. 13, Davis ¶ 6.  In early April 2015, Fish confirmed that the Brookshire representation had ended.  *Id.*  In May 2015, Fish completed a conflict check on Brookshire as a potential defendant in the *UroPep* case.  *Id.;* App. 45, Aidukas ¶ 4-5.

Like other large firms, Fish has substantial conflicts-clearing procedures and a sizeable conflicts staff.  App. 45, Aidukas ¶ 6.  The Fish conflicts staff identified the prior Brookshire representation and noted that no time had been billed for well over a year. Id.  A little over a month after Mr. Healey confirmed, in early April, that the Brookshire engagement had ended, the Fish conflicts staff sent him an email transmitting a

"closure" letter to send to Brookshire documenting the prior completion of work and consequent closure of the file.  Without "connecting the dots" between the early-April inquiry and the mid-May closure letter, Mr. Healey did not change it and sent it on to Ms. Fenley.  App. 45, 19 Aidukas ¶ 6-7; Healey ¶ 16-17.

The first sentence of the May 2015 closure letter to Ms. Fenley stated: "We have completed our work for you and thus have not had an attorney-client relationship with you in over a year."  That fact was true, App. 19, Healey ¶16, and Ms. Fenley signed and returned the letter signifying Brookshire's agreement. App. 45, Aidukas ¶8; Fenley Ex. D.

I.     **The erroneous "client pruning" language in Fish's May 2015 closure letter did not alter the fact that the attorney-client relationship had ended over a year earlier.**

The May 2015 closure letter confirming the prior termination of the attorney-client relationship stated: "In accordance with our normal client pruning procedures, we think that it would be best to _formalize_ the end of our attorney/client relationship with Brookshire Brothers, Ltd."  (emphasis added) Those words were written by Fish's conflict staff, which calls these letters "client pruning" and "closure letters" and understands their purpose—to avoid disputes like this one.  App. 45, Aidukas ¶ 6.

As the letter states, the Fish-Brookshire attorney-client relationship ended when Fish completed its work by settling the GeoTag case in 2013.  Sending the closure letter over a year later did not extend the attorney-client relationship or create a new one.

The "normal client pruning" language was a mistake, as was Mr. Healey's failure to catch it and delete it.  But the mistake caused no harm.  App. 19, Healey ¶ 16-17.

Fish's Brookshire engagement was for a single settled case; so, when Brookshire received this closure letter, it knew it was no longer a Fish client.  That was the main thrust of the closure letter, and it was and is true, App. 19, Healey ¶ 16—as Ms. Fenley confirmed by signing it.

Had Brookshire refused to sign this closure letter, the pivotal facts would remain unchanged: When Fish accepted the UroPep engagement, when it sent the closure letter, and when it sued, Brookshire was a former client, not a current one.

**J.      Brookshire and Ms. Fenley are sophisticated consumers of legal services.**

Brookshire is a big business. It owns some 119 supermarkets and pharmacies and 32 convenience stores. App. 48, 52, Strecker ¶ 3, Ex. A.  It has more than 7,000 employees. App. 49, 55, Strecker ¶ 4, Ex. B.  Its annual revenue appears to exceed $1 billion. App. 49, 57, Strecker ¶ 5, Ex. C.

Brookshire is a seasoned litigant.   Court records available online show that Brookshire Brothers (including its affiliates) has been a party in 68 federal civil suits from 1991 through 2015; 7 cases appealed to the Fifth Circuit from 1995 through 2014; and 13 Texas state court cases resulting in reported opinions from 1993 through 2010. App. 49, Strecker ¶ 6.

For the foregoing litigation, Brookshire and its affiliates have retained law firms in at least ten cities in at least five states.  App. 49, Strecker ¶ 6.

Ms. Fenley is a seasoned lawyer. She graduated from SMU law school and received her Texas law license in 1982. App. 49, 60, Strecker ¶ 7, Ex. D.  She has been

Brookshire's Corporate or General Counsel since 2007.  App. 49-50, 63, Strecker ¶ 8, Ex. E.  When she signed the Fish engagement letter in 2011, she had been practicing 29 years.  When she acknowledged the prior conclusion of the Fish-Brookshire attorney-client relationship in 2015, she had been practicing 33 years.

Brookshire knew it needed IP specialists for the Geotag case.  To find an IP specialist, Brookshire consulted one of its regular outside lawyers, Clay Dark, who had IP experience and appeared separately for Brookshire in the GeoTag.  Mr. Dark recommended Fish's David Healey, who was not otherwise involved in GeoTag and did no work for the other Fish clients in GeoTag.  App. 17, Healey ¶ 8.  Brookshire's choice of Fish gave it the IP expertise it sought, and its choice of Healey gave it the benefits of the joint defense, led by other Fish lawyers, without most of the costs.  App. 17, Healey ¶ 8-10.  These were the choices of a sophisticated consumer of legal services.

**K.    Brookshire's general counsel waived future conflicts.**

At the time of the Brookshire engagement for the GeoTag, Fish had not been contacted by UroPep or anyone else with a potential claim against Brookshire, so the Brookshire engagement letter could not identify a particular future conflict. Instead it made comprehensive disclosures.  App. 20, 26-033, Healey ¶ 18-19, Ex. B.

As Ms. Fenley recognized in signing the Fish engagement letter, (1) the engagement was "limited solely" to the GeoTag case, (2) Fish "is a large firm representing clients mainly in areas of patents" and other IP and non-IP areas, with "many clients from many countries and states within this country," and (3) as a result,

"it is inevitable that there are from time to time conflicts of interest between one or more of our clients." *Id.*

By listing examples, the engagement letter warned Brookshire of conflicts:

- "One client may have us representing it on an application for a patent that another client might later be accused of infringing, perhaps even your company."

- "We represent many companies … that enforce their patents..., and such a client might later seek to enforce a patent against your company."

- "One of our other clients may decide it has a claim for a contract dispute, or some other type of cause of against your company—or your company might decide it has a claim … against a different client." *Id.*

Informed by these disclosures—and necessarily aware that Fish might have a client who would "later seek to enforce a patent against [Brookshire]"—Ms. Fenley agreed for Brookshire to "waive any present or future conflict of interest," including conflicts concerning "any intellectual property right…or any lawsuit, other than the [I case], in order to allow us to represent another present or future client" against Brookshire. *Id.*

Brookshire further agreed that its conflict waiver would "survive the termination" of the *GeoTag* case.  Id. The waiver would have allowed Fish to commence the *UroPep* action while Brookshire was still a client. *A fortiori*, it allowed Fish to do so thereafter.

Ms. Fenley concedes that she read the engagement letter before signing it saying "understood and agreed to," then says she did not understand that Fish could be

adverse in patent cases. Fenley ¶ 6.  But that is precisely what the letter says.[1]

In discussions with Fish concerning the GeoTag engagement, Ms. Fenley did not express confusion about Fish's substantial presence in patent litigation.  Indeed, that was one reason Brookshire hired Fish.  Nor did she express concern about the possibility that Fish might be asked to sue Brookshire in a patent case, or about the plainly broad scope of Brookshire's waiver. Finally, Ms. Fenley did not express unfamiliarity with the applicable ethical rules.  She is a licensed Texas lawyer.  App 20, Healey ¶ 19.

## II.      Argument

Fish's proof contrasts sharply with Brookshire's.  Fish has painstakingly compared the *GeoTag* and *UroPep* cases and explained why they are not related.   Fish has painstakingly described Brookshire's peripheral posture in the *GeoTag* case—outside the joint defense groups as a low-exposure defendant—which explains why Brookshire gave Fish no confidential information that could be used against Brookshire.  And Fish has painstakingly denied, category by category, having any useful confidential Brookshire information.

The disqualification bar is high.  Especially when compared to the specifics in Fish's response, Brookshire's generalities would not clear the bar even if true—and they are false.

---

[1] Ms. Fenley also says she did not understand that Fish would say it could use confidential information against Brookshire.  *Id.* Fish is not making that contention.  It has no Brookshire confidential information.

## A.  Depriving a client of its counsel of choice requires a "painstaking analysis of the facts and precise application of precedent."

The quote is from *Duncan v. Merrill Lynch, Pierce, Fenner & Smith,* 646 F.2d. 1020, 1029 (5th Cir.), *cert. den*. 44 U.S. 895 (1981), *overturned on other grounds, Gibbs v. Paluk*, 742 F.2d 181 (5th Cir. 1984).  Because "disqualification is a severe remedy," the Court should strictly construe the Motion.  *Abney v. Wal-Mart*, 984 F. Supp. 526, 528 (E.D. Tex. 1997) (Schell, J.) (quoting *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990)); *Microsoft Corp. v. Commonwealth Scientific*, No. 6:06-CV-549, 2007 WL 4376104, at *9 (E.D. Tex.  13, 2007) (Davis, J.) ("A severe remedy such as disqualification cannot be granted on generalities.").

The right to be represented by counsel of choice is a valuable one.  "Absent a compelling reason, courts should not deprive litigants of that right because such deprivation could result in immediate and palpable harm."  *See Keller Indus., Inc. v. Blanton*, 804 S.W.2d 182, 185 (Tex. App.—Houston [14th Dist.] 1991, no writ). "[A]ttorney disqualification, particularly the disqualification of an entire firm, is a sanction that must not be imposed cavalierly."  *Fed. Deposit Ins. Co. v. United States Fire Ins. Co.*, 50 F.3d 1304, 1316 (5th Cir. 1995).

## B.  Courts must guard against tactical use of disqualification motions.

The Court should view Brookshire's motion "with caution" because such motions "can be misused."  *Id.* at 1315.  "A disqualification inquiry, particularly when instigated by an opponent, presents a palpable risk of unfairly denying a party the counsel of his

choosing."  *Id.* at 1316; *see also Kalmanovitz v. G. Heileman Brewing Co., Inc.*, 610 F. Supp. 1319, 1323 (D. Del. 1985) (observing that motions to disqualify "are often disguised attempts to divest opposing parties of their counsel of choice").

The Supreme Court has expressed "concern about the tactical use of disqualification motions." *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 436 (1985).  In reaction, district courts "'adhere to an exacting standard when considering [such] motions . . . so as to discourage their use as a dilatory trial tactic.'"  *Abney*, 984 F. Supp. at 528 (quoting *Spears*).[2]

Eli Lilly has indemnified Brookshire, Dkt. 28 at 1, and Lilly's lawyers are representing Brookshire, which does not have separate counsel.  The Court can draw its own conclusions about who is paying for this motion and whether it is being misused.

**C.**    **Brookshire falsely claims it was still Fish's client when it signed the closure letter acknowledging that the relationship was over.**

Brookshire says it "was a Fish client until May 2015."  Motion at 12.  Not so. *GeoTag* settled in November 2013.  Fish did no further substantive work for Brookshire. UroPep engaged Fish in March 2015.  In May 2015 Ms. Fenley signed the closure letter acknowledging that Fish and Brookshire had "not had an attorney-client relationship with [Brookshire] in over a year."  There was no ongoing relationship to terminate.

---

[2]    *See also Optyl Eyewear Fashion Inter. Corp. v. Style Cos. Ltd.*, 760 F.2d 1045, 1050 (9th Cir. 1985) ("Because of [the] potential for abuse, disqualification motions should be subjected to particularly strict judicial scrutiny."); *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir. 1982) ("such motions should be viewed with extreme caution for they can be misused as techniques of harassment"); Tex. Discip. R. Prof'l Conduct 1.06 cmt. 17 (a conflict-of-interest objection raised by opposing counsel "should be viewed with great caution . . . for it can be misused as a technique of harassment").

As a matter of law, the closure letter was unnecessary; it only "formalized" the prior completion of the engagement. Texas law is clear:  An attorney-client relationship terminates upon completion of the purpose of the employment, absent an agreement to the contrary.  *Stephenson v. LeBoeuf*, 16 S.W.3d 829, 836 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). The state and model rules are to the same effect:  A representation terminates "when the matter has been resolved." Comment 6 to Tex. Discip. Rule of Prof'l Conduct 1.02; Comment 4 to Model Rule 1.3.  Federal courts reach the same conclusion:   "When an attorney-client relationship is established, the relationship generally terminates once the purpose of the employment is completed, absent a contrary agreement."  *Simpson v. James*, 903 F.2d 372, 376 (5th Cir. 1990); *Hill v. Hunt*, No. CIVA 307-CV-02020-O, 2008 WL 4108120, at *3 (N.D. Tex. Sept. 4, 2008) (O'Connor, J.) ("attorney-client relationship … generally terminates when the purpose of employment is completed, absent contrary agreement.").

The Fish-Brookshire attorney-client relationship terminated when *GeoTag* settled in November 2013.  Even if Fish's gratuitous response to a June 14 email could have momentarily revived the relationship, that would have been its last gasp; by any measure, it ended long before the UroPep engagement began.

Brookshire's incorrect assertion that Fish had a "concurrent" conflict because Fish didn't send a closure letter until May 2015, over a month before suing, is no better than its baseless insinuation that Brookshire is still Fish's client *today* because, after filing this

case, Fish included Brookshire on a mailing list inviting attendance at a webinar.  Motion at 10.  To end a completed representation, closure letters are unnecessary.  Comment 6 to Tex. Discip. Rule of Prof'l Conduct 1.02; Comment 4 to Model Rule 1.3; *see JuxtaComm-Texas Software, LLC v. Axway, Inc.,* No. 6:10-CV-11, 2010 WL 4920909 (E.D. Tex. Nov. 29, 2010) (Davis, J.)( that the lawyer "confirmed with [the client] that he could close the file in November 2009 does not mean that the representation continued until that date").  And it takes more than an invitation to a webinar to create a new attorney-client relationship.

**D.**   ***GeoTag* and *UroPep* are not substantially related.**

Brookshire's Motion does not make a serious effort to show a substantial relationship.  Near the end (p. 24), Brookshire says (1) technology to *locate* nearby Brookshire pharmacies was at issue in *GeoTag*, and pharmacy *services* are at issue here; and (2) *GeoTag* and *UroPep* have legal issues that are "common to all patent infringement lawsuits."  Neither is relevant.

A website store locator has nothing to do with this case, and Brookshire's suggestion that all patent (or fraud, contract, or trademark) cases are substantially related is incorrect. *See Power Mosfet Techs, L.L.C. v. Siemens AG*, No. 2:99-CV-168, 2002 WL 32785219, at *2 (E.D. Tex. Sept. 30, 2002) (Folsom, J.) (holding that two patent infringement suits involving the same or similar technology were not substantially related because "the Court is not convinced that only the broad subject matter of the previous representation is the standard by which to determine disqualification.").

"Merely pointing to a superficial resemblance between the present and prior representations will not substitute for the careful comparison demanded by our cases." *Duncan*, 646 F.2d. at 1029 (vacating order disqualifying a firm where the current and former suits involved overlapping causes of action).

Brookshire cites *In re Riles*, 243 F.3d 553 (Fed. Cir. 2000), an unpublished opinion in a "playbook" case, for the proposition that patent cases may be substantially related even if they involve different patents.  Motion at 6.  But what the *Riles* court found— and what is not present here—is that by representing their adversary in multiple prior patent cases, the lawyers obtained *specific* confidential information regarding the client's patent infringement settlement and litigation strategy.  *Id.* at *1–3.  Neither *Riles* nor any other case stands for the proposition that all patent cases are substantially related, or that one-shot engagements with someone who has no patent-case "playbook" and settles without any substantive involvement are disqualifying.  *Riles* stands only for the proposition that if you have enough cases of the same type for the same client, you may learn "playbook"-type information that disqualifies you in those types of cases.  The *Riles* opinion noted that the district court decision did not turn on the fact that "the prior and current representations involve patent law."  *Id.* at 3.

E.      **Brookshire did not share with Fish confidential information useful to UroPep.**

Brookshire's confidential information argument is long on vague generalities but short on specifics and evidence—"Fish gained intimate knowledge of Brookshire's financial and legal strategies" (Motion at 4); Fish received "confidential and proprietary

financial information" (9); Fish "*likely*" received information about Brookshire's "general litigation philosophy [and] settlement strategies" (23).  Fish has demonstrated that none of those claims is true. When Brookshire was more specific, it still had no proof: "Fish received considerable financial information…including revenues, deductions, and profit margins," plus "information about Brookshire's accounting system."  (22)  The Harris and Healey declarations, App. 2-6 and 15-21, specifically disprove all of these unproven assertions.[3]

Ms. Fenley did not support any of Brookshire's claims about confidential information.  She did not specifically describe any confidential information shared with Fish.  She spoke only about unidentified and undocumented "confidential information regarding Brookshire's operations and finances" and apparently oral discussions about "Brookshire's size" and "limited budget for defending against charges of patent infringement." Fenley  ¶ 8.  Fish, in contrast, specifically addressed every assertion in the Motion and explained why Fish did not have any identified information—or any other confidential information—item by item.

**F.     Brookshire waived its right to complain of a conflict.**

Brookshire does not deny that its waiver in the engagement letter covers this case.  It argues, instead, that it is not bound by its waiver because Ms. Fenley, who

---

[3] The vague descriptions of what Brookshire claims Fish knows would not be disqualifying even if Brookshire had proved it.  Discoverable evidence should not be the basis for disqualification.  *See Abney v. Wal-Mart*, 984 F. Supp. 526, 530 (E.D. Tex. 1997) (because the physical condition of the plaintiff in a personal injury case was discoverable, court refused to disqualify defense counsel, who had represented plaintiff and knew his physical condition).

signed it, now says she did not understand that she was agreeing that Fish could "act adverse to Brookshire in other patent infringement actions."  Fenley ¶ 6.[4]  But the letter specifically discloses that a Fish client might "seek to enforce a patent against your company," and Brookshire "expressly agree[d]…to now waive any present or future conflict of interest…including…conflicts in regard to intellectual property rights."  Ms. Fenley signed saying "understood and agreed." Fenley  Ex. F.

As a general rule, a party cannot escape a contract by claiming to have signed without understanding it.  *Williams v. Adams*, 696 S.W.2d 156, 159 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.) ("A person who signs a contract is presumed to know its contents; and, absent a finding of fraud, his failure to read it will not discharge his obligations," citing  *G–W–L, Inc. v. Robichaux*, 643 S.W.2d 392 (Tex. 1982) and *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962) ("We reaffirm the principle that parties to a contract have an obligation to protect themselves by reading what they sign.").[5]

Yes, this waiver is broad, and informed consent is required.  But Ms. Fenley, a 30-year lawyer and general counsel for one of East Texas's biggest businesses, cannot fairly portray herself as unable to understand the plain words of her waiver.  Licensed in 1982

---

[4] She also complains that she did not mean to agree to allow Fish to use confidential information against Brookshire.  *Id.*  That complaint is a red herring:  Fish does not have any confidential Brookshire information.

[5] *See also Estate of Dogley v. Vega*, 797 S.W.2d 299, 304 (Tex. App.—Corpus Christi 1990, no writ) ("A party who signs a contract is charged with notice of its contents as a matter of law."); *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 425 (Tex. 2015) ("…[T]he law presumes that the party knows and accepts the contract terms.")*Stewart v. Johnson*, No. 07-05-0272-CV, 2007 WL 1345372 at *3 (Tex. App.—Amarillo May 8, 2007, pet. denied) (plaintiff had a duty to read agreements she signed).

and the general counsel of a 7,000-employee business running over 100 stores in two states, Ms. Fenley knew exactly what she was signing.  She selected Fish, according to the Motion (8), because of its reputation—as an IP litigation firm.  Fish asked her to agree that if it accepted the engagement, it could still sue Brookshire—whether for patent infringement or something else.  She signed saying "understood and agreed to." Her waiver was clear, not obscure.

When a party represented by counsel agrees to a conflict waiver it is presumed to be enforceable.  *See Galderma Laboratories, L.P. v. Actavis Mid Atlantic LLC*, 927 F. Supp. 2d 390, 403 (N.D. Tex. 2013) (Kinkeade, J.) ("[G]enerally a client who is independently represented by counsel in giving the consent should be assumed to have given informed consent.").

In *Galderma*, the court held that a "general and open-ended waiver" similar to Fish's was enforceable.  *Id.* at 405–06.  Brookshire attempts to distinguish *Galderma* because "the plaintiff in *Galderma* was a large international corporation with a General Counsel who had decades of relevant litigation experience."  Motion 17.  But a comparison between the *Galderma* plaintiff and Brookshire suggests that Brookshire was just as sophisticated as the *Galderma* plaintiff, if not more so:

- The general counsel in *Gladerma* had "over 20 years of experience." *Galderma*, 926 F. Supp. 2d at 403.  Ms. Fenley has some 30 years of experience.

- The *Galderma* plaintiff was a billion-dollar company.  *Id.* at 402.  So is Brookshire.

- The *Galderma* plaintiff had 240 employees.  *Id.* at 393.  Brookshire has over 7,000.

- The *Galderma* plaintiff was involved in a dozen different lawsuits. *Id.* at 402.  Online records show that, since 1991, Brookshire has been involved in 68 federal civil suits, 7 cases appealed to the Fifth Circuit, and several Texas state court lawsuits.

The Court can fairly conclude that Ms. Fenley and Brookshire had the resources and experience to understand the waiver, which was plainly written.

Brookshire argues that *Galderma* is distinguishable because "the advance waiver in *Galderma* was not as broad as the waiver in Fish's engagement letter."  Motion at 17. But *Galderma* repeatedly emphasized that broad, open-ended waivers may be enforceable, and were presumed to be enforceable when the party is represented by in-house counsel.  *Galderma*, 927 F. Supp. 2d 399–403.

*Galderma* held that that a sophisticated party represented by inside counsel is presumed to understand a waiver.  *Galderma* also established guidance regarding an enforceable waiver, even by an unsophisticated client.  *Id.* at 399-401.  First, such a waiver should explicitly state the type of conflict being waived—even if the waiver is "open-ended" and "general."  *Id.*  Fish's waiver meets this requirement.  It states that Brookshire agrees to waive "any present or future conflict of interest: Including but not limited to conflicts of interest in regard to any intellectual property right . . . or any lawsuit, other than on the specific matter identified above in the caption of this letter."

Second, *Galderma* said the waiver should disclose the risk it posed.  *Id.*  Saying the firm could later be adverse to the client is sufficient.  *Id.*  This waiver disclosed that

Fish could "represent another present or future client against your company."

Finally, *Galderma*—still speaking of an unsophisticated client—said the client should be aware that signing the waiver is not the client's only choice and alternatives are available.  *Id.*  It is hard to imagine a billion-dollar company such as Brookshire ever being under the misimpression that its only option is to hire a particular law firm on particular terms.   Ms. Fenley certainly does not say she thought Fish was her only choice.  Brookshire knew at it did not have to hire Fish—it had already hired Clay Dark for the *GeoTag* case, and it was accustomed to hiring other firms without any engagement letter at all.  Motion at 19.  Ms. Fenley knew there were alternatives.

Brookshire's reliance on *City of El Paso v. Soule*, 6 F. Supp. 2d 616 (W.D. Tex. 1998) is misplaced.  In *Soule*, a business owner signing a waiver was not made aware that the law firm intended not only to sue his business, but also to sue him personally and members of his family.  *Id.* at 393.  In contrast, the waiver here is clear—Fish might be asked to enforce a patent against Brookshire, and Brookshire agreed that Fish could do so.

Perhaps more importantly, *Soule* was decided prior to the 2002 amendments to the Model Rules.  As the *Galderma* court observed, "Prior to the 2002 Amendment of the Model Rules . . . informed consent [was] limited further by the need to identify the nature of the likely future matter."  *Galderma*, 927 F. Supp. 2d at 397.  But "following the amendment, open-ended, general informed consent was likely to be valid if the

client is an experienced user of legal services."  *Id.*  As an experienced user of legal services represented by a seasoned lawyer, Brookshire is bound by its agreement to waive future conflicts.

**G.      Brookshire's claims of disloyalty are unfounded.**

Brookshire's Motion is littered with claims of disloyalty.  But the premise of those claims is that Fish sued a "concurrent" client after "duping" it into terminating the *GeoTag* engagement.  That premise is false.  The *GeoTag* engagement ended long before the *UroPep* engagement began.  With or without the May 2015 closure letter, Fish's representation of Brookshire was over.

Ms. Fenley claims that although it is true that the *GeoTag* engagement was over, as she acknowledged by signing the letter, she would not have admitted it if she had known Fish was considering suing Brookshire.  What exactly is she saying?  That she would have lied and said the relationship was still going on?

Willingness to falsely claim an ongoing attorney-client relationship does not create one.  Nor does it change the fact that the *GeoTag* engagement ended long ago. Brookshire is trying to transform its acknowledgement that the *GeoTag* engagement had previously ended into proof that it was still going on.

**Conclusion**

For the reasons above, the Court should deny Brookshire's Motion to Disqualify.

**BAKER BOTTS L. L. P.**


_Kod Ahele_
_____

Rod Phelan
State Bar No. 15899800
Rod.Phelan@BakerBotts.com
Charles D. Strecker
State Bar No. 24066157
Charles.Strecker@BakerBotts.com
2001 Ross Avenue, Suite 600
Dallas, Texas  75201-2980
Telephone:  (214) 953-6500
Facsimile:   (214) 953-6503

ATTORNEYS FOR FISH & RICHARDSON


**<u>CERTIFICATE OF SERVICE</u>**

Pursuant  to  Local  Rule  CV-5(c),  the  undersigned  hereby  certifies  that  this

Response was served on November 6, 2015 via email on counsel as follows:

Jon B. Hyland
jon.hyland@btlaw.com
Todd G. Vare
todd.vare@btlaw.com
Felicia J. Boyd
felicia.boyd@btlaw.com
Barnes & Thornburg LLP

ATTORNEYS FOR DEFENDANTS
ELI LILLY AND COMPANY AND
BROOKSHIRE BROTHERS, INC.

/s/ Rod Phelan
_____
Rod Phelan

**CERTIFICATE OF MOTION FOR LEAVE TO FILE UNDER SEAL**

Pursuant to Local Rule CV-5(a)(7)(A), the undersigned certifies that a Motion for

Leave to Seal this Response was filed on November 6, 2015.


/s/ Rod Phelan
Rod Phelan