**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ERFINDERGEMEINSCHAFT UROPEP GbR, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Case No. 2:15-CV-1202-WCB |
| ELI LILLY AND COMPANY, and BROOKSHIRE BROTHERS, INC., | § § § | |
| *Defendants*. | § § | |

**MEMORANDUM OPINION AND ORDER**

The defendant Brookshire Brothers, Inc. has moved to disqualify the law firm of Fish and Richardson, P.C. ("Fish") from serving as counsel for plaintiff Erfindergemeinschaft Uropep GbR ("Uropep") in this matter. Dkt. No. 30. The Court heard argument on Brookshire's motion on February 11, 2016. At that hearing, the Court orally denied the motion and stated that a written opinion would follow, setting forth in more detail the Court's reasons for denying the motion. The Court now reaffirms that Brookshire's motion to disqualify is DENIED.

**BACKGROUND**

Brookshire, which is based in Lufkin, Texas, operates more than 100 retail stores in Texas and Louisiana, including grocery stores and stand-alone pharmacies. Before this case, Brookshire had been a party to only one patent suit. In that action, <u>GeoTag, Inc. v. The Western Union Company, et al.</u>, Case No. 2:10-cv-574 (E.D. Texas 2010) ("the GeoTag case"), Fish served as Brookshire's counsel.[1] Brookshire's disqualification motion stems from the fact that Fish now represents Uropep, the plaintiff in this case, against Brookshire, Fish's former client.

---

[1] The Brookshire Grocery Company, which is an unrelated entity, has been a party to a number of patent suits.

The facts bearing on the motion are derived from several declarations and exhibits that the parties have submitted to the Court.

On March 7, 2011, Brookshire hired Fish as its counsel in the GeoTag case and signed an engagement agreement memorializing the relationship. Dkt. No. 43-1, Ex. 3B at 7. The agreement stated that Fish was being retained only for the GeoTag case and that representation with respect to any other matter must be arranged through an additional written agreement. The engagement agreement also contained a broad waiver by Brookshire of future conflicts of interest on Fish's part, extending to Fish's possible representation of parties aligned against Brookshire in subsequent matters. Id. at 2. Brookshire's in-house counsel, Ms. Jule Fenley signed the agreement on behalf of Brookshire.

In the GeoTag case, Fish represented Brookshire along with 39 other defendants. Fish partner David Healey was the lead attorney representing Brookshire. Dkt. No. 43-1, Ex. 3 ("Healey Decl.") ¶¶ 3, 9. While the other 39 defendants represented by Fish formed a joint defense group, Brookshire did not join that group. Id. ¶ 9. Over the course of the two and a half years that Fish represented Brookshire, Brookshire paid Fish approximately $72,000 for some 200 hours of work. Dkt. No. 30-1 ("Fenley Decl.") ¶ 7. Brookshire was not billed for work done on behalf of the joint defense group. Response at 3; Dkt. No. 43-1, Ex. 1 ("Harris Decl.") ¶¶ 8, 11.

On November 20, 2013, the case against Brookshire was settled and Brookshire was dismissed.[2] GeoTag case, Dkt. No. 807. Although Brookshire was dismissed in November 2013, Brookshire asserts that as late as June 2014, Fish provided legal advice to Brookshire concerning an aspect of the GeoTag settlement agreement. Motion at 10; Dkt. No. 30-3.

---

[2] Fish continued to represent other defendants after Brookshire was dismissed.

Brookshire does not assert that Fish performed any legal work for Brookshire between June 30, 2014, and the filing of this suit on July 1, 2015.

Fish was first contacted by Uropep in the fall of 2014 and was retained in March of 2015. Dkt. No. 43-1, Ex. 2 ("Davis Decl.") ¶ 6. Fish initiated and completed a conflict check on the potential representation of Uropep in late 2014. Dkt. No. 43-1, Ex. 5 ("Aidukas Decl.") ¶ 4. Fish initiated and completed a conflict check on Brookshire Brothers as a potential defendant in May 2015. Aidukas Decl. ¶ 5. On May 19, 2015, Fish sent Brookshire the following letter, signed by Mr. Healey:

> In reviewing our records, we see that we have completed our work for you and thus have not had an attorney client relationship with you in over a year. We understand that it may be that your needs are not such as to require our services. However, at the same time, it is our policy to keep a close watch over our client list to ensure that all clients who are on that list are truly current clients.
>
> In accordance with our normal client pruning procedures, we think that it would be best to formalize the end of our attorney/client relationship with Brookshire Brothers. Ltd.
>
> Any litigation materials will be handled in accordance with the Firm's Litigation Document Retention and Destruction Policy, which provides that the firm will retain certain portions of your file for a period of seven years after the conclusion of the litigation during which time you may request these files.
>
> It has been our pleasure to serve you and I wish you continued success. Kindly please sign and return the enclosed duplicate copy of this letter as acknowledgment of receipt.

Dkt. No. 30-5; Dkt. No. 43-1 Ex. 3A. Ms. Fenley signed the acknowledgement on May 25, 2015.

Mr. Healey states that he was not aware of the Uropep case until after it was filed, but that he was asked in April 2015 "whether Fish could become adverse to Brookshire." Healey Decl. ¶ 17. Ms. Harris, who worked under Mr. Healey's supervision, states that her only

involvement in the Uropep matter has been responding to this disqualification motion. Harris Decl. ¶ 3.

Brookshire asserts that the Fish should be disqualified from representing Uropep in this matter on the grounds that Fish's actions are contrary to rules of practice protecting current and former clients from conflicts of interest and that Fish received confidential information from Brookshire during the GeoTag representation that could reasonably be expected to be used to Brookshire's prejudice in this action.

## APPLICABLE LAW

Motions for attorney disqualification in federal courts are governed by federal standards under the law of the regional circuit, even in patent cases in which an appeal would be taken to the Federal Circuit. Ring Plus, Inc. v. Cingular Wireless Corp., 614 F.3d 1354, 1365 (Fed. Cir. 2010); In re Dresser Indus., Inc., 972 F.2d 540, 543 (5th Cir. 1992). When considering motions to disqualify, the Fifth Circuit directs district courts to look first to the rules promulgated by the local court itself. In re ProEducation Int'l, Inc., 587 F.3d 296, 299 (5th Cir. 2009); FDIC v. U.S. Fire Ins. Co., 50 F.3d 1304, 1311-12 (5th Cir. 1995). In addressing Attorney Discipline, the Local Rules of the Eastern District of Texas provide as follows:

> (a) Generally. The standards of professional conduct adopted as part of the Rules Governing the State Bar of Texas shall serve as a guide governing the obligations and responsibilities of all attorneys appearing in this court. It is recognized, however, that no set of rules may be framed which will particularize all the duties of the attorney in the varying phases of litigation or in all the relations of professional life. Therefore, the attorney practicing in this court should be familiar with the duties and obligations imposed upon members of this bar by the Texas Disciplinary Rules of Professional Conduct, court decisions, statutes, and the usages customs and practices of this bar.

L. R. AT-3(a).

As this court's local rules indicate, determining the ethical standards that govern the conduct of attorneys appearing before it requires consideration of the ethical rules announced by the legal profession nationally as well as in Texas. This Court thus must look to the American Bar Association's Model Rules of Professional Conduct and the Texas Disciplinary Rules of Professional Conduct, which govern the conduct of attorneys practicing in Texas. <u>U.S. Fire Ins.</u>, 50 F.3d at 1312; <u>In re Am. Airlines, Inc.</u>, 972 F.2d 605, 610 (5th Cir. 1992).

Rule 1.09 of the Texas Rules covers a lawyer's representation of a client against a former client. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09, reprinted in Tex. Gov't Code Ann., tit. 2, subtit. G, app. A, art. 10, § 9 (Vernon 2005) ("TDRPC"). Parts (a) and (b) of that rule read as follows:

> (a) Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:
>
>> (1) in which such other person questions the validity of the lawyer's services or work product for the former client;
>>
>> (2) if the representation in reasonable probability will involve a violation of Rule 1.05 [Confidentiality of Information]; or
>>
>> (3) if it is the same or a substantially related matter.
>
> (b) Except to the extent authorized by Rule 1.10 [Successive Government and Private Employment], when lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so by paragraph (a).

TDRPC § 9(a) and (b). Although the term "substantially related" is not defined in the Rule, the comments on the Rule state that the term primarily applies in "situations where a lawyer could have acquired confidential information concerning a prior client that could be used either to that prior client's disadvantage or for the advantage of the lawyer's current client or some other

person. It thus largely overlaps the prohibition contained in paragraph (a)(2) of this Rule."

TDRPC § 9 cmt. 4A.

Rule 1.09 of the American Bar Association's Model Rules for Professional Conduct

similarly provides for "Duties to Former Clients."  It reads as follows:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.
>
> (b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
>
>> (1) whose interests are materially adverse to that person; and
>>
>> (2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter;
>>
>> unless the former client gives informed consent, confirmed in writing.
>
> (c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
>
>> (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or
>>
>> (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

MODEL RULES OF PROF'L CONDUCT R. 1.9 (2013) ("Model Rules").  The Rule's comments

provide additional detail:

- "A lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a factually distinct problem of that

type even though the subsequent representation involves a position adverse to the prior client." Model Rules, R. 1.9 cmt. 2.

- "Matters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." Id. cmt. 3.

- "Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related." Id.

- "In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation." Id.

## ANALYSIS

### A. Concurrent Representation

As an initial matter, the Court finds that Brookshire was a former (and not a current) client of Fish at all times relevant to this motion. Brookshire's retention letter states that Fish was retained only for the GeoTag case. There is no suggestion in the record that Fish ever performed work for Brookshire on matters other than the GeoTag case. Brookshire was dismissed from the GeoTag case on November 20, 2013. Between November 2013 and June 2014, the record reflects that Fish performed minimal work for Brookshire, recording only one-tenth of an hour of time, for work done in January 2014. In June 2014, Brookshire posed a question to a Fish attorney. The attorney answered the question as a courtesy but did not bill for the time. After June 2014, the record reflects that Fish performed no work at all for Brookshire. This suit was filed in July 2015.

An attorney-client relationship depends on a contract, express or implied, between the parties. Simpson v. James, 903 F.2d 372, 376 (5th Cir. 1990). When an attorney-client relationship is established, "the relation generally terminates once the purpose of the

employment is completed, absent a contrary agreement."  Id.  Here the parties' agreement expressly indicates that the "engagement is limited solely to the one matter captioned above [the GeoTag case], the patent-in-suit, and we do not represent Brookshire Brothers on any other matters absent an additional agreement in writing signed by both parties, whether related or not." Dkt. No. 43-1, Ex. B, at p. 2.  The express language of the parties' agreement indicates that the representation ended upon the completion of Brookshire's involvement in the GeoTag case.

Although there is no allegation that Fish performed any legal work for Brookshire for at least a year before this suit was filed, Brookshire's in-house counsel, Ms. Fenley, stated in her declaration that "[e]ven after the GeoTag action had settled, I considered Fish to be Brookshire's intellectual property counsel."  Based on that statement, Brookshire argues that Fish was retained on an on-going basis and not for the GeoTag case alone.  However, the only evidence that Brookshire points to as support for Ms. Fenley's belief is that she continued to receive marketing emails from Fish, such as announcements of webinars.  Dkt. No. 30-4.  By itself, the receipt of such marketing materials does not establish the existence of an ongoing attorney-client relationship, but merely indicates that Fish was interested in keeping its name before Brookshire in the event that Brookshire needed representation on another matter.  The Court does not find Brookshire's evidence sufficient to overcome the express language of the retention agreement stating that the engagement was only for the GeoTag case.  There is not even a suggestion of any actual representation other than in connection with the GeoTag case, and that matter ended in 2013, with no work at all done for Brookshire after June 2014.

The record reflects that Uropep first contacted Fish in the fall of 2014, that Uropep did not become a Fish client until March of 2015, and that Fish did not begin to explore whether it could be adverse to Brookshire until April or May of 2015.  As Brookshire does not provide any

evidence plausibly suggesting that the attorney-client relationship between Fish and Brookshire continued past the end of June 2014, the Court need not pinpoint the exact moment that the relationship ended. Even assuming the relationship ended as late as June of 2014, it was another nine months before Uropep became Fish's client. Therefore, the Court is satisfied that Brookshire and Uropep were never both clients of Fish at the same time.

## B. Representation Adverse to a Former Client

Brookshire argues that Fish violated its duties toward its former client both by taking on representation of an adverse party in a matter substantially related to the matter in which it represented Brookshire, and by receiving confidential information in the prior representation that is reasonably likely to be used against Brookshire in the present case.

### 1. Are the matters substantially related?

Brookshire's motion asserts that this case and the GeoTag case are substantially related and that Fish must be disqualified for that reason. Motion at 23-25. In particular, Brookshire asserts that "Fish's former representation has factual similarities with the present lawsuit because both matters involve the same delivery of pharmacy services." Motion at 24. A party seeking disqualification on such grounds bears the burden of proving that the present and prior representations are substantially related. Am. Airlines, 972 F.2d at 614. The Court finds that Brookshire has not satisfied that burden.

The GeoTag case concerned a patent relating to geographic search technology used in various "store locator" features on the retailers' websites. This case concerns allegations that Brookshire infringes U.S. Patent No. 8,791,124 when Brookshire's pharmacists dispense the drug Cialis. The Court does not find the technology relating to locating Brookshire stores through a web page and the actions of Brookshire's pharmacists in dispensing Cialis to both involve "the delivery of pharmacy services," except in the most general—and meaningless—

sense. Having reviewed the patents at issue in both suits and the parties' declarations in this case, the Court does not find any substantive relationship between the factual subject matter of the two suits. While it is true that both suits are patent suits, that is the end of their similarity. As noted by the commentary on the Model Rules, disqualification requires more than that two cases both involve the same type of legal problem.

Nor has Brookshire shown that the Uropep lawsuit is substantially related to the GeoTag case on the ground that Fish's representation of Uropep "in reasonable probability will involve" the disclosure of Brookshire's confidential client information. TDRPC § 9(a). Besides the fact that the subject matter of the two cases is very different, the GeoTag case against Brookshire was settled before it had progressed to the point that significant discovery had taken place or that Brookshire needed to share confidential information with Fish relating to pre-trial and trial strategy. In fact, as is set forth in more detail below, Brookshire has failed to show that it shared any significant confidential information with Fish during the GeoTag representation. Thus, the two matters are not "substantially related" based on any reasonable probability that Fish's representation of Uropep will result in the disclosure of confidential information obtained from Brookshire.

2. **Did Fish receive confidential information from Brookshire in the GeoTag matter that may be used against Brookshire in this case?**

Brookshire asserts that Fish should be disqualified because "during the course of the prior representation, Fish gained intimate knowledge of Brookshire's financial and legal strategies, including highly confidential information that can be leveraged against Brookshire in the present lawsuit." Motion at 4.

As to Brookshire's financial information, Ms. Fenley states that "[o]ver the course of Fish's representation of Brookshire, we had discussions with Fish attorneys where we provided

Fish with confidential information regarding Brookshire's operations and finances." Fenley Decl. at ¶ 8. Later in her declaration, Ms. Fenley reiterates that "Brookshire had shared substantial confidential information during the course of the GeoTag action." Id. at ¶ 15. Ms. Fenley's declaration points to a 2012 email drafted by Mr. Healey stating that GeoTag's demand was "approximately 25% or more of one year's revenue." Fenley Decl. ¶ 8. Brookshire therefore asserts that Fish had access to Brookshire's confidential financial documents and revenue information.

In response, Fish submitted declarations from two attorneys who worked on the Brookshire matter. Ms. Harris's declaration states that was assigned to the "leg work" of the case. Harris Decl. ¶ 3. At paragraphs 9, 12, 13, and 14 of her declaration, Ms. Harris makes a number of specific statements countering the allegation that Fish received confidential materials, including confidential financial materials, from Brookshire. She asserts:

> 9. David Healey, who led our Brookshire representation, quickly concluded that Google's defense of its Google Maps function against claims by a non-practicing entity meant that Brookshire's principal exposure was likely the cost of defense and whatever risk is inherent in any litigation. Consequently, Fish was relatively inactive in its defense of Brookshire, and Brookshire's involvement in the case was quite limited:
> . . . . .
> • Brookshire did not deliver to Fish or produce any financial documents of any kind. Fish received no Brookshire income statements, balance sheets, cash flow statements, projections, or anything disclosing Brookshire's firm or single-store sales, expenses, or profits.
>
> • Brookshire did not give Fish anything about product-line sales or profits. In particular, Brookshire gave Fish nothing about the profitability of Brookshire's pharmacy operations, or about any particular product sold in its pharmacy.
>
> • Brookshire did not deliver to Fish any technical documents describing the accused technology—a Google-Maps-based website store locator that Brookshire paid a third party to build and maintain.

- Invoices from that third party and data showing the numbers of visits to Brookshire's website were the only documents Fish received from Brookshire or produced to Geotag.

. . . . .

- Brookshire did not meet with or provide information to the [joint defense group] experts on invalidity, infringement, or damages.

12. Fish did not request or receive from Brookshire "confidential and proprietary financial information" to "formulate a damages analysis and respond to Plaintiff's settlement demand." (The quotes are from Brookshire's Motion to Disqualify.)

13. Further addressing claims in Brookshire's Motion: Fish did not request or receive from Brookshire any documents or information concerning any of the following:

- Brookshire's sales, expenses, profits, store profitability, product line profitability, projections, or any other business information, financial or operational;

- Brookshire's accounting systems, methods for classifying products, calculating prices and deductions, or estimating figures where data is not available; or

- Brookshire's document retention policies.

14. Given my role in representing Brookshire in the GeoTag case, I would have known about it if Fish had requested or Brookshire had provided any such information.

Brookshire has not rebutted those assertions. Indeed, in its reply, Brookshire states that it "has readily acknowledged . . . that it does not appear that Brookshire gave Fish any confidential documents." Reply at 2. Having reviewed the record, the Court finds no evidence that Brookshire disclosed any documents containing financial information, confidential or otherwise, to Fish.

This leaves the allegation that Brookshire orally disclosed confidential financial information to Fish. The Court's difficulty with this allegation is that Ms. Fenley does not

provide any specifics, such as what confidential information was disclosed and in what form; her declaration contains only a general allegation that confidential information was disclosed.  The only evidence Brookshire provides in support of the theory that revenue information was disclosed is the settlement-related email that Mr. Healey drafted for Ms. Fenley, which states that the settlement demand by the plaintiff was unreasonable because it was "approximately 25% of [Brookshire's] revenue."   In his declaration, Mr. Healey states that his "recollection is that Brookshire made this assertion in a general way, without any, 'back up'" and that it was "entirely arbitrary."  Healey Decl. at ¶¶ 13, 15.  He further states that if he was ever told of "Brookshire's 'size' or 2011 revenue" he no longer recalls it.  Id.  The Court notes that even Brookshire does not provide a definitive statement that revenue information was ever disclosed.  Having reviewed the record, the Court is not persuaded that disqualifying confidential financial information was disclosed.

Even assuming that Brookshire's revenue information was disclosed to Fish in the GeoTag case, the Court does not find that such a disclosure would warrant disqualification.  The record reflects that estimates of Brookshire's revenue are publicly available, and the Court is aware that profitability estimates for various industries, including the retail grocery industry, are well known.  Brookshire does not argue that the differences between those estimates and its actual revenues would play a meaningful role in this case or that they played a part in the bringing of this suit.  Furthermore, to the extent that Fish was aware of Brookshire's revenue information in early 2012, that information would necessarily relate to 2011 or earlier, and not necessarily reflect Brookshire's current revenues.  As the comments on the Model Rules note, "[i]nformation acquired in a prior representation may have been rendered obsolete by the passage of time."  Therefore, even if the Court were persuaded that confidential financial

information was disclosed, it is not persuaded that the disclosure of outdated revenue information would be sufficient to require disqualification in this case.

Brookshire's motion asserts that "Fish also analyzed in detail Brookshire's document retention and litigation hold practices." Motion at 22. Again, that allegation is general in nature and is controverted by Ms. Harris, who states that "Fish did not request or receive from Brookshire any documents or information concerning . . . Brookshire's document retention policies." Brookshire offers nothing to rebut that assertion. In any event, it is unclear how information about Brookshire's document retention and litigation hold policies could be used to advantage against Brookshire in litigation, as that kind of information would be readily discoverable.

Finally, Brookshire contends that it revealed confidential legal strategies to Fish in the course of Fish's representation in the GeoTag case. Ms. Fenley states that "Brookshire developed its 'playbook' with the help of Fish attorneys over the two years that Brookshire was involved in the GeoTag action." Fenley Decl. at ¶ 8. Again, Brookshire provides no specifics as to the nature of those strategies or "playbook," or how such information might be used against Brookshire. In addition to the absence of any concrete allegation, the record provides repeated indications that common substantive elements of a patent case (e.g., discovery, damages, validity, and infringement) were either wholly absent or only minimally present in the GeoTag case. Fish argues that the only strategy employed by Brookshire in the GeoTag matter was the strategy commonly employed by peripheral defendants in a multi-defendant patent case: "lie low, spend little, and get out—hopefully for less than the cost of defense." Healey Decl. ¶ 7. In light of that strategy, it is difficult to credit Brookshire's assertion that a "playbook" of any substance or complexity was developed.

### 3. Was Fish's failure to inform Brookshire of the reason behind the termination of its attorney client relationship a violation of the Texas Disciplinary Rules?

Brookshire asserts that the notice of termination of the attorney-client relationship provided by Fish in May 2015 was improper. Brookshire's theory on this point is that it was a concurrent client along with Uropep; that Fish failed to inform Brookshire that Fish would be representing Uropep against Brookshire in a patent matter; and that Brookshire therefore did not give (and could not give) "informed consent" to the adverse representation. See, e.g., Model Rule 1.7; TDRPC § 1.6. Brookshire's theory depends on there having been a concurrent attorney-client relationship between Fish and both Uropep and Brookshire. As the Court has already found, however, there was no such concurrent representation in this matter.

Brookshire relies on the fact that Fish sent Brookshire a letter (recited in full above) formalizing the termination of the attorney-client relationship in May 2015. Although the letter states that Fish and Brookshire have "not had an attorney client relationship . . . in over a year," it also states that the letter was "formaliz[ing] the end of our attorney/client relationship." Brookshire interprets that language as indicating that there was an attorney-client relationship until that time. To be sure, the wording and timing of Fish's letter could well have given rise to confusion. However, the letter is best read as simply memorializing the end of an attorney-client relationship that had terminated some time earlier. By its terms, the termination letter requested acknowledgement that the attorney-client relationship had already terminated at some unstated time in the past, and the Court interprets the letter in that fashion.

### 4. Was the blanket advance conflict waiver in Fish's retention letter invalid?

Brookshire also challenges the validity of the prospective conflict waiver that it signed in Fish's retention letter. The waiver provision in the retention letter is extremely broad, covering any potential conflict other than Fish's representation of the opposing party in the same matter

for which it had been retained. Such sweeping advance conflict waivers are of dubious validity, at least where the precise nature of the prospective conflict is not spelled out with scrupulous care. See Galderma Labs., L.P. v. Actavis Mid Atlantic LLC, 927 F. Supp. 2d 390, 396-97 (N.D. Tex. 2013) ("A general and open-ended waiver will ordinarily be ineffective, because the client will likely not have understood the material risks involved."). Because the validity of the advance waiver clause in Fish's retention letter is subject to doubt, the Court does not rely on that waiver provision in holding that Fish is not required to be disqualified. However, because the Court does not find that Fish has engaged in conduct that would make reliance on the waiver clause necessary, the Court finds that disqualification is not required, without regard to whether there was a valid advance waiver of the conflict by Brookshire.

## CONCLUSION

For the reasons set forth above and at the Court's hearing on this motion, the Court finds that Defendant Brookshire Brothers, Inc.'s Motion to Disqualify Fish & Richardson, P.C. should be DENIED.

IT IS SO ORDERED.

SIGNED this 26th day of February, 2016.


WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE