1386

1        UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF TEXAS
2            MARSHALL DIVISION

3   ERFINDERGEMEINSCHAFT    | DOCKET 2:15CV1202
    UROPEP GBR              |
4                           |
                            |
                            | APRIL 21, 2017
5   VS.                     |
                            | 8:02 A.M.
6   ELI LILLY AND COMPANY   |
    AND BROOKSHIRE BROTHERS, |
7   INC.                    | MARSHALL, TEXAS

8   ------------------------------------------------------------

9        VOLUME 5 OF 5, PAGES 1386 THROUGH 1514

10       REPORTER'S TRANSCRIPT OF JURY TRIAL

11      BEFORE THE HONORABLE WILLIAM C. BRYSON
              UNITED STATES CIRCUIT JUDGE
12
    ------------------------------------------------------------
13

14  APPEARANCES:

15  FOR THE PLAINTIFF:    ADAM K. MORTARA
                          J. SCOTT MCBRIDE
16                        BENJAMIN J. WHITING
                          ALEX L. GRODEN
17                        BARTLIT, BECK, HERMAN,
                          PALENCHAR & SCOTT
18                        54 WEST HUBBARD STREET, SUITE 300
                          CHICAGO, ILLINOIS  60654
19
                          JOHN M. HUGHES
20                        NOSSON D. KNOBLOCH
                          BARTLIT, BECK, HERMAN,
21                        PALENCHAR & SCOTT
                          1899 WYNKOOP STREET, SUITE 800
22                        DENVER, COLORADO  80202

23                        MELISSA R. SMITH
                          GILLAM & SMITH
24                        303 SOUTH WASHINGTON AVENUE
                          MARSHALL, TEXAS  75670

25



1387

1  COUNSEL FOR DEFENDANT ELI LILLY AND COMPANY:

2                     TODD G. VARE
                      JEFF M. BARRON
3                     BARNES & THORNBURG
                      11 SOUTH MERIDIAN STREET
4                     INDIANAPOLIS, INDIANA  46204

5                     VICTOR D. VITAL
                      JON B. HYLAND
6                     BARNES & THORNBURG
                      2100 MCKINNEY AVENUE, SUITE 1250
7                     DALLAS, TEXAS  75201

8                     FELICIA J. BOYD
                      ANTHONY SON
9                     BARNES & THORNBURG
                      225 SOUTH SIXTH STREET, SUITE 2800
10                    MINNEAPOLIS, MINNESOTA  55402

11

12
   COURT REPORTER:      CHRISTINA L. BICKHAM, CRR, RMR
13                      FEDERAL OFFICIAL REPORTER
                        300 WILLOW, SUITE 221
14                      BEAUMONT, TEXAS  77701

15

16
      PROCEEDINGS RECORDED USING COMPUTERIZED STENOTYPE;
17    TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

18

19

20

21

22

23

24

25

1388

1                <u>INDEX</u>

|  |  | PAGE |
|---|---|---|
| 4 | OBJECTIONS TO THE COURT'S CHARGE | 1398 |
| 5 | CLOSING ARGUMENT BY MR. HUGHES | 1434 |
| 6 | CLOSING ARGUMENT BY MR. VITAL | 1456 |
| 7 | REBUTTAL ARGUMENT BY MR. HUGHES | 1483 |
| 8 | COURT'S INSTRUCTIONS ON DELIBERATING | 1495 |
| 9 | JURY NOTE NO. 1 | 1502 |
| 10 | JURY NOTE NO. 2 | 1502 |
| 11 | JURY NOTE NO. 3 | 1508 |
| 12 | VERDICT | 1511 |
| 13 | COURT REPORTER'S CERTIFICATION | 1514 |

 1                    (Open court, all parties present, jury not

 2     present.)

 3                    THE COURT:  All right.  The first order of

 4     business is to see if folks want to renew their Rule 50

 5     motions.  Do you have something before that?

 6                    MR. MORTARA:  We just found a typo in the jury

 7     instructions, but it can wait for the jury instructions

 8     section.

 9                    THE COURT:  This is the set of jury

10     instructions that you have now or --

11                    MR. MORTARA:  It was from the one yesterday.

12     There is a missing "not" in the written description

13     instruction.

14                    THE COURT:  Oh, dear.  Where is it?

15                    MR. MORTARA:  Well, it was on page 16 at the

16     end of "written description."

17                    THE COURT:  Page 16 -- okay.  The pages have

18     changed somewhat and --

19                    MR. MORTARA:  It is right before "enablement";

20     so if you find "enablement," it is the paragraph that

21     precedes the beginning of "enablement."

22                    THE COURT:  "To summarize"?

23                    MR. MORTARA:  Yes.  In the second sentence, at

24     least in our version, it says, "If you find Lilly has met

25     its burden, then you must find that the claim is not

1    invalid" instead of "has not met this burden."

2              MS. BOYD:  Or the other "not."

3              THE COURT:  Yeah.  Either of the "nots" could

4    go, but one of them has to go -- one has -- certainly

5    either one has to go or one has to be added.

6              MR. MORTARA:  Yeah.  The previous sentence

7    is --

8              THE COURT:  If you find it has met the burden,

9    then you must find that it is -- "has not met its

10   burden."  Yeah, right.  Has "not" met its burden.

11             MR. MORTARA:  Sorry about that, your Honor.

12   We just saw it.

13             THE COURT:  Well, I didn't see it at all; so,

14   you're ahead of me.

15             MR. MORTARA:  And to answer your first

16   question, we would renew our motions that we made at the

17   close of --

18             THE COURT:  Right.  Okay.

19             MR. MORTARA:  -- defendant's case.  We don't

20   need to go through them, do we?

21             THE COURT:  No.  I think I have them all.

22             And you would renew yours as well, Mr. Barron.

23             MR. BARRON:  Yes.  Eli Lilly renews its as

24   well.

25             THE COURT:  All right.  Now, I am going to

1391

1    deny all of them except for the Rule 50 on willfulness,

2    which I am going to grant; so, willfulness is out of the

3    case.

4                MR. BARRON:  Thank you, your Honor.

5                THE COURT:  And there will be no instruction

6    on willfulness.

7                Now, let me go through --

8                MR. BARRON:  We have some additional Rule 50

9    motions to present, your Honor, prior to the charge.

10               THE COURT:  That you didn't raise before?

11               MR. VARE:  These would be after the close of

12   our invalidity case.

13               THE COURT:  I thought you had raised --

14               MR. BARRON:  We did, your Honor, but before

15   the close of --

16               THE COURT:  Well, okay.  Why don't you give

17   them to me anyway.  I'll hear them.

18               MR. VARE:  Your Honor, it is really just --

19   these would be Rule 50 motions directed to our invalidity

20   defenses.

21               THE COURT:  All right.

22               MR. VARE:  Whether or not you want to hear

23   those now or whether or not they would be raised --

24               THE COURT:  Let's hear them now, but I -- give

25   them to me in bite-size form.

1    MR. VARE:  Sure.

2    THE COURT:  I'm familiar with the issues.

3    MR. VARE:  Right.  The Rule 50 motion on

4  anticipation is that the evidence shows that the Cheung

5  reference is a printed publication available to persons,

6  you know, having an interest in the subject matter --

7    THE COURT:  Right.

8    MR. VARE:  -- and that it discloses all of the

9  elements of the claim.

10    THE COURT:  Okay.

11    MR. VARE:  The Rule 50 motion would be also on

12  written description, that the evidence meets the clear

13  and convincing evidentiary standard to show that the

14  inventors did not possess the full scope of the claim.

15    Third, the enablement issue, that the evidence

16  in the record proves by clear and convincing evidentiary

17  standard that the claims are not enabled to their full

18  scope.

19    And then -- oh.  And then, fourth, that the

20  evidence in the record proves by clear and convincing

21  evidentiary standard that the claims are obvious in view

22  of the evidence.

23    THE COURT:  All right.  Those will each be

24  denied.

25    MR. VARE:  Thank you, your Honor.

1    THE COURT:  Now, probably what makes the most

2  sense is for me to see if I can intercept Ms. Greenwald

3  and get her to make these changes because what I want to

4  do is distribute to you the revised instructions and --

5  here she is now.

6    Under the universal principle that nothing is

7  ever finished, we have actually found another typo which

8  we need to fix because it is of some significance.  It's

9  one of those that is easy to overlook, obviously, because

10  we've done it several times.

11    This is page -- let me go off the record a

12  minute.

13    (Off the record, 8:07 a.m. to 8:08 a.m.)

14    THE COURT:  All right.  What I'm going to do

15  is I have -- in light of the objections and discussion

16  yesterday and the briefs -- and thank you for the briefs.

17  They were quite helpful.  I have made several of the

18  proposed changes.  I've made some changes that -- and I

19  have decided not to make changes in other ways.  Let me

20  summarize the changes that I have made and not made on

21  the points of disagreement.

22    And maybe what makes sense is if you can just

23  give counsel at this point copies of the charge --

24    LAW CLERK:  Sure.

25    THE COURT:   -- with the understanding that the

1394

1  typo will be corrected in the copies that we'll give to

2  you and the final copies, obviously, that go to the jury.

3  But I will let you know what the changes are, and I will

4  give you an opportunity to renew your objections.

5           Now, let me understand that all of the

6  objections you made yesterday preserve objections fully

7  as far as I'm concerned.  So, you don't have to -- I

8  would recommend that you renew your objections just for

9  the record, but you are not at risk of waiving anything

10 as far as I'm concerned because you have put on the

11 record your objections and those stand.

12          So, let me go through the materials.  The

13 first point is on the whole question of BPH and enlarged

14 prostate.  On page 6 we have added a sentence -- let's

15 see.  I'll get the page.  This is to the definition of

16 "treatment of benign prostatic hyperplasia," and here is

17 how that paragraph will now read.

18          "The term 'treatment of benign prostatic

19 hyperplasia' means the treatment of a medical condition

20 known as benign prostatic hyperplasia (BPH) or the

21 symptoms of BPH."

22          And there is a new sentence.  "BPH is a

23 condition in which an enlarged prostate results in lower

24 urinary tract symptoms."

25          All right?

1      The next one, page 10.  There were objections

2  to the anticipation language.  We are going to stay with

3  the language that was in the prior version.

4      Page 15, we are going to retain the references

5  to "the full scope of the invention" in the written

6  description section.

7      Page 16, we're going to make a modification in

8  the language of the written description discussion as

9  follows, if I can find the spot.  Yes.  The sentence that

10  starts -- the second sentence on that page that starts

11  "It is not necessary."

12      "It is not necessary to describe every

13  compound used in the claimed method by name or structure

14  in order to satisfy the written description requirement

15  as applied to a group of compounds as long as the patent

16  includes a sufficient number of representative compounds

17  or a common structural feature such that a person of

18  ordinary skill in the art would understand from reading

19  the patent" -- and your copy may have the word "in" after

20  the word "reading," but that will be -- we caught that

21  and that has been eliminated -- "that the inventor

22  invented the full scope of the claimed method."

23      Okay.  The next one is on page 16, four lines

24  from the bottom, the words "full scope of" have been

25  added to that claim.

1        All right.  Additional points, just things
2   that we are not putting in.  The argument that the
3   written description requires the description of both
4   prophylaxis and treatment is not going to be given.
5   There was no focus in this case on prophylaxis.  The
6   focus was exclusively on treatment.
7            So, as far as I can see, the burden being what
8   it is, the idea that there is written description failure
9   with respect to prophylaxis not presented by the case.
10  And in any event, "prophylaxis" defined in a way that is
11  encompassed within the broader notion of "treatment"; so,
12  I think there is -- no separate written description is
13  required.
14           On negative claim limitations, I have
15  carefully considered your briefs and the cases that we
16  discussed yesterday; and I am persuaded particularly by
17  language in *Inphi* and *Johnson* that this is a case in
18  which it is not necessary to have an elaborate written
19  description for the excluded compounds -- and I would
20  call your attention particularly to page 1356 of *Inphi*
21  which cites Johnson and -- for the proposition that --
22  and I quote -- "the applicant narrowed the claims to
23  exclude content of, in that case, a lost interference
24  count and the court observed that it is for the inventor
25  to decide what bounds of protection he will seek."

 1              So, that will be denied.

 2              I am not going to give the natural phenomenon

 3  argument instruction.  We've called it by shorthand the

 4  101 instruction, but it is not, I understand, a 101

 5  instruction.  Nonetheless, that will not be given.

 6              Yes.  And I'm not going to give the one or

 7  more species because, in my view, that suggests to the

 8  jury that one would always be necessarily sufficient,

 9  which is not the law.

10              All right.  Those are my rulings.  Now, if you

11  like, because you haven't had very much time to look at

12  the full instructions, I will give you time to consider

13  them.  I am required to get your objections on the record

14  before the jury retires; so, if you would like, we can

15  take a few minutes to give you an opportunity to look at

16  the full text of the instructions and see if there is

17  anything further, or if -- I've tried not to slip

18  anything in on you, but -- I've tried to describe

19  everything that I have changed or not changed, but you

20  may want to confirm that for yourselves.

21              So, I will allow you to take a look at the

22  materials; and when you are ready, you can make your

23  objections.

24              And, again, if all you need to do or want to

25  do is to renew your objections from yesterday, that is

1398

 1   fully sufficient.

 2            All right.

 3            MR. BARRON:  Excuse me, your Honor.  I'm going

 4   to step out of the room to consult with our client.

 5            THE COURT:  That's fine.

 6            MR. BARRON:  Thank you.

 7            (Recess, 8:16 a.m. to 8:24 a.m.)

 8            THE COURT:  All right.  Plaintiff objections?

 9            MR. MORTARA:  Your Honor, we would just prefer

10   "one or more representative compounds"; so, we object to

11   "sufficient number."

12            Thank you.

13            THE COURT:  Okay.  Defendant?

14            MR. BARRON:  Your Honor, we renew our prior

15   objections.

16            THE COURT:  All right.

17            MR. BARRON:  In addition, we point out that

18   the anticipation instruction has some language regarding

19   infringing with regard to what it means for a prior

20   compound or prior use or prior publication to anticipate.

21   We would object to that.

22            THE COURT:  All right.

23            MR. BARRON:  We maintain our objections to the

24   written description including the use of the example.

25   And, again, we just feel like it should be emphasized

1   representative of the species.  We appreciate that

2   your Honor has made some changes that we suggested, but I

3   just need to maintain that objection.

4           THE COURT:  All right.

5           MR. BARRON:  We object based on all of the

6   grounds that were raised in the briefing last night,

7   including the negative claim limitation --

8           THE COURT:  We understand each other, but I

9   think for the benefit of Ms. Bickham, you have to slow

10  down a little.

11          MR. BARRON:  I will speak more slowly.  My

12  apologies.

13          In addition, we renew all of our prior claim

14  construction positions and summary judgment positions,

15  but the reason why I happen to mention that at this point

16  is that we did have an alternative claim construction on

17  prophylaxis; and, so, that would play into our

18  objection --

19          THE COURT:  Okay.

20          MR. BARRON:  -- to that.

21          In addition, there was some evidence from

22  Dr. Roehrborn in the record that demonstrated, we thought

23  quite clearly, that that claim limitation was neither

24  described or enabled.  And, so -- the prophylaxis

25  limitation.  So, there would be an additional basis.

1            And I can go through what was filed last

2    night, but if your Honor is satisfied that those

3    objections have been preserved --

4            THE COURT:  I am.

5            MR. BARRON:  Okay.  Give me one moment to

6    consult.

7            THE COURT:  All right.

8            MR. BARRON:  My apologies, your Honor.  I

9    just -- just to be clear on the record, I think I

10   understood you that the matters raised last night are all

11   subject -- and those objections -- are all subject to

12   objection, and those objections have been maintained.

13           THE COURT:  Yes.

14           MR. BARRON:  Thank you.

15           THE COURT:  Yes.  Everything that has been

16   raised since the formal charge conference, including the

17   briefing and including this morning, is preserved as

18   objections to the court's charge, as far as I'm

19   concerned; and I think -- well, I can't speak for the

20   Court of Appeals, at least right now, but I think that

21   should -- you should feel comfortable with my

22   acknowledgment.

23           MR. BARRON:  Thank you, your Honor.  I

24   appreciate you can't speak today for the Court of

25   Appeals.

1401

1          THE COURT:  Right.  My acknowledgment is that

2    I fully understand your objections, and you've preserved

3    them.

4          MR. BARRON:  Thank you, your Honor.

5          THE COURT:  All right.  So, we'll bring the

6    jury in in five minutes, and then I will give the charge,

7    and then we'll go directly into the closing argument.

8          Let me see.  My charge will probably take 30

9    to 40 minutes.  I'm just wondering if -- let's see.  So,

10   we'll have an hour and a half -- I'm kind of reluctant to

11   chop up the sequence of arguments with a break.  But if

12   we go without a break, that's a long time.

13         Yes, Mr. Hughes?  What are you suggesting.

14         MR. HUGHES:  Maybe we could have a brief break

15   after the charge and let us get set up.

16         THE COURT:  Why don't we do that.  That's

17   probably the most sensible place to break.  Then we don't

18   have the jury having heard somebody and they have ten

19   minutes to digest it.  And; so, we will break after the

20   court's charge.  It'll be a pretty quick break.

21         Yes, Mr. Vital.

22         MR. VITAL:  Thank you very kindly, your Honor.

23   I would also ask for just five minutes after the opening

24   argument of counsel so I can set up a flip chart.

25         THE COURT:  Well, we'll probably take ten.

1402

1      MR. VITAL:  Yes, sir.

2      THE COURT:  All right.  Good.

3      MR. VITAL:  Thank you, your Honor.

4      THE COURT:  Okay.  That sounds like a good

5  idea.

6      MR. BARRON:  Your Honor, since we have a brief

7  three minutes --

8      THE COURT:  Well, we've got about one,

9  actually.

10      MS. BOYD:  I think it may only take one.

11      There are two exhibits that are being lodged

12  that contain the kind of sensitive highly confidential

13  Lilly information that was not fully discussed at trial.

14  I believe both parties agree they should be maintained

15  under seal.

16      THE COURT:  Yes.

17      MR. BARRON:  And they are exhibits, for the

18  record, Plaintiff's Exhibit 81 and Plaintiff's

19  Exhibit 319.

20      THE COURT:  They will remain under seal.  I

21  assume we are not going to actually discuss the numbers

22  in the course of --

23      MR. BARRON:  I believe no further than they

24  have already been discussed.

25      THE COURT:  Right.  Well, actually, but when

1403

 1  they were discussed, they were discussed in sections of

 2  the transcript that were then sealed so -- we did seal

 3  some of the transcript, you will recall, when the

 4  financial information was put on and Mr. Hughes discussed

 5  that information.

 6          So, are we going to have a discussion of the

 7  particular numbers.

 8          MR. BARRON:  Certainly not from Lilly.

 9          THE COURT:  Well --

10          MR. BARRON:  I don't believe so.

11          MR. HUGHES:  No, your Honor.

12          THE COURT:  Okay.  Fine.  We won't seal the

13  transcript, then, unless something arises.

14          I think we are ready for the jury,

15  Mr. Johnson.

16          (The jury enters the courtroom, 8:33 a.m.)

17          (Open court, all parties present, jury

18  present.)

19          THE COURT:  Ladies and gentlemen of the jury,

20  you have now heard all of the evidence in this case.  The

21  time has come for me to instruct you on the law that you

22  are to apply.

23          The legal term for what I am going to give you

24  is the "jury charge," or the "court's instructions."

25  These instructions will be a little bit lengthy, and they

1 may be a little difficult to follow at times.  That's

2 because the law in this case is fairly complex.

3          To help you, I have made copies of the

4 instructions that will be available for you to use in the

5 jury room.  I mention this so you won't feel that you

6 have to take notes right now or try to memorize what I'm

7 saying.  In fact, I would suggest that you just listen to

8 the instructions without trying to write anything down.

9 You will have copies in the jury room of exactly what I'm

10 now saying.

11          Now, after I instruct you on the law, the

12 attorneys will have an opportunity to make their closing

13 arguments to you.  When they do, you should keep in mind

14 that statements and arguments of the attorneys are not

15 evidence and are not instructions on the law.  They are

16 intended only to assist you in understanding the evidence

17 and the parties' contentions.

18          When you return to the jury room, your job

19 will be to consider the evidence you have heard and to

20 decide what the facts are.  As jurors, you are what we

21 call the "finders of the facts."  My job as the judge --

22 or as we sometimes refer to the judge as "the court" --

23 you will hear that term used from time to time; it's just

24 me -- is to explain to you the law that you will apply to

25 the facts.

1      You should not be concerned with the wisdom of

2  any aspect of the applicable law that I state to you.

3  Also, please remember that nothing I may have said or

4  done during the course of the trial and nothing I say now

5  is intended to suggest, or should be taken by you as

6  suggesting, what I think your verdict should be.

7      As I go through these instructions, if anyone

8  has a hard time hearing me or if I start to go too fast,

9  just raise your hand; and I will slow down or I'll speak

10  more loudly.  Sometimes I have a tendency to speak too

11  softly.  And if I do, please just so indicate.  Index.

12      Now, first with respect to the burden of

13  proof, evidence, and the credibility of witnesses.  I'm

14  going to start by returning to the subject of the burden

15  of proof that we briefly discussed at the beginning of

16  the case.

17      For some of the issues in this case, such as

18  whether Lilly infringes the '124 patent, the burden of

19  proof is the preponderance of the evidence.

20      The "preponderance of the evidence" means that

21  a party who is asserting a particular claim, such as

22  UroPep saying that Lilly infringes its patent, has the

23  burden of persuading you that the evidence supporting

24  that claim is more likely to be true than untrue.

25      If the evidence does not persuade you that a

1  party's claim is more likely to be true than untrue, that

2  means the party with the burden of proof has failed to

3  satisfy that burden.  If that happens, you should find in

4  favor of the other party on that particular claim.

5           As I said before trial, some issues, such as

6  whether UroPep's patent is invalid, have a different

7  burden of proof.  For these issues, the burden of proof

8  is clear and convincing evidence.

9           Now, "clear and convincing evidence" means

10 that a party who is asserting a particular claim, such as

11 Lilly saying that UroPep's patent is invalid, has the

12 burden of leaving you with a clear conviction or belief

13 that the evidence supports that party's claim or defense.

14 That is a higher standard of proof than the preponderance

15 of the evidence, which means it is harder to prove

16 something by clear and convincing evidence than by a

17 preponderance of the evidence.

18           As the finders of the facts, you are

19 responsible for weighing the evidence in this case,

20 including the testimony of the witnesses you have heard,

21 the exhibits that have been introduced as evidence, and

22 any facts that the parties have agreed are true, such as

23 by stipulation.

24           As a reminder, the lawyers' statements and

25 characterizations of the evidence are not evidence.

1  While the opening and closing arguments may be helpful to

2  you, your decision should ultimately depend on your

3  evaluation of the evidence.

4       Now, as part of your job as jurors, you are

5  entitled to weigh the testimony of the witnesses.  This

6  is a job that is well suited for jurors like yourselves

7  who have heard and seen the witnesses.

8       For example, if two witnesses offer testimony

9  that is in conflict, you should use your common sense in

10 deciding which witness you think is more believable.  You

11 can consider, for example, each witness' motive, state of

12 mind, knowledge, and manner while on the jury stand --

13 witness stand.

14      If there is a question as to the relative

15 expertise of two witnesses, again, you should use your

16 common sense to decide which witness you find more

17 knowledgeable and more believable.  You are entitled to

18 give the testimony of each witness whatever weight you

19 feel is appropriate.  You may choose to believe or

20 disbelieve any witness' testimony, either entirely or in

21 part.

22      Now, you've heard some testimony about

23 payments to witnesses.  Parties in a lawsuit are allowed

24 to provide reasonable payment to witnesses for travel

25 expenses and the witness' loss of time.

1        Also, expert witnesses are typically

2   compensated for their work by the party that hired them.

3   Compensating such witnesses is permissible and is

4   commonly done.  The fact that a witness is paid does not

5   mean that his testimony should not be believed.

6        On the other hand, the fact that a witness has

7   testified as an expert does not mean that you must accept

8   that witness' opinions as true.  And in the case of any

9   witness who is compensated in connection with this case,

10  you may consider that fact to the extent that you

11  conclude that it bears on possible bias on the part of

12  the witness.  In the end, as with all other witnesses, it

13  is up to you to decide whether you find the witness'

14  testimony to be convincing.

15       Now, during the trial, some of the testimony

16  was presented not through a live witness but through a

17  deposition.  As you saw, a deposition is a recording of

18  the witness' sworn answers to questions that were asked

19  by the lawyers before the trial.

20       The deposition testimony that you heard at

21  trial is entitled to the same consideration as any other

22  evidence in the case, and you should judge its

23  credibility and weight the same as if the witness had

24  been present and testified from the witness stand.

25       Let me turn to the legal principles that apply

1  to this case.  I'm going to start with UroPep's claim

2  that Lilly has infringed its patent, which we have been

3  referring to as the "'124 patent."

4           What is patent infringement?  A patent, as

5  you've heard since the original video that you saw, is

6  issued by the U.S. Patent and Trademark Office.  If the

7  patent is valid, the owner of a patent has the right to

8  stop others throughout the United States from using the

9  invention that is claimed in the patent.

10          The right to exclude others lasts for 20 years

11  from the date that the application for the patent was

12  first filed.  Here, the application for the '124 patent

13  was first filed on July 9th, 1997; so, the patent will

14  expire in a couple of months, on July 9th, 2017.

15          Patent infringement occurs when a person uses

16  a product or method that is covered by the patent and

17  does so without the patent owner's permission.

18          How do we decide what is covered by a patent?

19  For that, we look at the patent's claims.  The claims, as

20  you know by now, are the numbered paragraphs at the end

21  of the patent.  These claims are important because it is

22  the words of the claims that define what a patent covers.

23          As you've heard, UroPep asserts that Lilly has

24  violated UroPep's rights in the '124 patent by inducing

25  others to infringe claim 1 of the '124 patent.  I will

1 say more a little later about the requirements for

2 inducement of infringement, but first I'll give you a

3 brief overview of the '124 patent.

4           The '124 patent, like any other patent,

5 includes these numbered claims at the end of the patent.

6 A patent claim can describe a product, such as a machine;

7 or it can describe a method for doing something.

8           The claim at issue here, claim 1 of the '124

9 patent -- that's the only claim that's at issue -- is

10 referred to as a "method claim" because it describes a

11 method for treating BPH.  Because only the claims of a

12 patent can be infringed, you must understand the meaning

13 of the claim before you do any infringement analysis.

14           There are several terms in the claim that I

15 will define for you.  I will give you my definitions of

16 those terms after I read the claim to you.  You are

17 required to accept my definition of those words in the

18 claim as correct.

19           You have a copy of claim 1 of the '124 patent

20 in your notebooks.  The claim is at the end of the

21 patent, along with two other numbered claims if you want

22 to follow along as I read it.  Claim 1 is the only claim

23 we are concerned with here.

24           So, claim 1 reads as follows:  "A method for

25 prophylaxis or treatment of benign prostatic hyperplasia

1  comprising administering to a person in need thereof an

2  effective amount of an inhibitor of phosphodiesterase

3  (PDE) V excluding a compound selected from the group

4  consisting of" and then the claim lists eight chemical

5  compounds by their chemical names that are specifically

6  excluded from the coverage the claim, along with certain

7  related compounds referred to as "pharmacologically

8  compatible salts thereof."

9          Now, you will notice that claim 1 uses the

10  word "comprising," which is a word that is used

11  frequently in patent law but not very often in ordinary

12  conversation.  What it means is "including" or

13  "containing."

14          So, a claim that uses the word "comprising" is

15  not limited to methods or products having only the

16  elements that are contained in the claims.  It also

17  covers methods or products that include additional

18  elements.

19          For example, take a claim that covers a table.

20  If the claim refers to a table "comprising" a tabletop,

21  legs, and glue, the claim will cover any table that

22  contains those structures, even if the table also

23  contains other structures, such as a leaf or wheels on

24  the legs.

25          I will now give you my definitions of other

1 terms that are used in claim 1 of the '124 patent.

2        The term "prophylaxis" means "prevention of

3 the progression or development of the disease."

4        The term "treatment of benign prostatic

5 hyperplasia" means "the treatment of the medical

6 condition known as benign prostatic hyperplasia (BPH) or

7 the symptoms of BPH."  BPH is a condition in which an

8 enlarged prostate results in lower urinary tract

9 symptoms.

10        The term "administering" means "providing

11 treatment, such as by implementing a course of action to

12 address a health issue."  "Administering" treatment can

13 take the form of personally causing that course of action

14 to be carried out or directing or supervising the

15 treatment; that is, by issuing instructions to another

16 person to carry out the course of action to address the

17 health issue.

18        In the case of the administration of drugs,

19 "administration includes direction or control over the

20 use of the drug or the decision to use the drug."

21        The term "an effective amount" means "an

22 amount that is effective to treat or prevent BPH."

23        And finally the term "an inhibitor of

24 phosphodiesterase (PDE) V" means "a selective inhibitor

25 of PDE5, which is at least 20 times more effective in

 1  inhibiting PDE5 as compared to PDE1 through PDE4."

 2          Again, I want to emphasize that you should not

 3  take my definitions of the language of the claim as any

 4  indication that I have a view regarding how you should

 5  decide the case or any of the issues that you are being

 6  asked to address, such as infringement and invalidity.

 7  Those issues are for you and for you alone to determine.

 8          Now let me turn to induced infringement.

 9  UroPep alleges that Lilly indirectly infringes the '124

10  patent by inducing others to infringe.  Now, induced

11  infringement is a common form of patent infringement; but

12  it takes a little explaining to make clear what it

13  involves.

14          To prove induced infringement, UroPep has to

15  prove three things:  First, that someone carried out acts

16  that directly infringed claim 1 of the '124 patent;

17  second, that Lilly took actions that were intended to

18  cause those acts of direct infringement; and, third, that

19  Lilly was aware of the '124 patent and knew that those

20  acts, if carried out, would infringe the patent.

21          So, if a person is charged with induced

22  infringement of a patent, it is necessary to show that

23  someone else directly infringed the patent.  To determine

24  whether a person infringes a method claim, you need to

25  find that the person is using the method in a way that

1414

1  includes each of the claim's elements.

2         If a person uses the method that is covered by

3  a patent claim and if he does so without the patent

4  owner's permission, then that person is said to directly

5  infringe the patent.

6         Proving direct infringement does not require

7  proving that the direct infringer intended to infringe

8  the patent.  Someone can be directly infringing the

9  patent even if he does not know that the patent exists.

10        In addition, in order to prove induced

11 infringement, it is necessary to show that the inducer

12 intentionally encouraged, caused, or induced the direct

13 infringer to infringe the patent.  In order to find a

14 party guilty of induced infringement, you must find that

15 they were aware of the patent and knew that their acts

16 caused others to infringe the patent.

17        Here's how these general concepts apply to

18 this case:  UroPep says that doctors and patients who

19 prescribe or take Cialis directly infringe claim 1 of the

20 '124 patent if they administer Cialis in an amount

21 effective to treat BPH.

22        UroPep then charges Lilly with induced

23 infringement by saying that Lilly actively induces those

24 doctors and patients to prescribe or use Cialis in an

25 amount effective to treat BPH.

1        In order to prove its case of induced

2   infringement by Lilly, UroPep must prove several things

3   by a preponderance of the evidence.

4        First, UroPep must prove direct infringement

5   by doctors and patients.  To do that, UroPep will have to

6   prove that it is more likely than not that Cialis was

7   being taken to treat the symptoms of BPH and that it is

8   more likely than not that those symptoms were caused by

9   BPH in those patients who were taking Cialis.

10       Second, UroPep must prove that it is more

11  likely than not that Lilly took action intending to cause

12  those infringing acts by doctors and patients.

13       And, third, UroPep must prove that it is more

14  likely than not that Lilly was aware of the '124 patent

15  and knew that the acts by the doctors and patients would

16  infringe the patent.

17       If you find that Lilly was aware of the patent

18  but believed that the acts it encouraged did not infringe

19  the patent, Lilly is not liable for induced infringement.

20       On the other hand, if Lilly intended to cause

21  direct infringement of the '124 patent and was aware of

22  the existence of the patent, it does not matter whether

23  Lilly may have believed that the '124 patent was invalid.

24       To summarize on infringement, if you find that

25  UroPep has proved, by a preponderance of the evidence,

1  that Lilly has induced infringement of claim 1 of the

2  '124 patent, you must find in favor of UroPep on the

3  issue of infringement.  If you do not so find, you must

4  decide in favor of Lilly on that issue.

5          I'll next turn to patent invalidity.  Even

6  after a patent issues, the patent can be found invalid if

7  a person challenging the patent can prove invalidity by

8  clear and convincing evidence.

9          Lilly contends that claim 1 of the '124 patent

10  is invalid and that Lilly is entitled to be found not

11  liable for that reason.  The claim terms are interpreted

12  in the same way for invalidity as for infringement.

13          In patent law what came before the invention

14  is often referred to as the "prior art."  You've heard

15  that term in the course of the trial.  Patent lawyers

16  often refer to each item of prior art as a "prior art

17  reference."

18          For example, you might say that the telephone

19  is prior art for the cell phone and that the cell phone

20  is prior art for the smartphone.  All that means is that

21  things referred to as "prior art" or "prior art

22  references" are those things that you are allowed to look

23  at to see if a particular invention really is new and not

24  obvious.

25          First, anticipation.  If an invention that is

1  set forth in a patent claim is not new because the same

2  invention was previously invented or described by someone

3  else, we say that it was "anticipated" by the prior art

4  and is not entitled to patent protection.

5       Lilly says that the '124 patent is anticipated

6  by prior art.  If you think Lilly has proved by clear and

7  convincing evidence that claim 1 of the '124 patent is

8  anticipated by the prior art, then that claim is invalid.

9       For the claim in this case to be invalid

10  because it is anticipated by the prior art, Lilly must

11  prove by clear and convincing evidence that all of the

12  elements of the claim were present in a single prior art

13  method or were described in a single previous printed

14  publication.

15       A claim is anticipated if the prior art

16  disclosed one or more compounds that was used in an

17  infringing manner.  To anticipate the invention, the

18  prior art does not have to use the same words as the

19  claim; but all of the elements of the claim must have

20  been disclosed, either by being expressly stated or being

21  implied in a way that a person familiar with the field of

22  technology of the invention, upon looking at that one

23  reference, could make and use the invention.

24       Now, in determining whether a single item of

25  prior art anticipates a claim, you should consider not

1 only what is expressly disclosed in the particular prior

2 art reference but also what is inherently present in that

3 prior art or inherently results from its practice.

4        Prior art inherently anticipates a patent

5 claim if the missing element or feature would necessarily

6 result from what the single item of prior art teaches to

7 persons of ordinary skill in the art.

8        A person claiming inherent anticipation must

9 prove by clear and convincing evidence that the allegedly

10 inherent element is necessarily present.  Evidence

11 outside of the prior art reference itself may not be used

12 to show that the elements that are not expressly

13 disclosed in the reference are inherent in it.

14        In order to be inherent, the feature that is

15 alleged to have been inherent must necessarily have

16 existed in the prior art reference.  The fact that it was

17 likely to be present is not sufficient.  It is not

18 required, however, that persons of ordinary skill in the

19 art actually recognize or appreciate the inherent

20 disclosure at the time the prior art was first known or

21 used.

22        So, the prior art -- excuse me -- the prior

23 use of the patented invention that was unrecognized and

24 unappreciated can still result in an invalidating

25 anticipation, provided the alleged inherent feature was

1419

1  necessarily present in the reference.

2           As I noted, a printed publication can qualify

3  as an anticipating prior art reference.  In order to

4  qualify as a printed publication for purposes of

5  anticipation, a publication must have been maintained in

6  some tangible form -- in this case prior to July 9th,

7  1996, which is one year before the application date of

8  the patent -- somewhere in the world and it must have

9  been reasonably accessible to that portion of the public

10 that is interested in the subject matter of the '124

11 patent.

12          In other words, it is not enough that someone

13 just wrote down his idea and never disseminated it or

14 submitted it for publication or had it cataloged in a

15 library.  On the other hand, it is not necessary that the

16 publication be widely known and available to every member

17 of the public.

18          For these purposes, publications include not

19 only books, periodicals, and newspapers but also

20 publications that are not as widely available to the

21 public, such as journal articles or scholarly papers that

22 are normally distributed or available only to those

23 working in the field of the invention.

24          However, a printed publication needs to be,

25 for example, indexed or cataloged in a library or

1  otherwise made available so that a person interested in

2  the art and exercising reasonable diligence who is

3  searching for materials on the relevant topic would be

4  able to find it.  A printed publication is not prior art

5  unless it can be found by the portion of the public that

6  is most likely to use it.

7            To summarize on anticipation, if you find that

8  Lilly has proved by clear and convincing evidence that

9  claim 1 of the '124 patent was anticipated by some single

10 prior art reference, then you must find in favor of Lilly

11 on anticipation.  But if you do not so find, you must

12 decide in favor of UroPep on that issue.

13           Now we will move from anticipation to

14 obviousness.  Lilly contends that claim 1 of the '124

15 patent is invalid because the invention was obvious.  To

16 prove invalidity based on obviousness, Lilly has the

17 burden of proving by clear and convincing evidence that

18 claim 1 of the '124 patent would have been obvious to a

19 person of ordinary skill in the art at the time of the

20 invention.

21           Now, you've heard the term "person of ordinary

22 skill in the art."  It's a term, again, used frequently

23 in patent law; and it has an important role in deciding

24 whether an invention would have been obvious at the time

25 it was invented.  So, what does it mean.

1      A person of ordinary skill in the art is a

2 person of average education and training in a particular

3 field but who is aware of all the relevant prior art in

4 that field.  The level of ordinary skill in the art often

5 depends on the nature of the field of the invention.

6      So, for example, if the invention is a way to

7 generate additional energy in a nuclear power plant, the

8 level of ordinary skill is likely to be significantly

9 higher than if the invention is, let's say, a new way to

10 fold cardboard boxes to make them stronger.

11      In this case the parties have agreed that a

12 person of ordinary skill in the art, at the relevant

13 time, which is 1997 when the patent was first applied

14 for, would be a member of a drug development team with a

15 graduate or postgraduate degree in one of the following

16 fields:  Anatomy, pathophysiology, biochemistry,

17 medicinal chemistry, pharmaceutical sciences, or related

18 scientific disciplines of urology and urologic surgery.

19      The drug development team could include

20 analytical chemists, biochemists, clinicians, formulation

21 scientists, and other related drug development

22 scientists.

23      So, what does it mean to say that a patent

24 claim would have been obvious to a person of skill in the

25 art at the time of the invention?  Unlike anticipation,

1 obviousness may be proved by considering more than one

2 item of prior art and considering these multiple prior

3 art references in combination.

4        For this purpose, you may consider whether

5 there is anything that would have prompted a person of

6 ordinary skill in the art to combine the elements or

7 concepts in the prior art in the same way the invention

8 does.  But you also have to keep in mind that a patent

9 claim that consists of several elements is not rendered

10 obvious merely because each of the separate elements was

11 known in the prior art.

12        For example, you could say that a piano is

13 really just a combination of wood, ivory, metal and

14 wires.  But that does not mean that inventing the piano

15 would be obvious if you just started with a pile of wood,

16 some wire, some pieces of ivory, and a few chunks of

17 metal.

18        If the claimed invention combined elements

19 known in the prior art and the combination yielded

20 results that would have been predictable to a person of

21 ordinary skill in the art at the time of the invention,

22 or the evidence shows that there was another reason to

23 combine the elements in the prior art, that evidence

24 would make it more likely that the claim is obvious.

25        On the other hand, if the combination of known

1423

1  elements yielded unexpected or unpredictable results, or

2  if the prior art would have led one to avoid combining

3  the known elements, that evidence would make it more

4  likely that the claim on the combination of those

5  elements is not obvious.

6         In deciding obviousness, you must avoid using

7  hindsight; that is, you should not consider what is known

8  today or what was learned from the patent.  You should

9  not use the patent, in other words, as a roadmap for

10  selecting and combining items of prior art.  Instead, you

11  must put yourselves in the shoes of a person of ordinary

12  skill at the time the invention was made.

13         In determining whether claim 1 of the '124

14  patent would have been obvious, you should ask yourselves

15  the following questions:  What is the level of ordinary

16  skill in the art?  What is the scope and content of the

17  prior art?  What differences, if any, are there between

18  the invention of the patent and the prior art?  And,

19  ultimately, the question you must decide is whether the

20  invention would have been obvious to a person of ordinary

21  skill in the art who was aware of all the prior art.

22         You also need to consider what are referred to

23  as "objective considerations of nonobviousness."

24         Now, objective considerations -- objective

25  indications are facts that may tend to suggest that the

1  invention was not obvious.  For example, one objective

2  indication, or consideration, that may shed light on

3  whether the invention was obvious or not is whether a

4  product that includes the invention was commercially

5  successful as a result of the invention.

6      Commercial success will support nonobviousness

7  if the success of the product is related to a feature of

8  the patent claim in question.  If the commercial success

9  is the result of something else, such as marketing or

10 advertising, and not the result of a patented feature,

11 then you should not consider it to be an indicator of

12 nonobviousness.

13     Other objective considerations or indications

14 are, for example, whether the invention satisfied a

15 long-felt need, whether others came up with the invention

16 at about the same time, whether the invention achieved

17 unexpected results, and whether persons of ordinary skill

18 in the field praised the invention or expressed surprise

19 regarding the invention.

20     Now, to summarize on obviousness, if you find

21 by clear and convincing evidence that the invention set

22 forth in claim 1 of the '124 patent would have been

23 obvious, you must find in favor of Lilly.  But if you do

24 not so find, you must decide in favor of UroPep on that

25 issue.

1          I'll turn next to two separate requirements

2   that every patent must satisfy in order to be valid.

3   They are known as the "written description" requirement

4   and the "enablement" requirement.

5          Under patent law, the patent is required to

6   contain a written description of the invention.  The

7   purpose of the written description requirement is to

8   ensure that the person who files a patent application

9   actually invented the claimed invention, and to keep

10  people from seeking patents on things they haven't really

11  invented.

12         For example, I could file an application for a

13  patent claiming that I invented an electric car that goes

14  a thousand miles before needing to be recharged.  But

15  unless my patent described my electric car in sufficient

16  detail to make it clear that I have actually invented

17  such a car, rather than just imagined that it would be

18  nice to have such a vehicle, any patent I might get would

19  be invalid because it lacks an adequate written

20  description of the invention.

21         Now, Lilly contends that claim 1 of UroPep's

22  '124 patent is invalid because the patent lacks an

23  adequate written description of the invention of claim 1.

24         In order to succeed on its written description

25  defense, Lilly must prove by clear and convincing

1426

1    evidence that the patent fails to meet the law's

2    requirement for a written description of the invention.

3         In deciding whether the patent satisfies the

4    written description requirement, you must consider the

5    written description in the patent from the viewpoint of a

6    person of ordinary skill in the art at the time that the

7    patent application was filed.

8         The written description requirement is

9    satisfied if a person of ordinary skill reading the

10   patent would have recognized that it describes the full

11   scope of the invention that is claimed in the patent and

12   that the inventor actually possessed the full scope of

13   the invention as of the filing date of the patent.

14        Remember that a person of ordinary skill in

15   the art has background knowledge that he or she will

16   bring to reading the patent.  You can consider that

17   background knowledge because inventors do not need to put

18   in their patents things that those working in the field

19   already know.

20        For claim 1 of the '124 patent, the question

21   of whether the written description requirement has been

22   satisfied does not turn on whether UroPep was in

23   possession of all PDE5 inhibitors.  Rather, the question

24   is whether the patent shows that the inventors were in

25   possession of the invention that is the method of

1 administering an effective amount of a selective PDE5

2 inhibitor to treat BPH as of the priority date, or the

3 date of the filing of the application for the patent,

4 July 9th, 1997.

5          The written description requirement can be

6 satisfied by any combination of the words, structures,

7 figures, diagrams and formulas and so forth contained in

8 the patent, as understood by a person of skill in the

9 art.

10          It is not necessary to describe every compound

11 used in the claimed method by name or structure in order

12 to satisfy the written description requirement as applied

13 to a group of compounds, as long as the patent includes a

14 sufficient number of representative compounds or a common

15 structural feature so that a person of ordinary skill in

16 the art would understand, from reading the patent, that

17 the inventor invented the full scope of the claimed

18 method.

19          To summarize, if you find that Lilly has

20 proved by clear and convincing evidence that the '124

21 patent lacks an adequate written description of claim 1,

22 you must find the claim invalid.  If you find that Lilly

23 has not met its burden, you must find that the claim is

24 not invalid for lack of an adequate written description.

25          Now, the other requirement I mentioned a

1 moment ago is the enablement requirement.  To be valid, a

2 patent must contain a description of the manner of making

3 and using the invention that would enable a person of

4 skill in the art to make and use the full scope of the

5 invention without undue experimentation.

6       Lilly contends that claim 1 of the '124 patent

7 is invalid because the patent does not contain a

8 sufficiently full and clear description of how to make

9 and use the full scope of the invention.  In order to

10 invalidate the '124 patent for lack of enablement, Lilly

11 must prove by clear and convincing evidence that the '124

12 patent would not have enabled such a person to make or

13 use the full scope of the invention.

14       In deciding whether a person of ordinary skill

15 would have had to use more than a reasonable amount of

16 effort or experimentation in order to make and use the

17 full scope of the invention, you may consider several

18 factors:

19       First, the time and cost of any necessary

20 experimentation;

21       Second, how routine any necessary

22 experimentation would be to make and use the method;

23       Third, whether the patent contains any

24 specific working examples of the invention;

25       Fourth, the amount of guidance presented in

1  the patent to identify compounds within the scope of the

2  claim;

3          Fifth, the nature and predictability of the

4  field;

5          Sixth, the level of ordinary skill in the

6  field; and

7          Seventh, the scope of the claimed invention.

8          A single factor does not necessarily decide

9  that question.  You should weigh those factors and

10  determine whether or not, in the context of this

11  invention and the state of the art at the time the

12  original patent application was filed in July, 1997, a

13  person of ordinary skill would need to use more than a

14  reasonable amount of effort and experimentation to make

15  and use the full scope of the claimed invention.

16          To summarize, if you find that Lilly has

17  proved by clear and convincing evidence that the '124

18  patent lacks enablement or, to put it more simply, is not

19  enabled, you must find the claim invalid.  If you find

20  that Lilly has not met its burden, then you must find

21  that the claim is not invalid for lack of enablement.

22          Now, I am almost finished; so, we'll be done

23  in just a couple of minutes.  Let me get some water.

24          Thank you.

25          I'll next turn to damages.

1    If you find that Lilly has infringed claim 1

2  of the '124 patent and that the claim is not invalid, you

3  must then decide the amount of money to award UroPep to

4  compensate UroPep for the infringement.  The legal term

5  for that award of money is "damages," and I will use that

6  term from here on out.

7    I will now instruct you on how to decide the

8  proper measure of damages.  By instructing you on

9  damages, again, I am not suggesting which party should

10  win this case.  It is your task to decide, first, whether

11  Lilly has induced infringement of claim 1 of the '124

12  patent and whether claim 1 is invalid.

13    If you find that Lilly has induced

14  infringement of claim 1 and you do not find that claim 1

15  is invalid, then you must determine the amount of damages

16  that are adequate to compensate UroPep for the

17  infringement.  UroPep has the burden to establish the

18  amount of its damages by a preponderance of the evidence.

19    If you conclude that Lilly has infringed

20  UroPep's patent, it will be necessary for you to

21  determine the scope of that infringement in order to make

22  a damages determination.  That means you must determine

23  how much infringement Lilly has caused.

24    For example, claim 1 extends only to acts of

25  inducement that result in the treatment of BPH.  So, if

1  you find that Lilly has induced infringement of the

2  patent, you should only award damages for acts of

3  administering Cialis, induced by Lilly, that were

4  provided by a preponderance of the evidence to infringe

5  claim 1 of the '124 patent.

6         A patent owner whose patent is infringed is

7  entitled to what is called a "reasonable royalty" as

8  damages for infringement.  A patent owner is not required

9  to make, use, sell, or offer to sell a product or process

10 claimed in a patent in order to be entitled to at least a

11 reasonable royalty to compensate for the infringement.

12        Now, a royalty is the amount of money that

13 someone pays a patent owner to be allowed to use the

14 patented invention.  A reasonable royalty is often

15 described as the amount of royalty payment that a

16 reasonable patent holder and a reasonable infringer would

17 have agreed to in a theoretical or hypothetical

18 negotiation, had it taken place at the time the

19 infringement began.

20        In considering that question, you should

21 assume that both parties to the negotiation believed that

22 the patent was valid and infringed and both were willing

23 to enter into an agreement.

24        You are to decide what a reasonable royalty

25 would be based on the circumstances in existence at the

1432

1    time just before Lilly started to infringe the '124

2    patent by inducing infringement, that is, when Lilly

3    learned of the '124 patent, which the parties have agreed

4    was in October, 2014.

5           In deciding the amount to select as a

6    reasonable royalty, you should consider the factors that

7    UroPep and Lilly would have considered if they had been

8    voluntarily trying to reach an agreement at the time the

9    infringement began.

10          To do that, you should ask yourselves what

11   amount of money a reasonable person would have paid for a

12   license to manufacture, sell, and promote the use of the

13   patented invention and still be able to make a reasonable

14   profit, if that amount would have been acceptable to a

15   reasonable patentee who was willing to grant a license.

16          Now, here are some of the factors you may want

17   to consider in determining the amount of a reasonable

18   royalty.  These factors are listed in no particular

19   order, and the significance of each factor is for you to

20   decide.

21          First, expert opinions as to what would be a

22   reasonable royalty;

23          Second, the royalties paid on similar licenses

24   that either Lilly or UroPep have entered into in the

25   past, together with differences in the circumstances of

1 those licenses that might suggest a different royalty

2 rate in this case;

3          Third, the profitability of the products used

4 in the infringing method and, in particular, the extent

5 to which Lilly has made use of the invention and the

6 value of that use to Lilly;

7          Fourth, the portion of any profit made by

8 Lilly that is due to the patented invention itself;

9          Fifth, the extent to which Lilly, as a result

10 of factors such as its marketing activities, has

11 contributed to the success of the product;

12          Sixth, advantages of using the patented

13 invention over products or processes not claimed in the

14 invention that were available and could have been used to

15 achieve similar results; and

16          Seventh, the commercial relationship between

17 the parties, in this case the fact that Lilly and UroPep

18 are not competitors.

19          No one factor decides the royalty amount.  In

20 addition to the factors I have just mentioned, you may

21 want to consider whether other factors would have

22 increased or decreased the royalty that Lilly would have

23 been willing to pay and UroPep would have been willing to

24 accept or any hypothetical party would have been willing

25 to negotiate to reach agreement acting as reasonable

1 businesspeople.

2          Now, that concludes my instructions to you on

3 the law.  We'll take a break.  But before we do, let me

4 just tell you what will happen next, which is that the

5 lawyers will present their closing arguments to you.

6          Mr. Hughes will go first for UroPep.

7 Mr. Vital will then argue for Lilly.  And then Mr. Hughes

8 will have a chance to come back and make a final rebuttal

9 argument for UroPep.  After that, I will give you a few

10 more housekeeping instructions, after which, the case

11 will be in your hands.

12          So, let's take a break; and we will reassemble

13 in about ten minutes.

14          (The jury exits the courtroom, 9:22 a.m.)

15          THE COURT:  Okay.  Counsel can set up.

16          (Recess, 9:23 a.m. to 9:32 a.m.)

17          (Open court, all parties present, jury

18 present.)

19          THE COURT:  Mr. Hughes, you may proceed.

20          MR. HUGHES:  Thank you, Judge Bryson.

21          Good morning, ladies and gentlemen.  This is

22 my favorite part of the case.  It's my last chance to get

23 to speak with you, and I suspect it might be your

24 favorite part of the case as your service is almost

25 finished.

1    Before I get started, on behalf of Dr. Uckert,

2  UroPep, the entire team here, we really do want to thank

3  each and every one of you for your service and attention

4  this week.  I know we've covered a lot of complicated

5  topics, a lot of science.  Some topics were maybe more

6  interesting than others, but we're grateful for your time

7  and attention and we trust that you will be fair and you

8  will be just.

9    When I first talked to you on Monday -- seems

10  like a long time ago to me -- I talked to you about a

11  simple rule and that simple rule is you don't go on

12  someone else's property without permission.  And I

13  thought it was telling, interesting that not a single Eli

14  Lilly witness came here and took the witness stand and

15  said that they don't infringe.  They never denied that

16  they are using our property.  They are on our property

17  without permission.

18    We'll talk more about what that means in a

19  moment, but I want to talk with you about another simple

20  rule, a rule that I try to teach my boys, a rule that I

21  try to live by.  And that rule is when someone comes to

22  you and says that you've wronged them, that they've got a

23  problem, whether that person is big or small, powerful or

24  weak, rich or poor, you have the common courtesy to sit

25  down with them and try to resolve your differences.

1         What happened here is that UroPep, a team of

2  doctors, scientists, medical researchers, were working on

3  new therapies for diseases and they had a breakthrough.

4  They came up with a new way to treat BPH.  They went to

5  the U.S. Patent Office and the Patent Office agreed, gave

6  UroPep the '124 patent.

7         UroPep then went to Eli Lilly and said, "We've

8  got this patent.  You infringe it by using Cialis to

9  treat BPH.  Let's try to work this out.  Let's try to do

10  a deal out of court."

11         And when Eli Lilly received that letter in

12  October of 2014 -- you've heard the evidence.  It's not

13  like we were strangers.  It's not like UroPep was someone

14  they had never heard of before.  As you saw in the

15  evidence, Eli Lilly, when they went to the FDA to get

16  Cialis approved for BPH over and over and over again,

17  cited the work of Dr. Uckert and the UroPep inventors.

18         And when Eli Lilly went to the Patent Office

19  to try to get its BPH patent, the patent they never

20  received, they cited one of our patent applications, the

21  work of our guys, for the idea that using a PDE5

22  inhibitor is a way to treat prostatic diseases like BPH,

23  the core of our invention.

24         So, they knew who we were, that we were real

25  people who had made a real breakthrough; but they chose

1    not to respond.  They chose to stonewall, to hope that we

2    would never stand up for ourselves.  But we decided to do

3    just that so we came here to Marshall, Texas.

4            We talked about during jury selection that

5    Marshall is a place that has a good reputation for patent

6    cases, and we decided that Marshall was a place where a

7    small team of scientists like UroPep could get a fair

8    shake against a company like Eli Lilly.

9            One thing that I thought might happen this

10   week is that Eli Lilly might bring a witness down here to

11   explain why they never responded, why they kept

12   infringing our patent, why they sold $700 million of

13   Cialis using our property.  But we got no such

14   explanation.

15           We heard from three Eli Lilly witnesses:

16   Dr. Viktrup, Dr. Sabo, and Ms. Hussain.  They are all

17   very nice people who came down here to testify for Eli

18   Lilly as part of doing their job for the company, but

19   none of them had seen the letter.  None of them had any

20   role in deciding whether or not to respond.  In fact,

21   none of them had even seen the patent until years after

22   we decided to stand up for ourselves and bring a lawsuit.

23           So, instead of any explanation, what we were

24   treated to was a list of excuses from expert witnesses

25   who make their living defending pharmaceutical companies.

1    And I've got Eli Lilly's theory of the case

2 here.  The road is the road of UroPep, the road of

3 Lilly's infringement.  No one denied it.  And that road

4 leads to reasonable royalty and damages.

5    But Lilly doesn't want you to go down that

6 road.  They want to divert your attention, send you any

7 which way they can.  They've got the horny goat weed

8 defense, obviousness, written description, enabled -- not

9 enabled, every single way they say the Patent Office got

10 it wrong.

11    And I predicted at the beginning of the case

12 this is exactly what we would hear, the "yeah but"

13 defenses.  Yeah, we might infringe your patent but the

14 Patent Office shouldn't have given it to you.  They made

15 a mistake.  They got it wrong.

16    We'll talk about the problem with each of

17 these diversions in a moment as we go through with you

18 the evidence.  I want to talk to you now about the issues

19 that you're going to need to decide at the end of the

20 case when you go back to deliberate.

21    And there are three of them -- Judge Bryson

22 has instructed you -- infringement, invalidity and

23 damages.  And for the rest of my time with you this

24 morning I'd like to walk through what the evidence shows

25 on those issues.  You just heard the jury instructions

1    from Judge Bryson and you'll have those back with you

2    when you deliberate.

3          And we've worked -- the parties have worked

4    with Judge Bryson to make those as understandable to you

5    as possible, but they still include a discussion of legal

6    terms that while we may all be familiar with them, you

7    are probably hearing them for the first time.

8          So, I'll do my best to apply those legal

9    concepts to the evidence to give you the tools that you

10   need to answer those questions on the Verdict Form when

11   you go back to deliberate this case.

12         So, let's start with the first question that

13   you need to answer, and that is the question of

14   infringement.  Before I get into the evidence on that, I

15   want to say a word about the burden of proof.  The burden

16   of proof on infringement is preponderance of the

17   evidence.  That means that we need to prove that it's a

18   little bit more likely than not.

19         You see the scales of justice up there over

20   there by Judge Bryson.  The idea is that if you just put

21   a feather on one side of those scales, that's what we

22   need to do to prove infringement.  But the evidence goes

23   way beyond a feather.  The evidence is overwhelming.

24         No Lilly witness denied infringement.  Their

25   own label, as we've been through many times during the

1440

1 trial -- I don't need to repeat it -- shows that Cialis

2 is a selective PDE5 inhibitor that is used in the

3 treatment of BPH.

4     The one concept I did want to talk to you

5 about which Judge Bryson instructed you on a moment ago

6 is this concept of induced infringement.  And, so, to

7 prove induced infringement what we have to show is that

8 someone carried out the acts that directly infringed

9 claim 1.

10     And as you heard the evidence, the people who

11 are administering -- there is that word "administering"

12 in the claim -- those are the doctors who are prescribing

13 Cialis.  So, they are using the invention.

14     But we're not saying that the doctors did

15 anything wrong.  This isn't about them because it all

16 starts with Lilly.  Lilly knew about the patent.  Lilly

17 encouraged the doctors to administer Cialis to treat BPH

18 with all of the advertising that we've talked about, the

19 hundreds of millions of dollars, and their label.

20     And the last part, the third part, we have to

21 prove that Lilly was aware of the patent and knew that

22 encouraging doctors to prescribe Cialis for BPH infringed

23 the patent.  And we've done just that.  They admit they

24 knew about the patent in October of 2014.

25     And when I asked Dr. Sabo whether she had been

1  asked in October of 2014 whether Cialis was a PDE5

2  inhibitor used to treat BPH, she said she would give it

3  an unqualified yes.  So, there is no question they induce

4  infringement.

5          The next set of issues you'll have to grapple

6  with is whether or not -- back to the signs -- whether or

7  not Eli Lilly has proved by clear and convincing evidence

8  that claim 1 of the '124 patent is invalid.

9          We talked about the feather on the scale a

10 moment ago for the standard of proof for infringement.

11 The standard of proof for invalidity -- that's their

12 burden, is clear and convincing evidence, a clear

13 conviction, a strong belief that the patent is invalid,

14 that the Patent Office got it wrong, that they made a

15 mistake.  And I submit to you that Lilly has not shown

16 evidence that comes remotely close to invalidating the

17 UroPep patent.

18         So, let's start with the first fork in the

19 road.  That's anticipation.  I like to call it the horny

20 goat weed defense.  What anticipation is it's the idea

21 Judge Bryson instructed you that a single reference -- in

22 this case the Cheung document -- has to have each and

23 every element of claim 1.

24         So, that document would have to show that a

25 PDE5 inhibitor, the teeny little amount that is in horny

1  goat weed, was actually administered to a person with BPH

2  and that it was that icariin, that little component of

3  horny goat weed, that actually resulted in the treatment

4  of BPH.

5          There is no evidence in this case to support

6  that, because what happened is the expert that they

7  brought in, Dr. Roehrborn, to testify about this, he

8  testified that himself and the American Urological

9  Association don't believe that horny goat weed, by

10  itself, works.  That's his opinion.  That's the American

11  Urological Association's opinion.

12          I'm showing you the testimony on the screen.

13  So, they don't believe it works.  There is no way they

14  can ever get to clear and convincing evidence.

15          And then the other point to look at when you

16  look at the Cheung reference -- and if you want some

17  entertainment, you can flip through it in the jury room.

18  What Cheung gave was this concoction of different things

19  and we don't know what is in these plants.  We don't know

20  what is -- we don't know what might actually be causing

21  any improvement in the conditions.

22          And remember they have to show that it is

23  actually the icariin, the PDE5 inhibitor, that is causing

24  any improvement.  It can't be attributed to something

25  else.

1        And Dr. Roehrborn admitted on the stand that

2  he didn't know what would be causing the improvement,

3  that it could be something else.  That alone is

4  sufficient to defeat their anticipation defense.

5        And finally, of course, Dr. Bell explained

6  that because there is such a super small amount of this

7  icariin in the horny goat weed that to ever get enough of

8  it to have any chance of helping you, you'd have to eat

9  pounds and pounds of it, which, of course, wasn't what

10  the Cheung study does, and shows you just how little

11  credibility this defense has.

12        Eli Lilly, a pharmaceutical company,

13  sophisticated pharmaceutical company, brought in

14  Dr. Roehrborn, who doesn't believe horny goat weed works,

15  brought in an acupuncturist from San Francisco, paid him

16  $280 an hour.  This defense has no credibility, and you

17  should judge all of their defenses based on that

18  credibility.

19        Let's turn to the next issue, which is an

20  issue of obviousness.  Would it have been obvious in 1997

21  to a skilled person to administer a PDE5 inhibitor to

22  treat BPH?  Would they have figured out PDE5 is in the

23  prostate?  Would they have figured out PDE5 played a

24  functional role.

25        And what Lilly says on this is that people

1444

1   knew that PDE5 was in parts of the male urogenital

2   system, the penis, the bladder, and people knew about the

3   NO-cGMP pathway and that putting all those things

4   together it would have been obvious to look to the

5   prostate.

6           But this fails right out of the gate because

7   Dr. Roehrborn admitted that the Patent Office had all

8   that information.  The Patent Office had information that

9   we supplied them when we applied for our patent that PDE5

10  was in the penis.

11          They had information cited right in our

12  patent.  PDE5 was in the bladder.  They knew about this

13  NO-cGMP pathway that we heard so much about and they gave

14  us our patent.  They have the same information you have.

15  There is no reason to second-guess it.

16          So, we don't have to go any further; but I'm

17  going to, because something very interesting happened in

18  this trial with Eli Lilly's witnesses on the subject of

19  obviousness.  And I want to make sure everybody

20  understands what happened.

21          The first thing that happened is we heard from

22  Dr. Roehrborn.  He testified that it would have been

23  obvious to use PDE5 inhibitors to treat BPH.  But the

24  interesting thing about Dr. Roehrborn is at the actual

25  relevant time in 1997, he had no experience with PDEs.

1 And he admitted, as I told you, everyone would admit

2 during this trial that there is not a single prior art

3 reference, not one, that identifies the presence of PDE5

4 in the prostate or the functional role of PDE5 in the

5 prostate.  He admitted that.

6          And then he admitted that when he looked at

7 the question -- when he looked at the question now, he

8 already had the answer.  He knew that PDE5 was in the

9 prostate.  He had a benefit that the people like Burnett

10 and the other people writing in 1997 did not have.

11          So, he had an advantage.  He had that

12 hindsight bias.  We all remember Mr. McBride's

13 cross-examination.  And none of those experts in 1997,

14 the people who actually had PDE experience, figured it

15 out.  Judge Bryson instructed you, you can't use

16 hindsight to judge the obviousness of the patent.

17          Next, we heard from Dr. Beavo.  Now, Dr. Beavo

18 is actually an expert in PDEs.  Mr. Vare said he was the

19 grandfather of PDEs.  He'd been working on them long

20 before 1997.  But you know what we did not hear from

21 Dr. Beavo?  We did not hear an obviousness opinion.  They

22 didn't ask him if it was obvious, the qualified guy,

23 probably because they wouldn't like the answer.

24          That brings us to Dr. Rotella.  Dr. Rotella

25 came to talk about how our patent wasn't enabled and

1  didn't have enough information for written description.

2  He didn't offer an obviousness opinion on his direct

3  examination.

4       But Mr. Mortara asked him about it during

5  cross-examination for an important reason.  Dr. Rotella

6  was working at another pharmaceutical company in the

7  mid-1990s, Bristol-Myers Squibb; and he and his team

8  applied for a patent in 1998 on millions of PDE5

9  inhibitors, and they had a claim in that patent to treat

10  30-plus different diseases, everything they could think

11  of.  And do you know what wasn't in that list?  BPH.

12       So, without the benefit of all the hindsight

13  information, that team of experts, including Dr. Rotella,

14  couldn't figure it out.  They do not have an obviousness

15  case.  It does not come close to clear and convincing

16  evidence, which brings us to the next couple of forks in

17  the road:  Written description and enablement.

18       The idea here is that we did not need to

19  describe our claim -- or that we didn't describe our

20  claim, that you couldn't use our invention, that it's

21  super complicated, billions of compounds.  But think

22  about what Eli Lilly is saying here.

23       They are saying, on the one hand, that our

24  invention is obvious; anyone could figure out how to do

25  it; and then, on the other hand, that no one could figure

1 out how to do it because it is not enabled or that we

2 didn't describe it or that you can do it with horny goat

3 weed.  These things don't add up.  They are not

4 consistent.  They don't go together.

5         And drilling down a little bit more, the issue

6 on enablement is pretty straightforward, and written

7 description.  We talked to Dr. Roehrborn about this.  The

8 experts at the Patent Office looked at this issue when we

9 applied for our patent, and they determined that we

10 satisfied the written description and enablement

11 requirements.  That's what they figured out.

12         We asked Dr. Roehrborn if he had any

13 experience in looking at what's required in patents, if

14 he had any experience figuring out the kind of

15 information that you need to include in a patent to

16 enable it, to provide written description.  And he and

17 Mr. McBride had that discussion about experience and how

18 it takes 10,000 hours to become an expert.

19         The Patent Office are the experts.

20 Dr. Roehrborn wasn't.  There is no reason to second-guess

21 the Patent Office on this issue.

22         But then we heard from Dr. Rotella on this

23 issue.  This is very important so I'll try to take it

24 very slowly.  He testified on direct -- Lilly put him on

25 the witness stand.

1    He came to this court to tell you that our

2    patent wasn't valid because we didn't include certain

3    information in it.  We didn't include in vitro

4    information, information from the lab.  We didn't include

5    in vivo data, data about how PDEs might work -- PDE5

6    inhibitors might work in the human body.  We didn't

7    include all sorts of other data.

8         You heard some big words like

9    "pharmacokinetic" and "half-life data."  Those are all

10   the criticisms he levels against our patent when he was

11   on direct testimony on the witness stand.

12        But on cross-examination when Mr. Mortara

13   talked to him and showed him his own patent, we learned

14   something very interesting.  He admitted that his own

15   patent that he got at Bristol-Myers Squibb on millions of

16   PDE5 inhibitor compounds when they had a claim to treat

17   numerous different diseases -- ours is only from one --

18   he admitted that in his patent there was no quantitative

19   in vitro data, no in vivo data, that that patent was

20   missing all of the same things that he faulted our patent

21   for.

22        And in his zeal to invalidate our patent -- we

23   heard Mr. Mortara establish this -- he makes his living

24   testifying for pharmaceutical companies.  In his zeal to

25   say that our intellectual property isn't valuable, that

1  our intellectual property shouldn't be respected, he

2  admitted on the witness stand that his own patent might

3  be invalid.  That's what he admitted.

4         So, you can judge the credibility of their

5  enablement and written description defense based on what

6  Dr. Rotella admitted on the witness stand.  We all

7  remember the testimony.  He didn't go back and tell the

8  Patent Office.  He didn't tell Bristol-Myers Squibb.  He

9  didn't tell anyone except us, for the first time on the

10 witness stand, in his zeal to invalidate our patent.

11        The last thing I want to say about the issue

12 of enablement is that we've heard a lot in this case

13 about this idea of human clinical trials.  We heard a lot

14 of evidence from Eli Lilly about the clinical trials that

15 Eli Lilly did when it went to the Patent Office to try to

16 get approval for BPH -- for Cialis for BPH.  And I just

17 want to make sure that all of you understand what that is

18 potentially relevant to and what it's not relevant to.

19        What it is not relevant to are these validity

20 issues, the issues of enablement.  Dr. Roehrborn admitted

21 that human clinical studies are not needed; you don't

22 need to put that information in your patent in order to

23 enable it.  Dr. Rotella certainly didn't in his.

24        And that -- to the extent it is relevant at

25 all, to the extent that what Lilly did with human

1 clinical trials is relevant is that it could be

2 potentially relevant to damages, but it is not relevant

3 to enablement.  That is the testimony of their own

4 witness.

5         So I just want to make sure that that evidence

6 is put in the proper context for all of you.

7         So, that brings us to the last issue that

8 you're going to need to decide.  That last issue is the

9 issue of damages, what is a fair and reasonable royalty.

10 We talked at the beginning of the case about the idea

11 that there are some big numbers involved here.

12         When I talk to you at the end, I'm going to be

13 asking you to award damages of $84.5 million.  That's a

14 big sum of money whether it's in Montana, whether it's

15 here in Texas, anywhere.  And I'm not going to be shy

16 about that.

17         The issue is Cialis is a product that involves

18 huge numbers and this invention that the UroPep inventors

19 came up with goes to the core of one of the uses of that

20 product that infringes our property.

21         And we've all seen the evidence.  Billions of

22 dollars brand-wide, huge profits.  And even when you

23 isolate it down to the infringing sales, the sales of

24 Cialis after October of 2014 that were used to treat BPH,

25 it's still a big number, $704 million.

1451

 1          And I want to just pause and make sure

 2    everybody remembers that the experts in this case agree,

 3    $704 million of infringing sales.  That's what

 4    Dr. Vellturo calculated.  He looked at the sales -- all

 5    the sales of 5-milligram one-a-day Cialis.

 6          Then he took Lilly's own surveys of physicians

 7    and patients, surveys where those physicians and patients

 8    were asked, are you -- the patients, are you taking

 9    Cialis for BPH or BPH+ED?  Physicians were asked, are you

10    prescribing BPH to treat -- or prescribing Cialis to

11    treat BPH or BPH plus ED?  That was the evidence and he

12    came up with 704 million.

13          And Mr. Jarosz -- I showed you this yesterday

14    during his cross-examination.  He used that 704 million

15    right in his report.  So, that's the starting point for

16    both the experts.  And Mr. Jarosz didn't get on the stand

17    and say that that number should be less; so, I just want

18    to make sure we are all on the same page.

19          So, the question then is:  What is a

20    reasonable royalty for these infringing sales?  And

21    Dr. Vellturo explained the logic.  On these sales, Lilly

22    made about a 30 percent profit.  And he explained that

23    since Lilly did all those human clinical trials and they

24    developed the product and they spent the money on

25    marketing, Lilly should get to keep more than half of

1   that product.

2            But he also explained that on the other hand,

3   UroPep has an important invention.  UroPep invented the

4   idea of using a PDE5 inhibitor like Cialis to treat BPH.

5   And UroPep has a right to keep Lilly from using that

6   property without permission.

7            So, both sides have something important here,

8   and Dr. Vellturo determined 12 percent would be fair and

9   reasonable given the relative importance of UroPep's

10  invention, which goes to a core indication of Cialis,

11  versus Lilly's contribution.

12           And it really comes down to the benefits to

13  Lilly of having that Cialis indication.  And I talked

14  about this yesterday a bit with Ms. Hussain.  We looked

15  at some of the data on those 5-milligram one-a-day sales

16  of Cialis.  That's when we had to go up there and talk

17  about sealing exhibits, the financial information that we

18  looked at.

19           And what we saw is, in October of 2011, once

20  they got that approval for BPH, the sales went way up.

21  They went on a rocket ship ride.  And, again, I'll remind

22  you, we're only claiming damages after October of 2014.

23  This is evidence that just shows the before and after,

24  before BPH and after, quantitative evidence on how

25  important BPH indication is to Eli Lilly.

1        And the reasons for that are pretty simple.

2  They are able to add new patients because of the BPH

3  indication.  They are able to take patients away from

4  Viagra because it's not approved to treat BPH, so now

5  doctors are switching away from Viagra, prescribing

6  Cialis.

7        They are able to get insurance companies to

8  cover more Cialis because insurance companies are more

9  likely to cover a prescription for BPH than they are for

10 erectile dysfunction.  So, it's helped them grow their

11 sales over and above the sales that they had before.

12 That's why it's so important.

13       And we looked at all of the documents I went

14 through with Mr. Jarosz during his cross-examination

15 about how BPH was core, was critical to this "why pause"

16 campaign.  And I'm not up here suggesting that erectile

17 dysfunction wasn't also important and hasn't always been

18 important, but BPH was something new, something that gave

19 them an advantage, something that gave them new sales.

20 It was important.  And that's why that puts the

21 reasonableness of that 84 million in perspective.

22       The last point I would say about this here is

23 that both the experts agree that Lilly has spent more

24 than $300 million advertising Cialis for the treatment of

25 BPH since October of 2014.

1454

1        Again, they would not have been able to do
2  that without using our invention.  That's the
3  infringement.  That's how they induce the doctors and the
4  patients to use.  So, that again shows the core of that.
5        And I looked at this concept with -- on the
6  "why pause" campaign, which started right at the key
7  time, at the end of 2014, beginning of 2015.  I looked at
8  an exhibit -- I think it's D 1170, page 6 -- with
9  Mr. Jarosz at the end of his cross-examination showing
10 how much each month Lilly was spending on this "why
11 pause" campaign that has both pieces -- 12, 14, 15 or
12 more million dollars each month.
13        Again, they could not do that without the
14 infringement, which puts the reasonableness of the
15 royalty in perspective.
16        And then what we heard on the other side is we
17 heard from Mr. Jarosz with his 1.9 percent royalty.  I
18 think his analysis makes no sense.  He assumes that if
19 Lilly took those approvals off the FDA label and quit
20 advertising BPH -- he assumes that physicians would write
21 hundreds of millions of dollars of off-label
22 prescriptions and that insurance companies would just
23 keep covering those prescriptions even though it is not
24 on the label.  He must have a different insurance company
25 than I have because I don't think that would happen in

1  the real world.

2          And he assumed that the profits -- the

3  infringing profits of Cialis would only be like

4  10 percent, when we know in the real world the profits of

5  selling Cialis are way, way more than 10 percent.  So,

6  his analysis is hopelessly flawed.

7          I'm going to sit down now.  I'm going to get a

8  chance to talk to you again after Mr. Vital finishes his

9  discussion with you; and when I get up, I'm going to talk

10  to you about returning a verdict that shows intellectual

11  property rights are valuable and that the patent rights

12  of small teams of inventors like UroPep are just as

13  important as they are for folks like Eli Lilly.

14          I look forward to speaking with you again

15  shortly.  Thank you.

16          THE COURT:  Thank you, Mr. Hughes.

17          And Mr. Vital.

18          MR. VITAL:  May I have moment, your Honor?

19          THE COURT:  Yes.

20          MR. VITAL:  Okay.

21          (The following proceedings were conducted at

22  sidebar with all parties present.)

23          MR. VITAL:  I apologize for the bench

24  conference.  I was looking for my notes, and I was

25  sitting on them.  But if I could have just a few minutes

1456

1 to -- I'm going to have to set up the flip chart.

2           THE COURT:  When you say a "few minutes," are

3 you talking about two or ten?

4           MR. VITAL:  If I could have at least five

5 so -- a short break would be okay.  I'd hate to shuffle

6 around in front of the jury.

7           THE COURT:  Okay.

8           MR. HUGHES:  If we could do a stand and

9 stretch, you know...

10           THE COURT:  Let's do a stand and stretch.

11 That seems to make more sense.  Thank you.

12           MR. VITAL:  That works.

13           (Sidebar conference concluded.)

14           THE COURT:  Okay.  Ladies and gentlemen of the

15 jury, Mr. Vital is going to be getting set up for his

16 closing arguments, so why don't we stand and stretch a

17 little bit and we'll take a couple of minutes -- not

18 long.  But you can just limber up.

19           (Off the record, 10:00 a.m. to 10:04 a.m.)

20           THE COURT:  Mr. Vital, you may proceed.

21           MR. VITAL:  Thank you very kindly.

22           Good morning, ladies and gentlemen of the

23 jury -- to be exact, six ladies and two gentlemen of the

24 jury.  I very much appreciate the opportunity to stand

25 here and deliver a closing argument on behalf of Eli

 1  Lilly and Company in a case that is very important, very

 2  important to Eli Lilly and Company.

 3          On its behalf and for my own sake, I'd like to

 4  thank you because I've watched you all during the entire

 5  week.  As I saw from time to time, y'all would look over

 6  and look at the -- various of the lawyers at the table.

 7  I appreciate that attention because I appreciate your

 8  time and I appreciate your service.

 9          And the reason I say that, the reason I feel

10  so passionately about what it is that I do for a living

11  is that I believe in juries.  I believe in what they

12  stand for.  I believe in your power.  And that power does

13  not come from Mr. Vital.  That power does not come from

14  Mr. Hughes.  That power comes from the law.

15          And I mention that for a very important

16  reason, because this case belongs to you.  It don't

17  belong to, in all due respect, even Judge Bryson.

18          I'm going to show you a Verdict Form.  This

19  Verdict Form is not filled out by Mr. Hughes.  This

20  Verdict Form is not filled out by Mr. Vital.  This

21  Verdict Form is not filled out by Dr. Uckert or, in all

22  due respect, Ms. Hussain or his Honor.  The Verdict Form

23  is your decision, is your verdict.  It is not the Patent

24  Office's verdict.  It belongs to you, members of the

25  jury.

1458

1           Mr. Hughes focused his argument on the Patent

2    Office being the experts and trust the experts.  I trust

3    the jury.  That's what I've been doing for a living for

4    20 years.  I trust the jury.  I trust the law.

5           The law is embodied in these Final Jury

6    Instructions, the court's charge to you.  You do not get

7    your charge from the Patent Office; you get your charge

8    from the judge.  The judge tells you what the law is, and

9    the law guides your decision.

10          So, as we make this argument, make no mistake

11   about it.  You get to make your own decision because the

12   law gives us the protection, as it gives any United

13   States citizen the protection or, frankly, any other

14   person, to trust a jury to make something right, even if

15   it's something the Patent Office did.  If we were to

16   trust the Patent Office and not trust the jury to follow

17   the law as a checks and balance, we wouldn't be standing

18   here.

19          So, with that backdrop, I'd like to cut to

20   Mr. Slyter and talk about what I believe this case is

21   about -- next slide -- an idea.  Mr. Hughes and I agree

22   on that.  I agree with him on a lot of things.  He's a --

23   I do this for a living, and he's a fine lawyer, and I

24   love arguing cases to juries against fine lawyers.  We

25   agree on this point.  This case is about an idea.

1459

1        And Mr. Hughes, in his opening argument to you

2   on Monday, said it right.  I don't know if I agree with

3   the word "new" so let me take that back.  This is about

4   an idea.  And he claims and his client claims in this

5   case that because they had an idea, they win this case.

6   I want to talk about that in the context of patent law

7   and the argument that you heard my colleague, Mr. Vare,

8   make in opening argument.

9        Mr. Hughes talked about the fact that you

10  don't step on somebody else's property without

11  permission.  And Mr. Vare responded, if you step on

12  property that somebody claims is theirs but there is no

13  notice, for instance, that's not fair and that's not

14  right.

15       And that's partially why we have the law

16  regarding some important concepts that we'll talk about,

17  like written description and enablement, because a party

18  cannot claim to own unlimited bounds of territory that

19  they don't have, that they didn't describe, or that is

20  not properly enabled.  That's what the patent law

21  requires.

22       Nor could a party claim ownership of an idea

23  that was already in existence and being used.  Nor can a

24  party claim ownership to something that was obvious

25  because it belongs to us all.

1    So, this diminishment, playing down, of the

2  notion of obviousness cuts against the core of what you

3  were asked to decide and the entire purpose of our patent

4  system, which is to make sure that people do not claim

5  ownership to things that they cannot claim ownership of.

6    And in that regard, I'd like to go to the

7  first point I'd like to spend my time talking to you

8  about in terms of what this case is about and why the

9  idea is not enough by talking about obviousness, was the

10  idea obvious.

11    Smart people.  This is the defense:  Smart

12  people did not say, as of 1997, that PDE5 was in the

13  prostate; so, therefore, it was not obvious.

14    I want to just say something just very simply.

15  We have two separate defenses.  In the patent system --

16  and these are not excuses, as Mr. Hughes said.  We are

17  entitled to assert these because the law gives us the

18  right to do so; and they are appropriate in this case.

19    So, on behalf of my client, I will take

20  offense -- they didn't say it, but I will take offense

21  for them at the notion that we are not entitled to cloak

22  ourselves in the law and ask you to make a decision that

23  you are empowered to make.  These are not excuses; this

24  is the law.

25    And what the law says is you have anticipation

1  and obviousness.  And I'll talk about anticipation in a

2  second.  But if you read the court's jury instructions,

3  if it was stated, it would be anticipated.

4         And I'll talk about that separately because it

5  was stated in the Cheung reference.  So, it is

6  anticipated.  They just don't like the source that it's

7  in because it's traditional Chinese medicine.  And I'll

8  talk about that in a second.  So, it is anticipated.

9         But on a separate side, even if it's not

10  anticipated, the law -- because if it was stated in a

11  document, it would be anticipated.  If it's not stated in

12  a document, the question we ask is:  Does the body of

13  prior art provide a natural extension to the proposition

14  that they claim is their idea.

15         And that's -- it's not whether people actually

16  said it; it's whether the prior art -- and this is from

17  the court's charge -- motivated or prompted somebody to

18  make the next logical step.

19         You heard Mr. Vare talk about Burnett, Trial

20  Exhibit Number 1245.  It's an important reference because

21  it is the extension that leads to that next logical step.

22  It wasn't stated.  But when you combine this reference

23  with other references that you heard in the evidence --

24  and this reference alone, frankly -- was it obvious.

25         Let's see what this reference says.  1995,

1  before the patent-in-suit.  Table 1, what was known?

2  That in the penis you could cause smooth muscle

3  relaxation to cause an erection.  In the urethra we knew

4  that there was this smooth muscle and it could be

5  manipulated for micturition purposes, which is one of the

6  signs and symptoms of BPH that we're talking about.

7           And in the same reference it talks about the

8  prostate, that same smooth muscle that could be

9  manipulated with respect to micturition.  Through what

10  means?  It says, in the concluding paragraph, "through

11  pharmacologic means."

12           I told you in jury selection I wasn't a big

13  "size" person, but that's just a fancy way of saying

14  medicine.  Through some way that you could take to cause

15  an effect.

16           So, if you look at this reference in 1997 and

17  you're a smart person and you see a reference saying we

18  should look at some pharmacologic agent or medicine to

19  cause an effect, what type of medicine might that be?  It

20  would be something that would cause smooth muscle

21  relaxation.

22           And what we know, in addition to alpha

23  blockers in the prostate, is that smooth muscle

24  relaxation -- you heard from the evidence --

25  Dr. Roehrborn stated it and it did not go credibly

1463

1  rebutted because it is a true statement -- that you can

2  manipulate smooth muscle relaxation through PDE5

3  inhibitors if you know that there is cGMP present, which

4  we knew.

5           Let me go through the slide that we just

6  created in this courtroom this morning, Mr. Slyter.

7           So, during Mr. Hughes' argument I asked

8  Mr. Slyter to put the slide together -- you may have seen

9  me leaning over to whisper to him -- because it occurred

10 to me that if we knew -- and the right side is the

11 Burnett reference.

12          If we knew about smooth muscle relaxation in

13 the urethra and if we knew about smooth muscle relaxation

14 in the penis and even though there is a question about

15 whether PDE5 was functional in the bladder -- we'll give

16 them that.  I think it was, and I think the evidence

17 shows it.

18          But the question is:  Would a smart person

19 skilled in the art in 1997, putting all of these puzzle

20 pieces together, have thought, hmm, the penis and the

21 bladder have a gland in between them in the same system,

22 the urogenital system?  Maybe we should look there.

23          We know it has smooth muscle in it.  We know

24 these other organs around it have PDE5.  We know about

25 these PDE5 inhibitors which are pharmacologic agents to

1464

1 cause a reaction based upon Burnett.  So, maybe we should

2 look for it there.

3          That's what they claim is their obvious --

4 their invention.  I slipped.  I said "obvious," because

5 it is obvious.  Look at it.  It is right there in front

6 of you.

7          That's why you have the power to speak, to

8 look at the references, to follow the law, to make the

9 next logical extension or step and come to the

10 conclusion, maybe we ought to look for it in the

11 prostate.  And that's what Dr. Uckert and the inventors

12 did.

13          Let's go back to the slide deck, and let's go

14 to the next slide.

15          The evidence also showed, through the

16 testimony of Dr. Bell, that there were other companies in

17 this area in the same timeframe.  Understand that these

18 are smart people who all know each other and are aware of

19 each other.

20          Dr. Andrew Bell, from the witness stand,

21 said -- and you know he worked for Pfizer -- said that

22 Pfizer scientists began looking at sildenafil to treat

23 BPH.

24          Let me pause here for a second.

25          What is sildenafil?  Viagra.  What is Viagra?

1   A PDE5 inhibitor.  What is BPH?  Benign prostatic

2   hyperplasia.

3           So, here is another group of scientists -- and

4   you see his answer.  He's anchoring it or referencing it

5   to 1997, doing work and looking at the same thing in the

6   same timeframe.  Because of Burnett references and

7   everything else, it's obvious.  People are looking at it.

8           Maybe we can manipulate the effects -- maybe

9   we can manipulate and have an effect on smooth muscle to

10  loosen up that smooth muscle and allow the man's urine --

11  or, as Dr. Viktrup said, "voiding" -- to happen more

12  smoothly.

13          And if we'll go to the next slide.

14          In the same timeframe -- and granted, it's

15  here in 2001.  But let me pause for a moment and ask you

16  if you will recall Trial Exhibit Number 1011.  I hope

17  it's in your notes, but I'll call it to your attention

18  right now.

19          Trial Exhibit Number 1011 is a slide deck from

20  the science and technology committee of Eli Lilly and

21  Company.  Slide Number 6, Bullet Point Number 2 talks

22  about why Eli Lilly and Company was interested in the

23  ICOS partnership and investing in the partnership.

24          And what they saw was the value of tadalafil,

25  a PDE5 inhibitor like Viagra, to cause smooth muscle

1466

1    relaxation.  It's right there in the slide, 1998.

2              So, you had 1997 activity.  We've got 1998

3    activity.  This is all around the same time because

4    Burnett and Takeda have spoken.  They have written and

5    everybody is looking at the literature and they are all

6    arriving at the same obvious conclusion.

7              And launching from Trial Exhibit Number 1011,

8    the 1998 document, three years later, considering the

9    entire life cycle of the drug as you heard Dr. Sabo say,

10   the extension was, where else can we have this smooth

11   muscle relaxation effect in the body; and we stated our

12   own rationale for a PDE5 inhibitor.

13             And I laugh because Mr. -- we work a lot

14   together.  I like Mr. Vare.  I like him a lot.  He's very

15   passionate and he said -- because it was right.  He said

16   you're going to hear Dr. Burnett a whole lot; because

17   it's very important, because Burnett is establishing a

18   principle from which everybody else is making an obvious

19   conclusion.

20             And we stated our rationale based upon his

21   work that we could reinforce the NO-cGMP signaling

22   pathway with a PDE5 inhibitor to induce smooth muscle

23   relaxation leading to the relief of BPH symptoms.

24             That's what Pfizer was looking at, based upon

25   Dr. Bell.  That's what these scientists for UroPep talked

1  about in 1997.  And it's all based upon the same set of

2  scientific literature.  Doesn't belong to anybody.

3          And that's the beauty of the power that you

4  have.  You are allowed to announce to the world that we,

5  the jury, agree that the body of scientific literature

6  establishes that it was obvious and you cannot claim

7  ownership to an obvious idea.

8          That's all the evidence says.  That's all it

9  leads you to.  And the relevant language is, would a

10 person have been prompted to do it, and I've shown you

11 they were prompted to do it -- I'll give them credit for

12 that.  They were prompted to do it, as were other people

13 because it was an obvious extension.

14         So they cannot own it.  And you have the power

15 to tell the Patent Office that you sat in a long trial in

16 Marshall, Texas, and you heard the experts speak and you

17 saw the evidence and you disagree.  You have that power.

18 And the evidence, I believe, compels you to make that

19 decision.

20         I would like to next move to anticipation.

21 This is a separate defense.  Remember I said, if a

22 reference had said PDE5 was in the prostate and it was

23 functional, then that would be anticipation.  So,

24 obviousness says it was not stated, but would it have

25 been a logical extension?  Yes, obvious.

1        Next defense.  If it's anticipated, meaning it

2   is not new, just like you can't claim ownership of an

3   obvious idea, Mr. Hughes' client cannot hold my client,

4   stick them up with the October 2014 letter because the

5   Patent Office got it wrong -- which they do; otherwise,

6   we wouldn't have the law that we have.  They can't stick

7   us up for something that is anticipated.

8        How do we know it's anticipated?  Because it

9   was stated within the four corners of one document.

10  That's Victor Vital's rendition of what the law says.

11  But the judge told you and it's in here.  And what is

12  that one document?  It's the Cheung reference, Trial

13  Exhibit Number 1551.

14       What I believe to be one of the most moving

15  parts of the trial was when Dr. LaForgia testified about

16  the Cheung reference.  I have a copy of it.  It's here on

17  the screen in electronic form.  But he had the original

18  from 1994.  That's an important date because 1994 comes

19  before 1997.

20       And if somebody said something in a reference

21  before 1997 -- I see you smiling -- it ain't new.  It's

22  not new.  That's why they want to make fun of it.  They

23  want to make fun of it and denigrate it because they know

24  it's not new.

25       The jury charge talks -- the jury instructions

1  talk about a person who was interested in the art.  So,

2  the question is, was this document otherwise available

3  prior to 1997 by someone who was interested in the art.

4  Who was interested in the art?  The art is this whole

5  notion and business about BPH.

6          How, do we know that someone interested in the

7  art was interested in it and had access to it?  Because

8  Brian LaForgia asked Dr. Cheung to write this because he

9  had patients who were having these symptoms.

10          And let me pause here for a moment.  We have a

11  slide on this, but I've got to talk about this.  The AUA

12  has their own guidelines and they do not officially

13  recognize phytotherapy or herbal supplements.

14          Doesn't mean you can't go to Whole Foods and

15  buy them or Tom Thumb or wherever you want to buy them

16  from.  They just do not at the time -- and we'll talk

17  about that in a moment -- say that they themselves

18  officially prescribe them, which kind of makes sense.

19  It's kind of obvious.  They are over the counter.  You

20  don't need a doctor to prescribe plant therapy.  You can

21  go to Whole Foods or some herbal supplement store and buy

22  your own.

23          So, this notion or business that Dr. Roehrborn

24  does not acknowledge that the AUA does not make it

25  official does not mean that it doesn't exist.  It's what

1470

1  we call in law a "strawman" or argument or debate.  It's

2  a strawman.  It's a false argument.  Doesn't matter what

3  the AUA believes.  But we'll talk about that in a moment.

4  It matters what the Cheung reference showed.

5           But what does the AUA say, in fact.

6           We'll go to the next slide.

7           This is Trial Exhibit -- Plaintiff's Exhibit

8  Number 265.  This is the AUA -- which is the association

9  for the urologists like Dr. Sliwinski, Dr. Roehrborn.  If

10 they weren't interested in it, if it wasn't on their

11 radar screen, it wouldn't be in their guidelines.

12          They are recognizing that nonconventional

13 approaches exist and have been of great interest for many

14 years.  It's been of interest to traditional Chinese

15 medicine and they are looking at it.

16          So, just because the fancy urologists -- and I

17 like Claus Roehrborn -- Dr. Roehrborn a whole lot and his

18 AUA association.  But the bottom line is, they do not get

19 to judge what is anticipated.  Just because they, at this

20 time, didn't officially recognize it, it doesn't mean it

21 didn't exist.

22          But even they recognize it and it has been of

23 interest for many years and they are studying it.  They

24 even acknowledge that higher quality evidence has begun

25 to appear and the assessments of efficacy are beginning

1   to evolve.  Those are fancy words for --

2              Next slide, please.

3              -- the fact that they recognize that this can

4   actually work, which means it is anticipated.  And I'm

5   going to show you that it does anticipate.  Here is the

6   claim, a method for treating benign prostatic

7   hyperplasia.  Is that what this is about?  Yes.

8              Next slide.

9              Administering to a man -- or person in need --

10  an effective amount of a PDE5 inhibitor, icariin is in

11  there, and it's a selective PDE5 inhibitor.

12             Let's go to the next slide.

13             The formula set out in pages 80 and 81 of

14  Trial Exhibit Number 1551 tell you that the ingredient

15  includes icariin --

16             Next slide.

17             -- which is why it's working.  This is not

18  rocket science.  It's not rocket science at all.  We know

19  that selective PDE5 inhibitors work to induce smooth

20  muscle relaxation causing men relief from BPH.

21             That's what this whole trial was about.  They

22  just don't like the fact that there was a reference that

23  existed before their claimed invention that said the same

24  thing, that did the same thing.

25             And we know it worked because it had a 94

1    percent success rate.  That's pretty good to me.  That

2    would mean you got an A in school.  So, icariin got an A.

3    That's just plain -- I like to be plainly spoken.  It got

4    an A.

5            94 percent of people who showed up in this

6    study had relief.  And we know they had relief because

7    they were supposed to get relief.  Why were they supposed

8    to get relief?  Because icariin said so.  Icariin is a

9    PDE5 inhibitor and it's supposed to work and it does

10   work.

11           Next slide.

12           Now, this whole notion about this slide -- you

13   know, it's a really misleading slide.  It really is.  The

14   claim doesn't require it to be equal to a potency of

15   tadalafil.  That's our own unique structure.  It belongs

16   to us.  And it is powerful.  But just because it's more

17   powerful than other PDE5 inhibitors doesn't mean that the

18   other PDE5 inhibitors are not PDE5 inhibitors that are

19   selective under the court's definition.

20           Next slide.

21           I would like you to remember this document and

22   take this back with respect to icariin, Defendant's

23   Exhibit 1328.  Exhibit 1328 gives you a better

24   comparison, not the misleading comparison they wanted to

25   leave you with.  It compares zaprinast, which is in the

1  '124 patent, to icariin.  And what does it show?  They

2  are roughly similar.  They are roughly similar.

3          So, I just kind of winged it last night and

4  put together this slide just to give you an impression of

5  what a true comparison could possibly look like.  If you

6  compare zaprinast to icariin and then you want to know

7  what the amount is, you don't have to eat pounds of it.

8  It's going to be a smaller amount.

9          You can manipulate the result to try to make

10  fun of our reference that existed in traditional Chinese

11  medicine by giving a false comparison, but if you look at

12  zaprinast, which is in the patent, you don't have the big

13  stack, the 3 pounds.

14          And we know it works, as I close this

15  argument, because 94 percent of men taking epimedii,

16  which is horny goat weed, which includes icariin, got

17  relief.

18          Now I'd like to move to written description --

19  oh, before we get to written description, let's back up

20  and I want to go outside of the presentation and play a

21  clip.  This is from Dr. Terrett, the independent expert

22  in this case.

23          (Testimony presented by video.)

24          Question:  In 1997, would a person of skill in

25  the art understand that there was a single common

1  chemical structure or feature for all inhibitors of

2  enzymes?

3           Answer:  No.  Inhibitors are very diverse in

4  their structures.

5           Question:  In 1997, would a person of skill in

6  the art understand or know of a common chemical structure

7  or feature for all inhibitors of PDEs?

8           Answer:  No.  The structures that inhibit PDEs

9  are, again, structurally very diverse.

10           Question:  In 1997, would a person of skill in

11  the art understand or know of a common chemical structure

12  or feature for all inhibitors of PDE5?

13           Answer:  No.  The PDE5 inhibitors, again,

14  represent a fairly diverse collection of different

15  chemical structures.

16           (End of video testimony.)

17           MR. VITAL:  That is important because of page

18  16 of the jury charge talking about written description,

19  which is the third defense that the law entitles us to

20  cloak ourselves in and to use as protection.  You cannot

21  claim ownership of an idea that you did not adequately

22  describe.  If I don't know the bounds of what the

23  property is, how fair is that to charge me?  It's not

24  fair at all.

25           And we have a defense called "written

1475

1   description."  And that's what Dr. Terrett basically just

2   testified to.  "The patent has to include a sufficient

3   number of representative compounds or a common structural

4   feature."

5           What you just heard is that that doesn't exist

6   and it can't exist.  And you can't feel sorry for UroPep

7   because they can't meet the burden or they didn't meet

8   the burden.  They listed so few compounds in the patent

9   they cannot meet the standard enunciated by the court,

10  set forth by the court in the jury instructions, based

11  upon what Dr. Terrett just said.  They fail big-time.

12          And not only do they fail under the written

13  description requirement under the testimony that you just

14  heard right here in closing argument, but they also fail

15  on enablement.

16          You can have an idea -- this is the fourth

17  defense.  But if that idea is not enabled, you can't

18  claim ownership to it and you shouldn't have gotten a

19  patent for it.  People have been talking about flying,

20  for instance, for many years going back centuries.  But

21  just because you had the idea, if you didn't enable it,

22  show how somebody who wanted to use it could work it,

23  it's not enabled.

24          Next slide.

25          So, there are factors that talk about whether

1  something is enabled, and these are the factors and they

2  are in the jury instructions.  I want to show you, for

3  instance, how one of them works, "working examples in the

4  patent."

5          Are there working examples in the patent?  It

6  talks about injecting yourself, as you heard from

7  testimony, six to seven times a day.  Is that working?  I

8  don't think so.  Who wants to do that?  That's not

9  working.  That don't make sense.

10         "Topical administration," that means to put

11  something on your skin like ointment if you have a rash.

12  How do you topically -- how do you put something on your

13  body to induce smooth muscle relaxation?  You cut

14  somebody open and go inside and put it on -- that just

15  doesn't make any sense.  It's not a working example.

16  Just one factor that they failed.

17         Next slide.

18         "Scope of the claimed invention."  You have to

19  consider the scope to consider whether they gave enough

20  enablement to use the invention.  And we know the scope

21  is huge, billions and billions, based upon Dr. Uckert's

22  testimony.  Confirmed by Dr. Terrett, whose audio we're

23  not going to play, for the sake of time, but you'll

24  remember.

25         Go to the next slide, Keith.

1477

1          (Video presentation to the jury.)

2          MR. VITAL:  Let's stop there.

3          He told you that we're talking about billions.

4  Again, we're talking about billions.  And why is that

5  important.

6          Next slide.

7          Because just for one class of compounds,

8  quinazoline, we got billions.

9          Let's just move through the slides until we

10  get to 500.

11          This is just one class of compounds.  And

12  that's just 500 derivative molecules and we're talking

13  about billions within that class alone, just that class.

14  So, we're talking about an immense universe that you have

15  to instruct or enable people interested in using the

16  invention how to use it.

17          Next slide.

18          (Testimony presented by video.)

19          Question:  Let's go to Column 2 of the '124

20  patent.

21          Beginning in Column 2 around line 28, do you

22  see that, where it starts, "preferred selective

23  inhibitors of PDE1, 4, and 5 are..."

24          Answer:  Yeah.

25          Question:  And do you know why that list of

1478

1  compounds with letters a) through j) are identified as

2  preferred selective inhibitors of PDE1, 4, and 5 in the

3  '124 patent?

4           Answer:  No.  I don't know.

5           Question:  Do you know who selected those

6  compounds?

7           Answer:  I don't know.

8           Question:  You did not select those

9  compounds --

10          Answer:  I did --

11          Question:  -- of preferred --

12          Answer:  I did --

13          Question:  -- inhibitors?

14          Answer:  I did not -- I did not make this

15  selection.

16          (End of video testimony.)

17          MR. VITAL:  Let's stop there.

18          Patent guidance, that's another factor.

19  You've got a broad scope, billions and billions and

20  billions, and the named inventors are telling you in this

21  courtroom, that we just heard again, that he doesn't know

22  why the examples in the patent selected as preferred

23  selective inhibitors were included.  That's not providing

24  any help to anybody who is interested.

25          Let's go to the next slide and beyond that

1  slide.

2          Question:  Would all inhibitors of PDE5 work

3  to treat or prophylactic BPH?

4          Answer:  It's impossible to say.

5          Why is that important?  We're talking about

6  billions.  They give no guidance for why they included

7  what they included in the patent.  And Dr. Terrett, who

8  is Dr. Bell's boss at Pfizer, basically just told you

9  that you don't know -- it's impossible to say what will

10 work.

11         So, if it's impossible to say with billions

12 and billions, you've got to provide a whole lot more

13 guidance than the eight-column patent that got approved

14 by the Patent Office.  You have the power to say this is

15 not enabled.

16         Next slide.

17         And we heard from Dr. Beavo who told you

18 about -- I call -- it talked about the pig, the pig

19 paper.  That's the Truss paper.  I just call it the pig

20 paper so I can remember it.  It's the Truss paper.

21         The grandfather of PDEs basically told you --

22 separately from the fact that we heard that we don't know

23 what will work and how it will work and how to make it

24 work -- you just heard that -- they got a paper that

25 doesn't work and the grandfather of PDEs told you that.

1480

 1           The patent is pockmarked with problems

 2  regarding whether it will work and how to make it work

 3  regarding this immense scope of the claim.

 4           May I have the ELMO, please.

 5           That's important because Dr. Bell testified

 6  and confirmed that with respect to the compounds that

 7  will inhibit, he couldn't tell you which ones could be

 8  administered in an effective amount to treat BPH.  The

 9  patent doesn't tell you.  It doesn't say which ones.

10           And that's important because on Mr. Mortara's

11  examination, final examination of Dr. Bell, asking about

12  this method -- they want to say it is just a method, but

13  you can't practice the method without the compounds.

14           This is what Dr. Bell said.

15           "Is it just the compounds that were known?  Is

16  it just the compounds in the patent."

17           This is one of the final answers in the case,

18  which is why I love it so much:  "It covered both," those

19  that were known and those that were brand-new, billions

20  and billions and billions.  So, if it covered both and

21  there are billions and billions and billions of

22  possibilities and we don't know which ones will work and

23  we are not told how they will work, this is not enabled.

24           Next slide.

25           And if we can animate this slide.

1          You will remember as it animates that Dr. Bell

2   told you he had a project at Pfizer, this is Trial

3   Exhibit Number 1598.  Starting with 500,000 compounds,

4   five years of work, with way more guidance, that's in the

5   patent.  Set of key criteria designed to give confidence.

6   And how many worked?  None.

7          So, even these criteria did not generate a

8   suitable compound of this diverse set of PDE5 inhibitors

9   that we know it's impossible to say if they would work.

10  If this is not enough, you know that what's in the patent

11  is not enough.

12          And now I'd like to go to what Eli Lilly and

13  Company did.  Based upon an entire universe of billions

14  and billions and billions, based upon hard work that the

15  company did that you heard about -- you saw the stacks of

16  documents -- we found a selective PDE5 inhibitor that

17  would work; and we put it on the market.  And we are here

18  today asking you not to let this company get held up in

19  this courtroom.

20          You heard Mr. Jarosz say that it's not fair to

21  try to hold somebody up.  That's not the way you do

22  patent damages.  You don't hold somebody up based upon

23  the work they did when you don't own the property.  You

24  send me a letter.  You tell me you want me to pay you for

25  standing on my own property?  What kind of sense does

1  that make.

2          What if I said I want you to pay me millions

3  of dollars because you are standing on your property that

4  you have the right to be on under patent law because it

5  belongs to us all?  You can't claim ownership to that.

6  You can't charge Victor for standing on his own property.

7  That's why we didn't respond to that letter.  The company

8  is offended by that letter because of work we did,

9  because of what we are entitled to rely on under the

10  patent law.  That's why we are proud to stand in this

11  courtroom to say you are our only protection, only

12  protection.

13          As I leave you, as you fill out the Verdict

14  Form, you are our only protection, as you answer the

15  questions that are in the court's charge, to prevent us

16  from being held up by this plaintiff.  So, I'm going to

17  ask you -- I'm not going to talk about infringement.

18  I'll leave that to your sound discretion.  Did they prove

19  an enlarged prostate?  I'll leave that to you.

20          I want to talk about enablement.  I want to

21  talk about invalidity.  You're going to answer yes to all

22  of these questions here because the law allows us to a

23  yes answer and you are entitled to protect us.

24          THE COURT:  Mr. Vital.

25          MR. VITAL:  Thank you very kindly.

1483

1        And the damages question you heard Mr. Jarosz

2   say, $11 million, is more than they deserve.  We don't

3   think they deserve anything.  We will leave that to your

4   sound discretion.  Don't let us get held up today.  We

5   appreciate your time.

6        Thank you.

7        THE COURT:  Thank you, Mr. Vital.

8        Mr. Hughes, you have rebuttal.

9        MR. HUGHES:  May I have one minute, your

10  Honor, to gear over?

11       THE COURT:  Yes, you may.

12       MS. SMITH:  Ms. Greenwald, do I have

13  18 minutes?

14       LAW CLERK:  Exactly.

15       MR. HUGHES:  Your Honor, may I proceed?

16       THE COURT:  Please do.

17       MR. HUGHES:  I've only got a few minutes left

18  to speak with you, and I'm not going to be able to

19  respond to everything that Mr. Vital said.  You've heard

20  a lot of testimony on each of these issues.  But let me

21  try to hit the high points for you now that it is clear

22  that really what Lilly is doing is focusing on every

23  single one of their different arguments for why the

24  patent is invalid.

25       And, again, I'll remind you as we go into

1484

1 these that the standard of proof on each of these is a

2 clear conviction, a strong belief that the Patent Office

3 got it wrong.

4          Mr. Vital is right.  That is a question for

5 you as the jury to answer.  You have that power, and we

6 want you to exercise it.  But I want to go through the

7 evidence and show you how Lilly has come utterly short in

8 satisfying their burden of proof.

9          I'll start where Mr. Vital started, on

10 obviousness.  And I'm showing you what he showed you,

11 which is the Burnett article.  I want to make sure that

12 there are a couple of things that are crystal-clear.

13 Burnett was an author who was writing in this area at the

14 key time.

15          Do you know what Burnett never figured out,

16 what he never wrote in any article?  He never wrote that

17 PDE5 was in the prostate.  Never once.  That's all the

18 hindsight bias of their expert.  What this article is

19 about is about nitric oxide.  It doesn't say anything

20 about PDEs and the prostate, and it's got question marks

21 and so forth all over it.

22          There has also been some testimony, Mr. Vital

23 point out, the urethra.  There hasn't been any evidence

24 in the case that that was known before 1997.  And as I

25 explained to you already, the Patent Office had this

1 information.  We told them that PDE5 was in the penis.

2 We told the Patent Office that it was in the bladder.

3 And the Patent Office determined that even in light of

4 all of that, it was a new invention.

5          And the evidence in the case that confirms

6 that, that confirms that UroPep and Dr. Uckert came up

7 with something new is Dr. Rotella:  Dr. Rotella is on a

8 team at a pharmaceutical company with a big group of

9 researchers and they are trying to figure out how to use

10 a patent that covers millions of PDE5 inhibitor compounds

11 in 1995 to treat every disease.  They listed like 30.

12 Mr. Mortara stood up here and read them all to you.  And

13 the one that was not on the list is treating BPH.

14          There is no way that they can overcome the

15 clear and convincing evidence requirement in light of the

16 fact that we know that a team of medical researchers who

17 were looking at this at the time didn't figure it out.

18          And Mr. Vital also showed you some testimony

19 from our witness, Dr. Bell, where he was asked about BPH.

20 But his answer was about high blood pressure,

21 hypertension.  So, I just wanted to make sure you saw

22 that on the screen.

23          And the last point that I'll make on here is

24 that Dr. Roehrborn's testimony was pretty compelling.  He

25 admitted he had the answer when he went to look at this

1  question.  He's the guy who sponsored the obviousness

2  opinion.  He's their expert who said it would have been

3  obvious.  He didn't know anything about PDEs in 1997.  He

4  had the answer when Lilly asked him to look at it today.

5        And the guys who were writing at the time --

6  Burnett, Takeda, all these folks they want to talk

7  about -- they didn't have the answer.  They didn't figure

8  it out.  It's the ultimate hindsight bias case.

9        And I want to point out to you that in the

10 obviousness instructions, the jury instructions that

11 Judge Bryson read to you, it provides, page 13:  "In

12 deciding obviousness you must avoid using hindsight; that

13 is, you should not consider what is known today or what

14 was learned from the patent.  You should not use the

15 patent as a roadmap for selecting and combining items of

16 prior art.  Instead, you must put yourself in the shoes

17 of a person of ordinary skill in the art at the time of

18 the invention."

19       And we know what people in those shoes did.

20 They didn't figure it out.  That's Dr. Rotella and his

21 team at Bristol-Myers Squibb.  That's all of these

22 authors.  They do not have clear and convincing evidence

23 on this issue.

24       Next is the issue of anticipation, the Cheung

25 reference.  I'd like to put that up on the screen and

1   make a couple things clear.

2           This is what they are relying on to say that

3   Cheung anticipates claim 1 of the '124 patent.  And what

4   they have to prove in order to show that is that this

5   herbal epimedii that I've got highlighted here was

6   actually administered to a patient.  There is a question

7   on that because there is an "or" on here so we don't even

8   know if that happened.

9           And then they have to prove that the icariin,

10  which is just a tiny component of the herbal epimedii,

11  was what actually helped these guys as opposed to all of

12  the other things on this list.

13          And Dr. Roehrborn testified -- he's the only

14  witness that sponsored this opinion.  He testified he

15  didn't know.  He didn't know whether it was these other

16  compounds versus the icariin.

17          And Mr. Vital showed you some things from the

18  American Urological Association.  I want to just put

19  those in context.  I'll show you what he showed you.

20  This has nothing to do, zero, with horny goat weed.  It

21  is about saw palmetto and stinging nettle.

22          The recent studies -- I see down here in the

23  lower right -- failed to confirm that there is any way

24  these even worked.  It has nothing to do with it.  No way

25  they have clear and convincing evidence on this question.

1              And then Mr. Vital showed you a slide that he
2    made about icariin and zaprinast and made fun of our
3    slide with all the weed in it.  But what he didn't
4    explain to you is that icariin is a tiny, tiny component
5    of horny goat weed.

6              What his slide is, is comparing if you take
7    that icariin out and compare it to zaprinast, then you
8    can have the kind of comparison he did.  What we are
9    talking about is that icariin is just a teeny, teeny
10   amount of that horny goat weed.  And Dr. Bell testified
11   you would have to consume a massive amount in order to
12   anticipate.

13             There is no way this comes to the clear and
14   convincing evidence standard that is required for you to
15   find that the '124 patent is not valid.

16             And, in fact, I just want to -- I want to show
17   you what Mr. Vital showed you because I've got a little
18   time.  This is what he showed you.  He is showing you a
19   comparison of the extracted icariin and zaprinast.  He's
20   not showing you a comparison of the horny goat weed to
21   zaprinast.  That's what Dr. Bell did.  He said how much
22   horny goat weed would you have to consume.

23             So, again, they don't have the clear and
24   convincing evidence on the issue of anticipation.

25             Then we come to the concept of written

description.  And here, again, the Patent Office has

looked at this issue.  Dr. Bell explained that the idea

is that someone with skill in the art -- remember the

instructions instruct you you've got to look at these

issues from the perspective of a person of ordinary skill

in the art.

So, that is somebody who, in 1997, was a

member of a research team with medicinal chemists,

urologists.  That's why we have to have these experts

come in here and talk to us about whether or not these

issues are satisfied.  So, you've got to put yourselves

in those shoes.

And Dr. Bell testified that you bring to the

table everything that is known in the art.  We don't have

to copy and paste it into the patent.

And what was known in 1997 in the areas of

PDE5 -- we talked about this during the trial -- PDE5s

were already in clinical trials with Viagra and

sildenafil.  Zaprinast was in clinical trials.  These

were known drugs.  These were known category of drugs or

compounds and they were published in the literature.

There were many of them known.  You heard Dr. Bell's

testimony.

What our patent is, is the idea of using that

known class of compounds in order to treat a new disease.

1  That's what we invented.  That's what we came up with.

2  And that's exactly what our patent describes.

3          And Mr. Vital focused on this language in the

4  jury instructions on page 16 about "a sufficient number

5  of representative compounds or a common structural

6  feature"; it's one or the other.  And there are

7  representative compounds in the patent.

8          You heard from Dr. Bell about it's got

9  sildenafil; it's got zaprinast; it's got selective PDE5

10  inhibitors.  Those are enough for a person like Dr. Bell,

11  a skilled person, to figure out the scope of the claimed

12  invention.

13          And then in terms of common structural

14  features, I think you all heard the testimony from

15  Dr. Bell yesterday about the common structural feature of

16  the frog example.

17          So, there is more than sufficient evidence to

18  support written description.  They don't have the

19  evidence to get them over the clear and convincing hurdle

20  that they would have to satisfy.

21          And, again, recall the testimony of

22  Dr. Roehrborn.  He didn't have the experience about what

23  needs to be in the patent.  The Patent Office had that

24  experience.  They had this information.  They looked at

25  the information you have, and they decided that the

1491

1  patent was valid and issued it to UroPep.

2          The last issue that Mr. Vital talked about is

3  enablement, and that's really the idea of how much

4  information do you have to put in these patents in order

5  to permit somebody of skill in the art -- it's not you or

6  me or Mr. McBride picking up the patent and saying,

7  "Well, sure, now I can use it."  It's somebody who is

8  actually an expert practicing in that field.  And, again,

9  that person brings all the tools to the table that are

10 known at the time.

11         So, the question is:  What kind of data, what

12 kind of information do you have to put in the patent in

13 order to enable the patent.

14         And, again, the testimony of Dr. Rotella is

15 important here because he testified that all of the

16 criticisms that are being leveled at our patent, because

17 it covers a lot of compounds and it's only got certain

18 data in it, apply equally to his patent that he got with

19 Bristol-Myers Squibb.

20         And that just undermines all of their claim

21 about enablement in this case, and it shows you that

22 these kind of patents frequently do cover millions of

23 compounds, lots of compounds.  And Dr. Bell explained

24 that the experts have the tools and the resources

25 available to test those, figure out which ones work and

Jury Trial, Volume 5

1492

1    move forward and practice the invention.

2              And that's exactly what's happened here.

3    There is no question that Lilly is using the invention.

4    Lilly is using the invention by selling Cialis to treat

5    people with BPH.

6              I want to go through now the Verdict Form with

7    you.  I'll go through the questions that you'll need to

8    answer.  The first one, I think there is no longer any

9    dispute.  Mr. Vital didn't get up here and say that there

10   is no infringement.

11             So, question 1, has UroPep proved by a

12   preponderance of the evidence that Lilly induced

13   infringement of claim 1 of the '124 patent?  That's an

14   easy one for you-all.  The answer is yes.

15             The next question you'll need to answer, "Has

16   Lilly proved, by clear and convincing evidence, that

17   claim 1 of the '124 patent is invalid for any of the

18   following reasons."

19             We have just walked through all of those.

20   They don't have credible evidence.  They can't get over

21   the hump on "clear and convincing," "firm belief."  They

22   don't even come close.  So, the answer to each of those

23   is "no."

24             I don't even really hear them defending the

25   damages issue in any meaningful way anymore.  BPH is

1  super valuable to Lilly.  Dr. Vellturo conducted that

2  analysis.  We talked about the value when I spoke with

3  you earlier.

4          And, again, this is a big number, but it's

5  leaving, you know, more than half with Lilly.  They get

6  to keep the lion's share of the profits.  This is a

7  reasonable royalty Dr. Vellturo calculated and we talked

8  about in the trial.  You heard the evidence.

9          Now, Mr. Vital talked about the power of a

10  jury and how this case is in your hands.  And it is about

11  to be in your hands; and, again, we thank you and

12  appreciate your service and we respect your power and we

13  respect the verdict that you will return.

14          And for the first time from Mr. Vital we heard

15  Eli Lilly's outside lawyer finally give an explanation

16  for why they never responded to the letter, that they

17  don't think it's valid for the host of different reasons

18  that we've talked about today.

19          But Lilly didn't send anybody down from

20  Indianapolis to give an explanation during the trial.

21  Instead, those executives stayed there waiting to see if

22  their strategy of never responding to UroPep would pay

23  off, of stonewalling, of not being willing to sit down

24  with us and try to work it out.

25          And, so, now the case is about to go into your

1  hands, and it is up to you to decide if Lilly's strategy

2  is going to pay off.  It's up to you to give Dr. Uckert

3  the response that Lilly never provided, that his work and

4  the work of the UroPep inventors mattered, the work that

5  was cited over and over again by Lilly, the work that was

6  cited by Lilly to the Patent Office.

7           Did he and UroPep make a valuable

8  contribution?  You get to decide whether Dr. Uckert and

9  the inventors at UroPep invented something, made a

10  valuable contribution.  And you get to judge the

11  credibility of Lilly's criticisms of this patent with

12  their experts in court with their out-of-court conduct

13  where they are citing our inventors over and over and

14  over again to the FDA, where they are citing one of our

15  patent applications in their own failed BPH patent

16  application to the U.S. Patent Office.  You can decide

17  the credibility of Lilly's position based on that

18  evidence.

19           It is really up to you to decide if the

20  intellectual property rights of small teams, small teams

21  of scientists working at medical schools are valuable and

22  are as valued as the intellectual property rights of

23  companies like Eli Lilly.

24           I hope that after the verdict, Lilly will

25  understand that there aren't two rules here.  There is

1  not one rule for Dr. Uckert and the UroPep inventors and

2  one rule for Lilly and their patents.  The rules are the

3  same.

4         We have valuable intellectual property rights.

5  Lilly has been on our property without permission since

6  October of 2014.  No one disputes they have infringed to

7  the tune of $700 million, and I respectfully submit that

8  the right verdict is a verdict of infringement, that the

9  patent is valid, and that damages are $84.5 million.

10        Thank you very much.

11        THE COURT:  Thank you, Mr. Hughes.

12        Jurors, it is now time for you to deliberate

13  on your verdict.  The first thing you should do when you

14  retire to the jury room is to select a foreperson who

15  will be responsible for communicating with the court as

16  needed.

17        You should then begin your deliberations.

18  Your verdict on each issue must be unanimous.  There will

19  be a Verdict Form in the jury room waiting for you when

20  you retire for your deliberations.

21        You will note that the Verdict Form has a

22  series of questions to be answered during the course of

23  your deliberations that corresponds to the jury

24  instructions I've just given you.  When you reach a

25  unanimous verdict as to each question on the Verdict

1    Form, the foreperson is to fill in the answers on the

2    Verdict Form.

3            Please make sure to read the questions

4    carefully; and note that some of the questions may not

5    require answers, depending how you answer other

6    questions.

7            Do not reveal your answers to any of the

8    questions to anyone outside of the jury until you return

9    your verdict and are discharged.  Also, if there is a

10   divided vote on any of the issues at some point during

11   your deliberations, you should not reveal how the vote is

12   divided on any issue, even to me.

13           It frequently happens that there is

14   disagreement among jurors when they begin deliberating,

15   but part of your responsibility as jurors is to continue

16   to deliberate in order to attempt to reach a unanimous

17   verdict on each of the questions you are being asked to

18   answer.  In the course of respectful discussion among the

19   jurors, it is almost always the case that the jurors can

20   reach a unanimous verdict even if they are divided at the

21   outset.

22           When you return to the courtroom to announce

23   your verdict, please bring the completed Verdict Form

24   with you.

25           Now, during your deliberations you must not

1   communicate with or provide any information to anyone

2   other than your fellow jurors about this case.  This

3   includes through the use of any electronic device or

4   media such as a smartphone or a computer or by way of the

5   Internet or any Internet service or text or instant

6   messaging service, any Internet chat room, blog, or

7   website such as Facebook, LinkedIn, YouTube, or Twitter.

8            In short, you may not provide information to

9   anyone about the case or conduct any research about the

10  matter until I accept your verdict.  I should add that

11  the court security officer, Mr. Johnson, as well as other

12  persons, is forbidden to communicate in any way or manner

13  with any member of the jury on any subject touching the

14  merits of the case.

15           Of course, you can have contact with

16  Mr. Johnson and Ms. Martin, the chief deputy clerk, or

17  other court staff as necessary to deal with any needs you

18  may have; but you should not speak with them or anyone

19  else about the case itself.  This is your business as

20  long as you are deliberating.

21           Now, it is important to add the caution that

22  nothing said in these instructions and nothing in any

23  Verdict Form prepared for you is meant to suggest what

24  verdict you should return.  What the verdict shall be is

25  your sole and exclusive duty and responsibility.

1498

1          Now, I expect when you get to the jury room to

2     begin your deliberations, you may feel a little

3     overwhelmed.  This has been a very complicated case, and

4     there is a lot of evidence and argument to think about.

5     But I think you will be pleasantly surprised that as you

6     start working methodically through the case, things will

7     begin to seem more manageable.

8          I hope and expect that you will listen to one

9     another's views respectfully, even if initially you

10    disagree on some issues.  Discussing the issues from

11    different perspectives can often help in formulating your

12    own ideas about how particular issues should be decided.

13         If you wish to see any of the exhibits, you

14    are free to see them.  All you need to do is have your

15    foreperson sign a note asking for the exhibit and to

16    provide that note to Mr. Johnson or any other court

17    security officer who might be taking care of you at the

18    time.  You can ask to see all the exhibits, or you can

19    just ask to see some of them.  It's your choice.  Just

20    let us know what you want, and we will get those exhibits

21    for you.

22         If you have a question or otherwise want to

23    communicate with me at any time, please follow the same

24    procedure by providing a written message or question to

25    the court security officer, who will then bring it to me.

1  You probably will not get a reply right away because I

2  usually need to summon all the lawyers and get their

3  input before I can respond to the questions.  That just

4  means that I usually can't get back to you right away,

5  but we will do our best to get you an answer to your

6  question as soon as we can.

7            If you do have a question that is hanging you

8  up, you are entitled to ask.  I will tell you, however,

9  that once the case is submitted to you, as it will be in

10  a moment, we will not be able to take any additional

11  evidence; and I may just have to tell you to rely on your

12  collective recollection of what the evidence was and tell

13  you that you have to decide the case based on the

14  evidence you have heard.

15            I think you will find that in most instances,

16  if you put your heads together, you will recall the

17  evidence that you need to get over the problem.  That's

18  one of the reasons there are eight of you.  Eight

19  memories are better than one.

20            Finally, and most importantly, trust your

21  common sense throughout.  As I mentioned earlier, the

22  founding fathers of this country had great confidence in

23  the sound, common sense of an American jury.  They had

24  confidence in you to do your job diligently and well.

25  The parties in this case have confidence in you, and so

1500

1   do I.

2           Thank you.  You may now retire for your

3   deliberations.

4           (The jury exits the courtroom, 11:13 a.m.)

5           (Open court, all parties present, jury not

6   present.)

7           THE COURT:  Okay.  Please be seated.

8           Do we have any further matters that we need to

9   take up.

10          MR. VITAL:  No, your Honor.

11          MR. BARRON:  No, your Honor.

12          THE COURT:  All right.  I have two matters

13  that I would like to put on the record before we adjourn.

14          The first has to do with something that I

15  neglected to say at the time of the Rule 50(a) ruling on

16  willfulness.  And I alluded to this point earlier, but I

17  will now make clear for the record that on willfulness,

18  had willfulness gone to the jury and had there been a

19  verdict of willful infringement in this case, I -- based

20  on the evidence I heard in the course of the trial, I

21  would have exercised my discretion not to award enhanced

22  damages under 35 USC, Section 284.

23          The second point I'd like to make is a

24  point -- well, Ms. Veazey has just left, but I wanted to

25  extend my appreciation to Ms. Veazey, the courtroom

1  deputy; to Ms. Bickham, the very hard-working court

2  reporter -- I'm afraid I've been a very tough task

3  master -- here is Ms. Veazey.

4          I was just expressing my appreciation to your

5  work and that of Ms. Bickham during the trial and also to

6  Mr. Johnson and to Ms. Martin and the entire court staff.

7  This courtroom -- the courthouse, as I've said on

8  numerous occasions, is a remarkably efficient and cordial

9  place.  It is as friendly as it is efficient.  They

10  really know how to handle juries and to make things as

11  comfortable as possible for the parties, and, I have to

12  add, for visiting judges; and I admire them enormously

13  for that.

14          Right now they have three trials going at

15  once, which turns out is not actually a record, but it's

16  remarkable that with as small a staff as they have they

17  are able to do this seamlessly.  So I appreciate that.

18          And one other group of people I'd like to

19  thank is a group of people that we don't see, which is

20  you're all getting daily transcript, I assume.  Yes.  And

21  that means that unbeknownst -- well, perhaps beknownst,

22  but unseen, are the people that are working late into the

23  night to produce these transcripts, and I just think they

24  need some acknowledgment as well because that is hard,

25  hard work and I appreciate it.

1          And, finally, I appreciate the professional

2  presentations made on the part of the parties in this

3  case and the lawyers.  It has been a pleasure to preside

4  over the trial.

5          So, let's adjourn.  If we get notes or other

6  communications from the jury, we will contact you.  And

7  have, I hope, a more relaxed lunch.

8          Thank you.

9          (Recess, 11:17 a.m. to 12:58 p.m.)

10          (Open court, all parties present, jury not

11  present.)

12          THE COURT:  Okay.  We have a note which I will

13  share with you, and I have some thoughts.

14          Okay.  Well, we have actually two notes; but

15  only one of them is really pertinent.  The first note

16  reads, "We, the jury, nominate Dick Tracy, Jr., as our

17  foreman."

18          The second note, which is pertinent, reads as

19  follows -- and it's from "D.T.," Mr. Tracy, I assume --

20  "How long do we have to get to an animous" -- clearly

21  meaning unanimous -- "vote?"

22          So, I'm open to suggestions.  I have one which

23  I will throw out, but this may be an occasion in which we

24  might want to get ahead of the curve a little bit by

25  having someone do a little research on the state of the

1    *Allen* charge in Fifth Circuit law which --

2              MR. HUGHES:  It's only 1:00.

3              MR. VITAL:  Right.

4              THE COURT:  I know.  It's only 1:00

5              Here is my take on this.  It could mean one of

6    two things.  It could either mean how long do we have to

7    stay here, or it could mean is there a limit on the

8    amount of time within which we have to decide -- to get

9    to the verdict.

10             I would think at this point the best thing to

11   do would be to construe the note in the first -- excuse

12   me -- the second thing; that is to say that they are

13   asking whether they need to decide within a fixed period

14   of time, the answer to which is simple.  No.

15             MR. VITAL:  Right.

16             THE COURT:  And then to add something to the

17   effect of keep going until you get there, without putting

18   any kind of suggestion that, you know, we'll keep you the

19   whole weekend if we have to.

20             As far as -- I think it would be premature to

21   give any kind of *Allen* charge at this point.  I mean,

22   they haven't indicated deadlock; although, there may be

23   some hints of that at least.  But the problem with the

24   *Allen* charge is, as you-all have dealt with this

25   before -- is that once you use it, you've used up your

1   bullet.  And I would be inclined to do something more

2   modest at first; and then if they come back and they

3   still have problems, then we can push them a little

4   harder.

5           There is a lot of sensitivity about the *Allen*

6   charge; and I would think it would be wise for us to have

7   a good handle, which I haven't looked at Fifth Circuit

8   law on *Allen* charges for probably -- well, for 24 years.

9           MR. VITAL:  Your Honor, there is a pattern

10  instruction.

11          THE COURT:  Is there?  Okay.  Well, I'll --

12          MR. VITAL:  There is a pattern for civil

13  cases.

14          THE COURT:  Yeah.  I assume there is; so, I

15  don't think we have to do any real deep research.  But

16  this is one of those occasions in which pattern

17  instructions would seem to have a real appeal because we

18  know that it has been blessed by the Fifth Circuit, and

19  that's good.

20          MR. VITAL:  Right.

21          THE COURT:  So, here is my proposal -- and I'm

22  all ears for any others -- something like this:  There is

23  no specific time limit within which you are required to

24  reach a unanimous verdict.  For now, you should continue

25  to deliberate in an effort to reach a verdict on which

1505

1    you can all agree.

2         Does that language -- one concern -- and I

3    suppose this may be not terribly likely, given the fact

4    that "unanimous" was not, you know, spelled -- it's

5    spelled A-N-I-M-O-U-S, and that could just be a glitch.

6    But I want to make sure that they understand the concept

7    that you all have to agree; so, I'm putting that in the

8    second sentence.

9         Everybody okay with this?

10        MS. SMITH:  Yes.

11        MR. VITAL:  Yes.

12        THE COURT:  Okay.  Why don't we get the jury,

13   and I will so instruct them.

14        MR. MORTARA:  Your Honor, should we close the

15   doors to the courtroom; or do you want to leave them

16   open?

17        THE COURT:  Leave them open.  I mean, it is an

18   open court.

19        MR. MORTARA:  They are usually shut when we

20   have court.  That's why I asked.

21        THE COURT:  Oh, no.  There's no reason.  It's

22   a little warm in here.  I don't think there is any

23   reason.  We have open court.

24        Actually, Jill, could I have the note just so

25   that -- I will read it to them to make sure that we are

1506

1  all -- that this is consistent with their concerns.

2            (The jury enters the courtroom, 1:03 p.m.)

3            THE COURT:  Ladies and gentlemen of the jury,

4  we have a note from you and we've conferred and we have

5  an answer which may help.

6            What the note says is, "How long do we have to

7  get to a unanimous vote?"  And our answer is that there

8  is no specific time limit within which you are required

9  to reach a unanimous verdict.  For now, you should

10 continue to deliberate in an effort to reach a verdict on

11 which you can all agree.

12           I hope that's helpful.  And you should now

13 retire and continue to deliberate, if you would.  Thank

14 you.

15           (The jury exits the courtroom, 1:05 p.m.)

16           THE COURT:  Okay.  And if anyone has any

17 comments, suggestions, or any other observations, I'm all

18 ears.

19           MR. VITAL:  We don't have anything, your

20 Honor.

21           THE COURT:  Okay.  Any comments?

22           MS. SMITH:  No, your Honor.

23           THE COURT:  All right.  Why don't we do this.

24 Let's -- I don't think this is going to be difficult.  As

25 Mr. Vital points out, there are standard

1 circuit-blessed -- and the fact that it is Fifth

2 Circuit-blessed, this is going to be Fifth Circuit law

3 for sure, even though it will be in the Federal Circuit

4 potentially -- but a Fifth Circuit-blessed *Allen* charge

5 just in case we need so we don't end up scrambling if we

6 find ourselves at 3:00 or 4:00 with a jury coming back

7 reporting deadlock.  You can divide the labor however you

8 want to.

9          Thank you.

10          Actually, you know, it occurs to me -- I say

11 "*Allen* charge" because I -- you know, when I used to do

12 this, it was all criminal; and that was -- the *Allen* case

13 is a criminal case.  Do they --

14          MR. MORTARA:  It is still *Allen*.  We just had

15 a two-*Allen*-charge trial.  Yes, it is still *Allen* in a

16 civil case.

17          THE COURT:  All right.  Well, I don't know if

18 Fifth Circuit does this; but I know some circuits divide

19 the *Allen* charge into stages to try to avoid, you know,

20 too much intimidation at the first stage but to kind of

21 push a little harder at the later stages.  But that will

22 be in the standard form, I expect.

23          MR. VITAL:  Yes, it will.

24          THE COURT:  Good.

25          MR. MORTARA:  Thank you, your Honor.

1508

 1          THE COURT:  Thank you.

 2          (Recess, 1:07 p.m. to 4:08 p.m.)

 3          (Open court, all parties present, jury not

 4  present.)

 5          THE COURT:  We have a note.  I think the

 6  answer is going to be easy, but you may think otherwise.

 7  And I'll read it to you.  It starts:  Final Jury

 8  Instructions.  In the middle of page 15, does the

 9  sentence mean, quote, person of ordinary, quote, mean in

10  the art, which is underlined, as shown on example -- and

11  then the sentence isn't finished.

12          But I think the gist of it is that the

13  question is does "person of ordinary skill" mean "person

14  of ordinary skill in the art," the answer to which

15  seemingly is a resounding yes.

16          Now, there are a couple of ways we could do

17  this.  We could haul them in here and tell them, "The

18  answer to your question is 'yes'"; or we could send them

19  a note back, which I would be perfectly content to do,

20  and avoid making quite as much of a big show.

21          MR. HUGHES:  We would prefer to call them

22  back.

23          THE COURT:  Do you?

24          MR. HUGHES:  Yes, please.

25          THE COURT:  Okay.  That's fine.  We'll do

1509

1  that.

2          Does anybody have anything other than the word

3  "yes" to suggest?

4          MR. VARE:  No.

5          MR. VITAL:  Not from us, your Honor.

6          MR. HUGHES:  No, sir.

7          THE COURT:  Okay.  Why don't we call them

8  back.

9          (The jury enters the courtroom, 4:14 p.m.)

10         THE COURT:  Ladies and gentlemen of the jury,

11 you've asked a question about wording on the middle of

12 page 15, specifically does the sentence that refers to a

13 person of ordinary skill mean in the art.

14         And the answer to that question is yes, it

15 does.  I hope that's helpful to you.

16         Okay.  Very well.  Thank you.

17         (The jury exits the courtroom, 4:15 p.m.)

18         THE COURT:  Okay.

19         MR. VITAL:  Were you all able to find the

20 civil --

21         THE COURT:  Yes.  We were able to find the

22 pattern charge.  I think it's a 2014 version, which I

23 suspect -- since this goes back many years, I suspect

24 it's the same even if there is a later version.  But we

25 also were able to find some case law that sort of fills

1  in with respect to such factors as how long, what kind of

2  predicate there has to be for -- such as some kind of

3  announcement of deadlock.  There are a variety of

4  factors, but I think we have a pretty good handle on

5  what's necessary --

6           MR. VITAL:  Thank you, your Honor.

7           THE COURT:  -- to trigger the *Allen* charge.

8           Nonetheless, I think -- well, let me suggest

9  that it might be a good idea for you-all if you can

10 briefly confer.  And if you agree on particular language,

11 if we get to the point of the *Allen* charge -- presumably

12 the language of the pattern charge.  But if you have any

13 departures that you want to suggest from that, if you

14 first would meet and confer on that, it will save us

15 potentially some time.

16          MR. VITAL:  I will do that.

17          THE COURT:  So, it would be nice if we could

18 come in here with a -- I've actually written out both the

19 pattern charge and multiple copies for the jurors in case

20 having it in writing would be helpful to them.

21          MR. VITAL:  Yes, your Honor.

22          THE COURT:  If you don't agree with the

23 pattern charge, it would be helpful to know.

24          MR. VITAL:  Yes, your Honor.

25          THE COURT:  Good.  Thank you.

1              (Recess, 4:17 p.m. to 5:38 p.m.)

2              (Open court, all parties present, jury not

3    present.)

4              THE COURT:  Okay.  We have a verdict.  So, if

5    everybody is settled in.

6              Mr. Johnson, could you bring in the jury,

7    please.

8              (The jury enters the courtroom, 5:39 p.m.)

9              THE COURT:  Mr. Tracy, as foreman of the jury,

10   do you have a Verdict Form?

11             THE FOREPERSON:  Yes, we do, your Honor.

12             THE COURT:  Could you give that to

13   Mr. Johnson, please.

14             Thank you.

15             I will now read the verdict question by

16   question.

17             Question Number 1.  Has UroPep proved by a

18   preponderance of the evidence that Lilly induced

19   infringement of claim 1 of the '124 patent?  (For the

20   judge's instructions on infringement, see Instruction

21   Numbers 1 through 3 in Part III of the instructions.)

22             Answer, yes.

23             Question Number 2.  Has Lilly proved, by clear

24   and convincing evidence, that claim 1 of the '124 patent

25   is invalid for any of the following reasons?

1          A, anticipation.  No.

2          B, obviousness.  No.

3          C, lack of written description.  No.

4          D, lack of enablement.  No.

5          Question Number 3.  What is the reasonable

6   royalty that UroPep is entitled to receive from Lilly for

7   infringing the '124 patent?

8          $20 million.

9          It is dated 4-21-17.  Dick Tracy, Jr., jury

10  foreman.

11          Now, does anybody want me to poll the jury?

12          MR. VITAL:  For Lilly, only at your pleasure,

13  your Honor.  We are fine with however you choose to

14  proceed.  I understand --

15          THE COURT:  If you don't want to poll the

16  jury, I think it makes --

17          MR. VITAL:  We don't have a --

18          THE COURT:  That's fine.

19          MR. VITAL:  -- specific request but --

20          THE COURT:  That's fine.

21          MR. VITAL:  -- your Honor could do it.

22          THE COURT:  We'll just -- let me give

23  Ms. Veazey the Verdict Form.

24          All right.  I just want to express our sincere

25  thanks for the hard work you've done this week, and I

Jury Trial, Volume 5

1513

1  know this is a very difficult case and you've worked very

2  hard.  You've been very attentive.  And on behalf of the

3  court staff and this whole Eastern District court, we are

4  very grateful for your service.

5             Now, I would like you now to go with

6  Mr. Johnson back to the jury room, if you would, and wait

7  for me.  I'll be in there in just a moment, and I want to

8  have an opportunity to discharge you and greet you

9  individually and personally.

10             As to going forward, you are free to talk

11  about this case to anyone that you want; but you are

12  also free not to talk about it if you don't want to.  So,

13  the lawyers will not approach you; but if you're

14  interested in talking to the lawyers, they will be happy

15  to do that.

16             So, you are done with your service as soon as

17  I discharge you in just a couple of moments.  But once

18  again thank you so much.

19             Court is adjourned.

20             (The jury exits the courtroom, 5:42 p.m.)

21             THE COURT:  Actually, I said court is

22  adjourned; but is there anything that anyone needs to

23  further -- any other matter anyone needs to raise?

24             MR. VITAL:  I'm just happy to go home and

25  sleep in my own bed tonight.

1514

1    THE COURT:  Nothing other?  Now the court is

2 adjourned.  Thank you.

3    (Proceedings concluded, 5:43 p.m.)

4 COURT REPORTER'S CERTIFICATION

5    I HEREBY CERTIFY THAT ON THIS DATE, APRIL 21,

6 2017, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

7 RECORD OF PROCEEDINGS.

8    _____/s/_____
CHRISTINA L. BICKHAM, RMR, CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25