**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ERFINDERGEMEINSCHAFT UROPEP GbR, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Case No. 2:15-CV-1202-WCB |
| ELI LILLY AND COMPANY, | § § | |
| *Defendant*. | § § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is the motion of plaintiff Erfindergemeinschaft UroPep GbR ("UroPep") for ongoing royalties in this case. Dkt. No. 363. Defendant Eli Lilly & Co. ("Lilly") opposes. The Court GRANTS IN PART UroPep's motion for royalties for the period between April 17, 2017, and July 9, 2017.

## BACKGROUND

In its complaint, UroPep alleged that Lilly infringed UroPep's patent, U.S. Patent No. 8,791,124 ("the '124 patent"), by marketing the drug Cialis for the treatment of benign prostatic hyperplasia ("BPH"). Lilly answered by denying infringement and contending that the '124 patent was invalid. The evidence at trial showed that Lilly made approximately $704.3 million in sales of Cialis attributable to the BPH indication between October 9, 2014 (the date on which Lilly was notified of UroPep's patent), and April 16, 2017 (the day before the beginning of the trial). <u>See</u> Dkt. No. 342, Trial Tr. at 401, 403; Dkt. No. 344, Trial Tr. at 1120. The jury found that Lilly had infringed the '124 patent and that the patent was not invalid. It awarded UroPep

$20 million in damages.  The implied royalty rate adopted by the jury was therefore 2.84 percent of the total infringing sales for the pretrial infringement period.

For the reasons set out in detail below, the Court will apply twice the jury's implied royalty rate to the infringing sales of Cialis made between April 17, 2017, and July 9, 2017 (the date the '124 patent expired).  That amount has been added to the total amount awarded to UroPep, as reflected in an amended judgment entered today.  The prejudgment interest rate (the applicable prime rate, compounded quarterly) will apply to the entire monetary award granted in the amended judgment.  The statutory post-judgment interest rate will apply thereafter.  The parties are directed to determine the precise amount owed by Lilly to UroPep as an ongoing royalty for the April 17 to July 9 period, based on the Court's award and in light of the volume of the relevant infringing sales during that period.  The parties are also directed to determine the dollar value of the prejudgment interest to be paid on the ongoing royalty for the period between April 17 and July 18, the date of the amended judgment in this case.

## DISCUSSION

UroPep requests an ongoing royalty rate of 15 percent—much greater than the 2.84 percent royalty rate implied by the jury's verdict for Lilly's pretrial infringing conduct.  According to UroPep, the proposed 15 percent rate is supported by (1) the increased profitability of Lilly's post-verdict infringing sales, (2) UroPep's post-verdict bargaining power, and (3) Lilly's post-verdict willful infringement.  Lilly, on the other hand, contends that the Court should not award an ongoing royalty.  If the Court does award an ongoing royalty, Lilly argues that it should be limited to a royalty rate of 2.84 percent, or at most 3 percent.

## I.  UroPep's Right to an Ongoing Royalty

At the outset, it is clear to the Court that UroPep is entitled to be compensated for infringement occurring between the cut-off date for its calculation of damages, April 16, 2017, and the expiration date of the '124 patent, July 9, 2017.  See Fresenius USA, Inc. v. Baxter Int'l, Inc., 582 F.3d 1288, 1303 (Fed. Cir. 2009) ("A damages award for pre-verdict sales of the infringing product does not fully compensate the patentee because it fails to account for post-verdict sales.").  Lilly makes several arguments for why any recovery for that period is barred, but none of those arguments is persuasive.

First, Lilly argues that the statement in the Court's Final Judgment denying all relief other than that set forth in the judgment bars any recovery for the post-verdict period.  See Dkt. No. 360, at 2, ¶ 6.  In fact, however, the Court explained in a telephonic conference conducted on May 15, 2017, shortly before the judgment was entered, that the Court would address the issue of ongoing royalties in an amended judgment following the parties' briefing of that issue.  As part of that discussion, the Court stated that it would allow the parties additional time to brief the ongoing royalties issue based on Lilly's request for an extension of time for filing its response to UroPep's motion.  The Court made clear that it contemplated addressing the ongoing royalties issue separately from the initial judgment.  There is thus no force to Lilly's suggestion that the Court's initial judgment contemplated the termination of UroPep's rights in that regard.

Second, Lilly argues that UroPep waived its right to an ongoing royalty award pursuant to 35 U.S.C. § 283 by not requesting an injunction.  Section 283 provides that a court "may grant [an] injunction[] in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  The Federal Circuit has "interpreted that provision to permit a court to award 'an ongoing royalty for patent infringement

- 3 -

in lieu of an injunction' barring the infringing conduct." <u>Prism Techs. LLC v. Sprint Spectrum L.P.</u>, 849 F.3d 1360, 1377 (Fed. Cir. 2017) (quoting <u>Paice LLC v. Toyota Motor Corp.</u>, 504 F.3d 1293, 1314 (Fed. Cir. 2007)); <u>SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC</u>, 807 F.3d 1311, 1332-33 (Fed. Cir. 2015) (en banc) ("[A]bsent egregious circumstances, when injunctive relief is inappropriate, the patentee remains entitled to an ongoing royalty."), <u>vacated in part on other grounds</u>, 137 S. Ct. 954 (2017).

In its complaint, UroPep sought an injunction, or an accounting of future royalties if an injunction was denied. Lilly points out, however, that in the joint pretrial order UroPep did not include an express request for ongoing royalties in lieu of an injunction. Instead, UroPep stated in the joint pretrial order that it "is entitled to recover both pre-verdict and post-verdict damages in the form of a reasonable royalty for the infringement of the '124 patent by Lilly." Dkt. No. 251, at 9, ¶ 2.

The Court interprets that statement as a request for ongoing royalties in lieu of an injunction, to be assessed by the Court pursuant to 35 U.S.C. § 283. UroPep did not request an injunction, no doubt appreciating that the equities would not favor issuance of an injunction in favor of a non-competitor and for the short period of time remaining in the life of the '124 patent. <u>See</u> <u>Prism</u>, 849 F.3d at 1377 (an ongoing royalty may be awarded if "a conduct-barring injunction is not warranted"). In addition, UroPep likely recognized that it would be better served by a post-verdict award of ongoing royalties than by an order enjoining Lilly from promoting the Cialis's BPH indication for a three-month period. Under those circumstances, UroPep's decision to seek a post-verdict royalty award—i.e., ongoing royalties in lieu of an injunction—cannot reasonably be treated as a forfeiture of its right to relief of any sort for the post-verdict infringement period. Lilly cites no authority that would support that odd

proposition.  Thus, the Court concludes that UroPep has not waived its right to post-verdict ongoing royalties under 35 U.S.C. § 283.

Third, Lilly argues that the Court has the option to refuse to award any ongoing royalties. While that is technically true, it would be improper for the Court first to conclude that the damages awarded by the jury do not cover the post-verdict period, but then to rule that UroPep is not entitled to any relief for that period.  Lilly quotes language from the Federal Circuit's decision in Whitserve, LLC v. Computer Packages, Inc., 694 F.3d 10, 35 (Fed. Cir. 2012), where the court stated that "[t]here are several types of relief for ongoing infringement that a court can consider: (1) it can grant an injunction; (2) it can order the parties to attempt to negotiate terms for future use of the invention; (3) it can grant an ongoing royalty; or (4) it can exercise its discretion to conclude that no forward-looking relief is appropriate in the circumstances."  Lilly interprets that statement as offering the Court the unfettered option of granting no relief at all for post-verdict infringement.  In Whitserve, however, the Federal Circuit did not suggest that it would be proper to deprive the prevailing plaintiff of any remedy whatsoever for post-verdict infringement.  Quite the opposite.  The court concluded that the jury's award covered only past harm, rejecting the argument that the jury's verdict indicated that the award was meant to "cover future use of [the asserted] patents."  Id. at 35.  The Federal Circuit then held that the district court abused its discretion by denying the request for prospective relief (i.e., an injunction or an ongoing royalty), and forcing the plaintiff to "resort to serial litigation" to obtain compensation for the post-verdict period.  Id. at 35-36.

This case is quite similar.  The parties did not argue to the jury (or the Court) that the damages award would constitute compensation for a paid-up license, nor did they otherwise indicate that the jury should consider future conduct in making its damages assessment.  Rather,

as Lilly acknowledges, both experts "applied their proposed royalty rates to the pretrial royalty base—i.e., the incremental profits and revenues that existed at the time of trial." Dkt. No. 370, at 4 (emphases omitted).  As in <u>Whitserve</u>, the parties "limited their damages arguments to past infringement rather than projected future infringement."  694 F.3d at 35.  In addition, "[t]he jury was instructed to award 'damages,' which by definition covers only past harm," and its "verdict did not indicate that the award was meant to cover future use" of the patented invention.  <u>Id.</u>

Lilly has offered no reason for the Court to decline to provide prospective relief under section 283.  <u>See</u> <u>Whitserve</u>, 694 F.3d at 36 (court is required "to explain any decision it makes" denying such relief).  Lilly only points out that the experts at trial neither addressed future royalty payments nor explained why any royalty would change post-trial.  Dkt. No. 370, at 4. But that reinforces the fact that, as in <u>Whitserve</u>, the issue of future royalties was not before the jury and not resolved by the verdict.

The Court has concluded that an injunction would not be appropriate in this case, given the short period between the verdict and the expiration of the '124 patent and the absence of any evidence that UroPep would suffer irreparable harm during that period without an injunction. The Court also has concluded that ordering the parties to attempt to negotiate terms for future use of the invention is unlikely to be successful in light of the wide divergence between the parties' positions on the ongoing royalty issue.  Nor have the parties indicated that they "believe additional negotiation attempts would be fruitful"; rather, they have indicated by their briefing "that they wish[ ] the court to resolve the issue of the amount of any ongoing royalty." <u>Affinity Labs of Tex., LLC v. BMW N. Am., LLC</u>, 783 F. Supp. 2d 891, 896-97 (E.D. Tex. 2011). Finally, the Court has no reason to deny UroPep relief for Lilly's ongoing infringement and consign UroPep to the inefficient process of initiating follow-on litigation to seek damages for

the three-month period of infringement at issue here.  See Whitserve, 694 F.3d at 34-35. Accordingly, the Court concludes that UroPep is entitled to an award of ongoing royalties for the period between April 17, 2017, and July 9, 2017.

Although the Court has addressed the question of relief under section 283, the Court appreciates that this indirect infringement case presents an additional wrinkle:  Even if UroPep had obtained an injunction under section 283, it would still be entitled to damages under 35 U.S.C. § 284 for post-verdict infringing sales that were attributable to Lilly's pretrial inducement.  Those damages would be derived from infringing sales that were caused by Lilly's pretrial acts of inducement but were not covered by the jury's verdict because the induced sales occurred after the jury's verdict.  See Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1213 (Fed. Cir. 2010) (reversing denial of request for damages because "the district court should have awarded compensation for any infringement [activity] prior to the injunction.").  Under section 284, the Court has "broad discretion in determining appropriate relief for patent infringement." Id. at 1212-13.  But "injunctions [under section 283] and damages [under section 284] must be tailored to the circumstances and be correlatively determined."  Id. at 1212-13; accord Carborundum Co. v. Molten Metal Equip. Innovations, Inc., 72 F.3d 872, 881 (Fed. Cir. 1995).  Therefore, the Court's determination of the ongoing royalty due to UroPep in lieu of an injunction under section 283 (i.e., the ongoing royalty on infringing sales attributable to Lilly's post-verdict inducement) must be added to the damages due to UroPep for post-verdict infringing sales attributable to Lilly's pre-verdict inducement under section 284.  For that reason, the Court includes both forms of relief in its analysis of the post-verdict hypothetical negotiation to determine a reasonable ongoing royalty.

- 7 -

Lilly raises two objections to UroPep's claim to such damages under section 284, neither of which has merit.  First, Lilly argues that section 284 bars the Court from departing from the jury's implied royalty rate.  However, section 284 and Federal Circuit case law contradict Lilly. Section 284 instructs the court to assess damages "not found by a jury" (the jury in this case awarded damages for the pretrial period but did not consider future conduct and sales), and requires the court to determine a royalty that is "reasonable under the circumstances."  The Federal Circuit's decision in Finjan clarifies that courts have "broad discretion" to fashion an appropriate remedy and requires the court to consider the differing circumstances that may apply to an award of damages under section 284 for a period not covered by the jury's verdict.  626 F.3d at 1212.

Second, Lilly argues that UroPep was required to disclose before trial and to present at trial any argument for post-verdict damages under section 284.  But there is no rule that plaintiffs must ask the jury to decide all prospective damages under section 284.  Such a rule would make no sense in this context in light of the fact that the post-verdict sales giving rise to damages under section 284 had not occurred at the time the case was submitted to the jury.  See Finjan, 626 F.3d at 1213 (remanding for the district court to award post-verdict damages based on Finjan's request, made after trial, "to amend the judgment to include damages for infringing sales that the jury did not consider").

## II.  Calculation of the Ongoing Royalty

While the Court agrees that UroPep is entitled to monetary relief for the post-verdict period, the Court disagrees that UroPep is entitled to the royalty rate that it requests for that period.

As noted, the jury's verdict of $20 million in damages for the period between October 9, 2014, and April 16, 2017, represents an implied royalty rate of 2.84 percent of the infringing Cialis sales. UroPep argues that it is entitled to a much larger recovery for the three-month period between April 17, 2017, and July 9, 2017, than would result from a straight application of the jury's 2.84 percent implied royalty rate to the infringing sales made during that three-month period. UroPep asks the Court to increase the royalty rate more than five-fold and award a 15 percent royalty rate for all infringing sales made during the post-verdict period. UroPep's argument is that the jury's verdict should not control the royalty rate for the post-verdict period; instead, the Court should calculate the post-verdict royalty rate by determining the rate that would have been agreed upon in a hypothetical negotiation occurring just after the verdict.

According to UroPep, that hypothetical negotiation would produce a higher royalty rate both because of the greater certainty provided by the verdict regarding infringement and validity, and because the evidence shows that Lilly could expect to earn a higher profit margin on its sales of Cialis during the three-month post-verdict infringement period than in the pre-verdict infringement period. UroPep argues that a hypothetical negotiation at the time of the verdict would produce a royalty rate of 10 percent. UroPep then argues that the Court should add a premium of 5 percent to the royalty rate (i.e., multiply the 10 percent royalty rate by 1.5) because, following the jury's verdict, Lilly's infringement must necessarily be regarded as willful.

Underpinning UroPep's argument is the theoretical framework discussed in Amado v. Microsoft Corp., 517 F.3d 1353 (Fed. Cir. 2008). See Dkt. No. 363, at 4. In Amado, the Federal Circuit explained that there is a "fundamental difference" between "a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement." 517 F.3d at 1361. "Prior to

judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in the context of that uncertainty. Once a judgment of validity and infringement has been entered, however, the calculus is markedly different because different economic factors are involved." Id. In the Amado case itself, the Federal Circuit directed the district court to consider a hypothetical negotiation following the trial, which the court concluded would produce a higher royalty rate for the infringement period following the verdict, largely because of the fact that any uncertainty as to whether the jury would find infringement or invalidity had been removed. Id. at 1362 & n.2.

To be sure, it is not entirely clear that the Amado analysis applies to a case such as this one. In Amado itself, the Federal Circuit applied that framework to a case in which the district court granted an injunction and then stayed it in favor of an ongoing royalty award. Moreover, the court used language suggesting that the rule in Amado might be limited to instances in which an injunction was, or could be, granted. See Amado, 517 F.3d at 1362 ("When a district court concludes that an injunction is warranted, but is persuaded to stay the injunction pending an appeal, the assessment of damages for infringements taking place after the injunction should take into account the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability . . . as well as the evidence and arguments found material to the granting of the injunction and the stay.").

The Federal Circuit subsequently applied Amado in ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312 (Fed. Cir. 2012). In that case, the circuit court held that the Amado framework is applicable to the determination of the ongoing royalty rate that Verizon should pay the patent owner, ActiveVideo, for the "sunset" period during which the injunction was stayed. ActiveVideo Networks, 694 F.3d at 1342-43. Citing Amado, the court rejected

Verizon's argument that the sunset royalty rate should be limited to the rate that ActiveVideo negotiated with a different party, Cablevision, prior to the litigation.  The court explained that the pre-litigation royalty rate with Cablevision was not applicable to the post-verdict calculation of the royalty rate between ActiveVideo and Verizon, in light of the "substantial shift in the bargaining position of the parties" following the jury's finding that the patent in suit was infringed and not invalid.  Id. at 1342.

Neither of those situations is presented here.  UroPep, which is not a competitor or a party that would otherwise suffer irreparable harm in the absence of an injunction, has not asked for a post-trial injunction, and in the Court's judgment would not be entitled to one if it had asked.  For that reason, Lilly argues that the analysis employed by the Federal Circuit in Amado does not apply to this case.  Because this case does not involve a pre-litigation license to the same patent with another party, as was the case in ActiveVideo, Lilly argues that the Federal Circuit's analysis in that case is also not directly applicable here.

UroPep contends that Amado is not limited to cases in which an injunction was sought, obtained, and stayed or vacated.  There are suggestions in Federal Circuit law that Amado is not limited to that context.  See SynQor, Inc. v. Artesyn Techs., Inc., 709 F.3d 1365, 1384 (Fed. Cir. 2013); Telcordia Techs., Inc. v. Cisco Sys., Inc., 612 F.3d 1365, 1378-79 (Fed. Cir. 2010); Paice LLC v. Toyota Motor Corp., 504 F.3d 1293, 1317 (Fed. Cir. 2007) (Rader, J., concurring) ("[P]re-suit and post-judgment acts of infringement are distinct, and may warrant different royalty rates given the change in the parties' legal relationship and other factors.").  Nonetheless, the extent to which the imposition of an injunction is a realistic threat is an important factor that largely accounts for the difference between pre-verdict and post-verdict hypothetical negotiations.  As the court explained in Presidio Components Inc. v. American Technical

Ceramics Corp., No. 08-CV-335, 2010 WL 3070370 (S.D. Cal. Aug. 5, 2010), the difference between reasonable royalties for pre-verdict and post-verdict infringement "is largely due to the threat of an injunction, which serves as a big stick, essentially framing negotiation in terms of how much an adjudged infringer would pay for a license to continue its infringing conduct. Where . . . an injunction is no longer proper, the Court is hard pressed to find in what material respect the situation is different now than it was during trial." Id. at *4 (citations and quotation marks omitted); see also Univ. of Pittsburgh v. Varian Med. Sys., Inc., No. 08-cv-1307, 2012 WL 1436569, at *12 (W.D. Pa. Apr. 25, 2012) ("The change in bargaining position found in Amado was that the patentee was seeking a permanent injunction when such a remedy did not exist for sales that occurred prior to the entry of final judgment."). Because an injunction was plainly not called for in this case, the "big stick" threat of an injunction was not available to UroPep and thus should not be a factor suggesting a higher royalty rate for post-verdict infringement.

A second consideration bearing on whether and to what extent the Amado model applies to this case has to do with the assumptions underlying the jury's calculation of the hypothetical royalty rate of 2.84 percent. In Amado, the Federal Circuit noted "a fundamental difference" between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement, in that "[p]rior to judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in the context of that uncertainty"; but "[o]nce a judgment of validity and infringement has been entered, . . . different economic factors are involved." Amado, 517 F.3d at 1361-62.

While the economic factors bearing on the post-verdict royalty rate may differ from those that informed the pre-verdict rate, the basic assumptions informing the hypothetical negotiation

in those two settings are often not dramatically different.  In this case, for example, both parties relied on a damages theory based on a hypothetical negotiation conducted at the outset of the infringement period.    The parties' experts both based their analyses of the hypothetical negotiation on the assumption that the '124 patent was valid and infringed.  See Dkt. No. 179-1, at 25 (UroPep's expert Dr. Vellturo); Dkt. No. 344, Trial Tr. at 1052, 1107 (Lilly's expert Mr. Jarosz).  Importantly, the Court instructed the jury that in applying the hypothetical negotiation method of calculating damages, the jury was required to assume that the '124 patent was both infringed and valid.  Dkt. No. 346, Trial Tr. 1431.  Therefore, it is clear that the jury's assessment of the hypothetical royalty at the start of infringement was predicated on an assumption that both validity and infringement would be resolved in UroPep's favor.

In that regard, the jury's hypothetical negotiation analysis was quite similar to the Court's assessment of the ongoing hypothetical royalty rate to be conducted at the conclusion of the trial.[1]  See TransPerfect Global, Inc. v. MotionPoint Corp., No. C10-2590, 2014 WL 6068384, at *5 (N.D. Cal. Nov. 13, 2014); Mark A. Lemley, The Ongoing Confusion over Ongoing Royalties, 76 Mo. L. Rev. 695, 704-705 (2011) ("Juries are already required to assume that the patent is valid and infringed when setting past damages.  There is no reason to think that asking the same question twice should produce different answers in most cases.").  As Chief Judge

---

[1]  In fact, in this case there is greater uncertainty in the Amado post-verdict negotiation than in the jury's assessment of damages.  In determining a reasonable royalty and resulting damages, the jury was instructed to "assume that both parties to the negotiation believed the patent was valid and infringed."  Dkt. No. 346, at 46 (Trial Tr. at 1431).  In contrast, Amado instructs the district court to "take into account the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability—for example, the infringer's likelihood of success on appeal . . . ."  517 F.3d at 1362; see also ActiveVideo Networks, 694 F.3d at 1343 ("The district court may wish to consider on remand additional evidence of changes in the parties' bargaining positions. . . . Indeed, ActiveVideo's bargaining position is even stronger after this appeal.").  The jury in this case assumed certainty when awarding a royalty; the district court assessing ongoing royalties under Amado must take into account the uncertainty stemming from a possible reversal on appeal.

Clark has aptly explained, "it is logically inconsistent to argue that a calculation based upon assumptions of infringement and validity would change when those assumptions are replaced by jury findings of the same facts." Ariba, Inc. v. Emptoris, Inc., 567 F. Supp. 2d 914, 918 (E.D. Tex. 2008); see also Cummins-Allison Corp. v. SBM Co., 584 F. Supp. 2d 916, 918 (E.D. Tex. 2008) ("[A] jury finding of infringement and no invalidity does not change any logically consistent analysis; rather, it merely confirms the original assumption of those facts.    It is inconsistent and unnecessarily confusing to adopt the position that once the assumed facts upon which the expert's analysis of the hypothetical negotiation are confirmed by a verdict, the expert can change his opinion of a reasonable royalty rate.").

In both Amado and cases following it, the courts have made clear that the Amado analysis does not necessarily entail an increase in the post-verdict royalty rate over the pre-verdict rate found by the jury.    Courts that have applied Amado have held that the ongoing royalty rate can ordinarily range from the rate found by the jury for pre-verdict infringement to a rate somewhat higher.    And in some instances, those courts have concluded on the facts of the cases before them that the royalty rate for post-verdict infringement should be no greater than the pre-verdict rate.    See, e.g., XY, LLC v. Trans Ova Genetics, LC, No. 13-cv-876, 2016 WL 6664619, at *1-2 (D. Colo. Nov. 10, 2016) (adopting a post-verdict royalty rate lower than the pre-verdict royalty rate selected by the jury); TransPerfect Global, Inc. v. MotionPoint Corp., No. C 10-2590, 2014 WL 6068384, at *5 (N.D. Cal. Nov. 13, 2014); Bianco v. Globus Med., Inc., 53 F. Supp. 3d 929 (E.D. Tex. 2014) (same analysis applied to a trade secret claim); Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd., No. 09-290, 2014 WL 1320154 (W.D. Pa. Mar. 31, 2014), rev'd in part and vacated in part on other grounds, 807 F.3d 1283 (Fed. Cir. 2015); see also J. Gregory Sidak, Ongoing Royalties for Patent Infringement, 24 Tex. Intell.

- 14 -

Prop. L.J. 161, 175-76 (2016) (noting that of 35 cases in which ongoing royalties were awarded between 2007 and 2015, the same royalty was awarded for post-verdict and pre-verdict infringement in 18 of them).

While under Amado the royalty rate determined by the jury for pre-verdict infringement does not restrict a court from adopting a higher post-verdict royalty rate, the jury's decision is an important consideration in the Court's calculus.  Recognizing the importance of the jury's verdict, courts have uniformly held that the starting point for the Amado analysis of the ongoing royalty rate is the royalty rate found by the jury for the pre-verdict infringement period.  See Arctic Cat Inc. v. Bombardier Recreational Prods., Inc., No. 14-cv-62369, 2016 WL 4267375, at *7 (S.D. Fla. Aug. 15, 2016); Apple, Inc. v. Samsung Elecs. Co., No. 12-CV-00630-LHK, 2014 WL 6687122, at *4 (N.D. Cal. Nov. 25, 2014); Bianco v. Globus Med., Inc., 53 F. Supp. 3d 929, 932 (E.D. Tex. 2014); VirnetX Inc. v. Apple Inc., No. 6:13-CV-211, 2014 WL 12672822, at *3 (Mar. 6, 2014); I/P Engine, Inc. v. AOL Inc., No. 2:11CV512, 2014 WL 309245, at *2 (E.D. Va. Jan. 28, 2014); Fresenius USA, Inc. v. Baxter Int'l, Inc., No. C 03-1431, 2012 WL 761712, at *11 (N.D. Cal. Mar. 8, 2012), vacated on other grounds, 721 F.3d 1330 (Fed. Cir. 2013); Mondis Tech. Ltd. v. Chimei InnoLux Corp., 822 F. Supp. 2d 639, 647 (E.D. Tex. 2011).  The burden is on UroPep to show that it is entitled to a royalty rate in excess of the rate initially determined by the jury.  Creative Internet Advertising Corp. v. Yahoo! Inc., 674 F. Supp. 2d 847, 855 (E.D. Tex. 2009).

Moreover, as explained above, the similarity between the hypothetical negotiation calculus performed by the jury under the Court's instructions and the hypothetical negotiation that the Court is called upon to perform following the verdict provides a strong reason for following the jury's lead.  To the extent that the jury can be discerned to have made a decision

based on the assumption that the patent was infringed and valid, and to the extent that other considerations do not compel a departure from the jury's assessment of the proper royalty rate, the Court should defer to the jury's decision as the finder of fact under the principles of <u>Dairy Queen, Inc. v. Wood</u>, 369 U.S. 469 (1962), and <u>Beacon Theatres, Inc. v. Westover</u>, 359 U.S. 500 (1959).  Those cases stand for the proposition that when exercising equitable powers in the context of a jury trial, the trial court must defer to the findings of fact made by the jury in the legal portion of the case, to the extent that there is overlap between the legal and equitable issues. In this case, the jury's finding as to the proper royalty rate in a setting in which the patent is assumed to be infringed and valid is highly pertinent to the Court's equitable task of determining a post-verdict award in lieu of an injunction.

The Court therefore looks to other facts that may be pertinent to distinguishing the royalty resulting from the jury's hypothetical negotiation from one resulting from a hypothetical negotiation conducted at the time of the verdict.  UroPep makes three arguments on that score. First, UroPep argues that it had increased bargaining power as a result of the jury's verdict of infringement and no invalidity.  As noted, any argument to that effect is tempered by the fact that those assumptions were in place when the jury decided on an implied royalty rate of 2.84 percent.

Lilly counters UroPep's "bargaining power" argument by contending that, despite the jury verdict in UroPep's favor, UroPep would have relatively little bargaining power in a negotiation held in April 2017.  That is so, Lilly contends, because the only ongoing infringing conduct by Lilly is its advertising and promotion of Cialis as a treatment for BPH, and Lilly would suffer little hardship in giving up those infringing activities during the three-month period between April 2017 and the expiration of UroPep's patent in July 2017:  Because of Lilly's

extensive advertising and other promotional activities during the period leading up to the trial, even complete cessation of marketing efforts during the April-to-July 2017 period would not significantly injure Lilly.  And for that reason, according to Lilly, UroPep would not have a strong hand in any negotiation over the royalty rate for that period.

The evidence, including evidence presented by UroPep's expert, shows that the advertising and marketing of Cialis for the BPH indication was very intensive throughout the pretrial infringement period.  Physician and patient awareness of Cialis as a treatment for BPH was already at a very high level in April 2017.  For that reason, the Court agrees with Lilly that it is unlikely that cessation of advertising and promotional efforts for the April-to-July period would have made a large impact on sales in that saturated market.  Therefore, even an injunction against active inducement of sales of Cialis for BPH, or BPH plus ED, during that period would not have led to significant losses of profits for Lilly.  Under such an injunction, Lilly would no longer be free to actively promote the use of Cialis to treat BPH, but it would be free to continue selling Cialis to distributors, who could then sell Cialis to treat BPH.

With that said, there is a significant problem with Lilly's argument regarding UroPep's putatively weak bargaining position.  Lilly's argument ignores a major consideration bearing on the hypothetical post-verdict negotiation:  Many of the sales of Cialis for BPH during the three-month post-verdict period are attributable to Lilly's promotional and marketing activities during the pre-verdict period.  Lilly's own expert admits as much.  Dkt. No. 372-1, at ¶ 32 ("Because Lilly had promoted the use of 5mg Cialis [once a day] for the treatment of BPH through trial, the marketplace awareness and acceptance increased noticeably between October 2014 and April 2017."); see also Dkt. No. 370, at 12 (Even if Lilly stopped promoting and advertising Cialis for BPH in April 2017, Lilly had already created a "well-informed and robust market" that, as Lilly

agrees, would cause infringing sales in the post-verdict period).  Lilly's potential liability for those post-verdict sales in the form of an award of supplemental damages would constitute a significant bargaining chip for UroPep in any post-verdict hypothetical negotiation, regardless of whether UroPep sought an injunction to prevent further inducement of infringement during the post-verdict period.  Therefore, the Court concludes that even though an injunction might not have been severely burdensome to Lilly, that factor would not substantially strengthen or weaken the parties' respective bargaining positions in a hypothetical negotiation conducted at the conclusion of the trial.

UroPep next argues that Lilly infringed the '124 patent by including BPH as an indication on the Cialis label and that Lilly would not have been able to cease that infringing conduct during the three-month post-verdict period even if it had wanted to, because the administrative process of amending the label would have taken too long.  That argument, however, does not help UroPep with regard to the hypothetical negotiation.  UroPep could have demanded that Lilly request that the U.S. Food and Drug Administration authorize the amendment of the Cialis label to omit the BPH indication, but Lilly's acquiescence to that demand would not be expected to have any effect on Lilly during the three-month post-verdict infringement period, given the administrative delay that would ensue following such a request.  Even UroPep acknowledges that "it is unclear Lilly could stop promoting Cialis for BPH even if it wanted to," because of the unlikelihood that the Cialis label could be changed during the April-to-July 2017 period.  Dkt. No. 373, at 2.  In any event, it is improbable that even a successful label change would have had a significant impact on Lilly's sales in light of the existing awareness among patients and physicians regarding the use of Cialis as a treatment for BPH and the likelihood of continuing "off-label" prescriptions during the post-verdict infringement period.  Thus, nothing in the record

suggests that physicians who were prescribing Cialis for BPH before April 17, 2017, would stop doing so simply because the Cialis label was amended for three months to omit the BPH indication.  So any demand by UroPep that Lilly seek to modify the Cialis label during the three months following the jury's verdict would not provide UroPep with a valuable bargaining chip with which to seek an increase in the royalty rate.

To explain why UroPep would not enjoy increased bargaining power in a post-verdict negotiation, Lilly advances a separate argument based on several of the so-called Georgia-Pacific factors.  See Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  Lilly argues that the short duration of the post-verdict infringement period and the nature of the ongoing infringement, which is limited to Lilly's promotion of the BPH indication, would favor Lilly.  Dkt. No. 370, at 12 (citing Lilly's expert's declaration, Dkt. No. 372-1, at ¶¶ 35-36).

The Court is not persuaded by Lilly's expert's bald statement that the shortness of the post-verdict infringement period "gives greater leverage to Lilly in the hypothetical negotiation." Dkt. No. 372-1, at ¶ 35.  As UroPep points out, the shortness of the post-verdict infringement period may in fact favor UroPep, because it may "be more expedient for Lilly to pay UroPep's requested royalty than to change its entire marketing strategy [] and promotional materials . . . for just a few months."  Dkt. No. 373, at 4-5.  On the other hand, the "nature of the invention" and the theory of infringement favor Lilly, because any additional advertising—or the absence thereof—would have little effect on Cialis sales for the three-month period at issue due to physician and patient awareness of the efficacy of Cialis in treating the signs and symptoms of BPH.  See Dkt. No. 372-1, at ¶ 36.  Because the first factor cuts in favor of UroPep, while the second cuts in favor of Lilly, the Court views those factors, taken together, as neutral.

Finally, UroPep contends that regardless of any other enhancements, a post-verdict royalty award should be increased by a factor of 1.5 because Lilly's post-trial infringement is willful.  UroPep cites a number of cases for the proposition that ongoing infringement after entry of judgment of infringement and no invalidity is willful.  E.g., VirnetX Inc. v. Apple Inc., No. 6:13-cv-211, 2014 WL 12672822, at *4 (E.D. Tex. Mar. 6, 2014); Soverain Software LLC v. J.C. Penney Corp., 899 F. Supp. 2d 574, 590 (E.D. Tex. 2012); Mondis Tech. Ltd. v. Chimei InnoLux Corp., 822 F. Supp. 2d 639, 651 (E.D. Tex. 2011).  UroPep then urges the Court to enhance damages for willful infringement based on several of the factors set out in Read Corp. v. Portec, Inc., 970 F.2d 816, 827 (Fed. Cir. 1992).

The first point to be made in this connection is that the Federal Circuit rejected the "willfulness" ground for an enhanced ongoing royalty in Amado.  The district court there "centered its damages assessment on willful infringement," but the circuit court rejected that ground for decision, holding that "willfulness, as such, is not the inquiry when the infringement is permitted by a court-ordered stay."  Amado, 517 F.3d at 1362.  If it is improper to use willfulness as a basis for enhancing the ongoing royalty in a case in which an injunction has been granted and stayed, it would seem at least equally improper to use willfulness as a basis to enhance the ongoing royalty in a situation in which the equities would not even permit the issuance of an injunction in the first place.  And it may be even more improper in a case such as this one, which involves a non-competitor, in which the plaintiff chooses not to seek an injunction, and in which the defendant's continuing infringement in fact benefits the plaintiff by generating sales from which ongoing royalties can be awarded.

Moreover, this Court rejected UroPep's willfulness argument at trial and in a post-trial memorandum opinion, holding that under the analysis of Read v. Portec and the Supreme

Court's decision in Halo Electronics, Inc. v. Pulse Electronics, Inc., 136 S. Ct. 1923 (2016), UroPep has not met its burden to prove willful pretrial infringement. Dkt. No. 359, at 6-7 ("In particular, the Court concluded that there was no evidence of deliberate copying; there was no improper behavior by the infringer in its capacity as a party to the litigation; Lilly made reasonable arguments with respect to certain of the issues of invalidity; there was no showing that Lilly had a motivation (or sought) to harm UroPep; and there was no evidence that Lilly attempted to conceal any misconduct.") (citing Read, 970 F.2d at 827-28).

The Court reiterates that the Read factors do not favor enhancement in the post-trial context, for several reasons. First, there is no evidence of copying of the '124 patent, which post-dates Lilly's initial work on the BPH indication in 2001, approval of Cialis for the BPH indication in 2011, and several years of Lilly's marketing of Cialis for BPH before the start of infringement in 2014.

Second, although the jury found the '124 patent not invalid, that alone does not negate Lilly's good faith belief that the patent is invalid. Lilly has filed a motion for judgment as a matter of law to challenge the verdict and has expressed its intention to file an appeal in the event that its motion is denied. Despite the jury's verdict in UroPep's favor, the Court regards Lilly's invalidity arguments as non-frivolous.

Third, and relatedly, the "closeness of the case" factor from Read favors Lilly, because this case was closely contested and presents several difficult legal issues. As the Court stated previously, "Lilly raised substantial arguments as to the validity of the '124 patent" both before and during the trial. Dkt. No. 359, at 3.

Fourth, Lilly's size and financial condition, while sufficient to weather an award of an enhanced royalty, does not by itself support UroPep's contention that Lilly has engaged in conduct deserving of an enhanced royalty award.

Fifth, there is no evidence of litigation misconduct in the course of the proceedings in this case.  In arguing that Lilly has been guilty of litigation misconduct, UroPep focuses on Lilly's failure to disclose a revised term sheet in a Lilly contract with IntelGenX that was executed a month before trial.  UroPep credits, as it did at trial when the revised IntelGenX license term sheet was discovered, that Lilly's outside counsel was unaware of the revised agreement.  See Dkt. No. 363, at 14.  UroPep notes, however, that one of Lilly's in-house attorneys, a designated Rule 30(b)(6) witness, knew of the earlier term sheet agreement and was present during the trial.  Id.  UroPep then states that Lilly's in-house attorney "was presumably also aware of the [revised term sheet] agreement."  Id.  But there is no evidence that the in-house attorney was aware of the revised agreement.  It appears that other members of Lilly's legal department knew of the revised agreement, including Lilly's general counsel, who signed the agreement, and it is clear that the agreement should have been produced prior to trial.  Dkt. No. 344, Trial Tr. at 1140-41.  However, the failure to produce the agreement under those circumstances was not shown to be the product of purposeful evasion of Lilly's disclosure obligations.  The evidence regarding this incident therefore does not justify a finding of "wanton, malicious, bad-faith, deliberate, consciously wrongful [or], flagrant" litigation misconduct sufficient to justify a finding of willfulness.  Halo Elecs., 136 S. Ct. at 1932.

The only difference between the Court's earlier Read analysis for pretrial infringement and UroPep's current argument for a post-verdict willfulness determination is that Lilly's post-verdict activities took place following the entry of the jury's verdict and the Court's judgment of

infringement and no invalidity.  However, the entry of a verdict and judgment does not justify recharacterizing Lilly's post-verdict behavior as "wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate."  Halo Elecs., 136 S. Ct. at 1932.  Although Lilly now knows that a jury has found its conduct to be infringing, Lilly has not committed any new acts deserving of enhanced punishment.  Lilly has merely continued its previous conduct with the reasonable belief that UroPep would not seek an injunction and in circumstances in which Lilly would be required to pay any ongoing royalty to which UroPep is entitled.  See Wisconsin Alumni Research Found. v. Apple, Inc., No. 14-cv-062, 2017 WL 2438832, at *14 (W.D. Wis. June 6, 2017) (refusing to enhance ongoing royalty based on willfulness because "Apple reasonably believed that the court would not enter a permanent injunction, . . . and instead would award an ongoing royalty based on a hypothetical negotiation—an expectation shared by this court. . . . Apple knew it was going to have to pay for its continued use of the infringing technology, unlike a willfully infringing party who hopes to conceal its knowing infringement.").  And because UroPep has in fact not sought an injunction, there is no apparent reason that UroPep would want Lilly to cease its infringing conduct at this point.  If anything, Lilly's continuing infringement, to the extent it has boosted Cialis sales during the post-verdict judgment period, would benefit UroPep.  Under an ongoing royalty award, UroPep will obtain a cut of Lilly's profits, while UroPep would obtain no tangible benefit from an injunction other than the possible "hold-up" value that an injunction would give UroPep in any settlement negotiations.  See Paice LLC v. Toyota Motor Corp., 609 F. Supp. 2d 620, 624 (E.D. Tex. 2009).

 At bottom, UroPep's argument is that every adjudged infringer of an unexpired patent must immediately cease all infringing activity or be subject to an enhanced ongoing royalty for

willfulness.  The Court declines to accept that rule.  As a legal matter, the <u>Halo</u> decision counsels against it.  The Supreme Court has directed district courts to exercise their discretion to award enhanced damages for willfulness as a means of punishing "egregious" conduct; the Court did not suggest adopting a bright-line rule punishing all instances of knowing infringement.  136 S. Ct. at 1934; <u>see also</u> <u>id.</u> at 1932 (enhanced damages "are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious behavior.").[2]  As a policy matter, the rule UroPep advocates would give the patentee unfair bargaining power after a verdict to force the infringer to agree to license the patent at an enhanced rate in order to avoid an even greater enhancement by the court.  As a result, even infringers who have not engaged in egregious misconduct would effectively be punished through the imposition of enhanced damages, contrary to the thrust of <u>Halo</u>.

### III.  Changed Circumstances in the Post-Verdict Period

For the reasons set forth above, the Court concludes that the previously discussed factors bearing on the <u>Amado</u> analysis would not by themselves compel a departure from the jury's implied royalty rate of 2.84 percent for the post-verdict period.  There is, however, another factor that affects the Court's judgment as to the proper royalty rate for that three-month period of infringing activity.

That factor is the evidence that, as of April 17, 2017, Lilly's profit margin on Cialis for the BPH indication was expected to be higher during the three-month post-trial infringement

---

[2]  The Court also notes that the cases cited by UroPep applying <u>Read</u> to enhance damages for post-verdict willful infringement precede the Supreme Court's decision in <u>Halo Electronics</u>. And even those pre-<u>Halo</u> cases question the applicability of the <u>Read</u> standard to enhance damages for post-verdict (versus pretrial) infringement.  <u>E.g.</u>, <u>Mondis Tech. Ltd. v. Chimei InnoLux Corp.</u>, 822 F. Supp. 2d 639, 652 (E.D. Tex. 2011) ("In this Court's view, many of these [<u>Read</u>] factors are not well-suited for analyzing future willful infringement, as the factors were designed to analyze a party's willful infringement in the past.").

period than during the two-and-a-half year pretrial infringement period.  Based on pre-existing data, both parties' experts agreed that the incremental profit margins on sales of Cialis for BPH were likely to be higher during the post-verdict period than in the pre-verdict period.  UroPep's expert, Dr. Vellturo, explained that Lilly's profit margins would be greater during that period because its prices would be higher and its costs would be lower.  Lilly's expert, Mr. Jarosz, did not disagree with Dr. Vellturo's conclusions that "Lilly's incremental profitability from infringement has consistently increased over time" and that "Lilly's incremental profitability from infringement for the [post-trial] period . . . would be expected to be higher than the pre-trial damages period."  Dkt. No. 372-1, at ¶ 7; see also id. ¶ 18.  Thus, all other factors being equal, parties engaged in a hypothetical negotiation at the time of the verdict would understand that an anticipated increase in Lilly's incremental profits would likely produce a higher recovery for UroPep, since the size of the pie being divided is an important factor in determining the size of the slice allocated to each of the interested parties.  See Aqua Shield v. Inter Pool Cover Team, 74 F.3d 766, 772 (Fed. Cir. 2014) ("anticipated incremental profits under the hypothesized conditions are conceptually central to constraining the royalty negotiation").

In this case, UroPep's expert, Dr. Vellturo, estimated that Lilly's average profit margins during the post-verdict period would be approximately twice as high as the average profit margins during the entire pretrial infringement period between October 2014 and April 16, 2017. Lilly's expert, Mr. Jarosz, estimated that Lilly's profit margins would be approximately 5.2 times as high during the post-verdict period as during the pretrial infringement period (although his

estimate of Lilly's profit margin during the pretrial period was substantially lower than Dr. Vellturo's).[3]

While there are strong reasons in this case to adhere for post-verdict purposes to the royalty rate found by the jury for pre-verdict purposes, the Court concludes that it is appropriate to adopt a rate higher than the jury's royalty rate upon a persuasive showing that circumstances have changed, or, more precisely, are perceived as likely to change at the time of the post-verdict hypothetical negotiation. See ActiveVideo Networks, 694 F.3d at 1343 ("The district court may wish to consider on remand additional evidence of changes in the parties' bargaining positions and other economic circumstances that may be of value in determining an appropriate ongoing royalty."); Amado, 517 F.3d at 1362; Creative Internet Advertising Corp. v. Yahoo! Inc., 674 F. Supp. 2d 847, 855 & n.10 (E.D. Tex. 2009); see also Mark A. Lemley, The Ongoing Confusion over Ongoing Royalties, 76 Mo. L. Rev. at 706-07. Based on the evidence from the parties' experts, the Court is persuaded that Lilly's profit margin had increased during the pretrial period and could be expected to increase further during the post-verdict period. That evidence supports UroPep's contention that a hypothetical negotiation at the time of the verdict would have resulted in agreement on a higher royalty rate for UroPep than the rate found by the jury, which was based on a hypothetical negotiation taking place at the time of first infringement in 2014. Because UroPep's expert concluded that the profit margin for the post-verdict period would be approximately twice that of the pre-verdict infringement period, Dkt. No. 365-2, at ¶ 6, the Court

---

[3]    Dr. Vellturo conservatively used the average profitability between January and September 2016 as a proxy for the (presumably higher) average profitability in the post-verdict period, as those profit numbers were not yet available. See Dkt. No. 365-2, at ¶ 7. Mr. Jarosz's estimate of the "post-verdict period" is also based on Mr. Jarosz's derived estimate of the average profitability between January and September 2016. See id. at ¶¶ 4-5.

accepts that increase as supported by the evidence, particularly in light of the fact that Lilly introduced no evidence that its profit margin for that period would be lower than that.

Lilly challenges UroPep's reliance on Lilly's probable post-verdict profit margin on three grounds.  First, Lilly argues that consideration of Lilly's post-verdict profitability is inappropriate because it is not part of a <u>Georgia-Pacific</u> analysis, which district courts have applied in the <u>Amado</u> ongoing royalty context.  <u>See</u> Dkt. No. 376, at 5.  Lilly is incorrect.  "The established profitability of the product made under the patent; its commercial success; and its current popularity"—i.e., profitability—is factor 8 of the <u>Georgia-Pacific</u> factors.  And even if profitability were not among the <u>Georgia-Pacific</u> factors, <u>Amado</u> neither requires a <u>Georgia-Pacific</u> analysis nor bars reliance on factors outside of the <u>Georgia-Pacific</u> considerations.  There is no magic to the <u>Georgia-Pacific</u> factors.  District courts may, but are not required to, apply the <u>Georgia-Pacific</u> factors to determine whether changes in the parties' legal status or bargaining positions will affect <u>Amado</u>'s post-verdict hypothetical negotiation.

In addition, Lilly argues that profitability was not the basis for the jury's award, and therefore a change in profitability should not enhance the royalty rate for post-verdict infringement.  There are two answers to this argument.  First, the basis for the jury's royalty is not clear.  The jury awarded an amount between the amounts recommended by the parties' experts in their respective profitability analyses.  <u>See</u> Dkt. No. 370, at 11 (Dr. Vellturo recommended a royalty rate of 12 percent based on a profit-sharing determination; Mr. Jarosz recommended 1.6 percent).  And the jury did not adopt a rate that otherwise demonstrated the jury's thinking.[4]

---

[4]  The Court is unpersuaded by Lilly's suggestion that the jury ignored profitability and was convinced to match the rate in the initial IntelGenX term sheet agreement, which was 3 percent.  The jury awarded $20 million, which implies a 2.84 percent rate.  The Court considers

Second, profitability is not only included in the <u>Georgia-Pacific</u> factors but is also a key concern in a negotiation between reasonable parties. For those reasons, the Court views the change in profitability as appropriate to consider in its ongoing royalty analysis.

Lilly's third ground for arguing that increased profitability is irrelevant is that UroPep has little or no bargaining power with regard to the post-verdict infringement period. Lilly points to Mr. Jarosz's expert declaration showing that overall sales would drop very little in response to a cessation in Lilly's advertising and promotion. But, as noted above, Mr. Jarosz relied on the assumption that "what the parties would negotiate over would be how much Lilly should pay for being able to continue promoting the BPH indication after trial." Dkt. No. 372-1, at ¶ 31. He failed to take into account that Lilly would also be paying for its liability for post-trial infringing sales resulting from Lilly's pretrial inducement. <u>See id.</u> at ¶ 32 (Jarosz declaration attributing post-verdict infringing sales to pre-verdict inducing conduct). UroPep therefore does not have diminished bargaining power and could negotiate for an equivalent proportional share of Lilly's increased profits.

For the foregoing reasons, the Court concludes that the royalty rate determined implicitly by the jury through its verdict should be increased for the post-verdict period. As noted, UroPep's expert estimated that the increase in Lilly's profits on infringing sales during the post-verdict period would be approximately twice the level of its profits for the pretrial infringement period as a whole. Dkt. No. 365-2, at ¶ 6. Given that Lilly's expert's derived estimate of the degree of the increase in Lilly's profits on infringing sales during the post-verdict period was

it unlikely—or at least highly speculative—that the jury decided to apply a 3 percent rate equivalent to $21.13 million award, and then decided to "round down" to $20 million. In addition, UroPep conducted an effective cross-examination showing that the 3 percent rate in the IntelGenX initial term sheet agreement was superseded by a 5 percent rate in a revised agreement. <u>See</u> Dkt. No. 344, Trial Tr. at 1137-42. For that reason as well, it seems unlikely that the jury seized on the 3 percent rate as the basis for its damages award.

even higher, see id. at ¶¶ 4-5, the Court will accept UroPep's expert's estimate of the increase in the profitability of Lilly's sales of Cialis for BPH during the post-verdict infringement period.

Accordingly, the Court will adopt an ongoing royalty rate of twice the rate awarded by the jury for the pretrial infringement period. That is, the ongoing royalty rate for the period between April 17, 2017, and July 9, 2017, will be 5.68 percent of all Cialis five milligram sales for the treatment of BPH or for the treatment of BPH plus erectile dysfunction during that period. The amount of those sales should be amenable to calculation on the same basis that was used to calculate the pre-verdict sales. The amended judgment will therefore direct the parties to calculate the incremental amount of the monetary award to UroPep for the post-verdict period based on a 5.68 percent royalty rate, which will be added to the amount owed by Lilly to UroPep under the amended judgment. The Court will retain jurisdiction to enforce the amended judgment in the event the parties are not able to agree on the amount of the infringing sales during the three-month post-verdict period.

IT IS SO ORDERED.

SIGNED this 18th day of July, 2017.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE